FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2014 AUG 14  P 1: 23

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

PRO-FOOTBALL, INC.,

Plaintiff,

v.

AMANDA BLACKHORSE, MARCUS
BRIGGS-CLOUD, PHILLIP GOVER, JILLIAN
PAPPAN, and COURTNEY TSOTIGH,

Defendants.

Civil Action No. 1:14CV1043-GBL-IDD

## COMPLAINT

Plaintiff Pro-Football, Inc. ("Pro-Football," "Washington Redskins," "Redskins," or "the Club"), through its counsel, for its Complaint against defendants Amanda Blackhorse, Marcus Briggs-Cloud, Phillip Gover, Jillian Pappan, and Courtney Tsotigh ("Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.      This appeal seeks a reversal of the singular, unprecedented, split decision issued by the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office ("TTAB" or "Board"), which ordered the cancellation of six federal trademark registrations containing the word "Redskins," as used in connection with the Washington, D.C. professional football team, on the ground that these trademarks "may disparage" Native Americans. The TTAB's decision is replete with errors of fact and law, including its failure to restrict its analysis to the relevant time frame of 1967–1990, when the registrations were first issued. Further, the TTAB's decision violates the First and Fifth Amendments to the Constitution. This Court need give no deference to the TTAB's flawed findings, and should reverse the TTAB's order of cancellation.

2.     The Washington Redskins is one of the most storied sports franchises in the United States. It has, for more than eight decades, continuously used the famous name "Redskins" as the name of its professional football team and has held federal trademark registrations for nearly fifty years. This action seeks *de novo* review, pursuant to 15 U.S.C. § 1071(b), of an administrative decision by the TTAB in a trademark cancellation proceeding brought by five Native Americans, captioned *Blackhorse v. Pro-Football, Inc*, Cancellation No. 92,046,185. By Order dated June 18, 2014, 2014 WL 2757516 (the "TTAB Order"), a divided (2-1) TTAB ordered the cancellation of six of Pro-Football's federal registrations for trademarks containing the word "Redskins" (the "Redskins Marks").

3.     The TTAB action was based on a sparingly used statutory provision, Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), which is rarely invoked to cancel any registered trademarks, let alone long-held, valuable registrations such as the Redskins Marks. The test under Section 2(a) for whether a mark "consists of or comprises … matter which may disparage" turns not on present-day perceptions of the matter at issue, but rather on the views of the referenced group at the time of registration. In this case, the inquiry is strictly limited to whether the Redskins Marks were disparaging to a substantial composite of Native Americans in a time period ranging from 1967–1990, when each was registered. The TTAB found that, as of the registration date for each Redskins Mark at issue (one in 1967, three in 1974, one in 1978, and one in 1990), and as supported by "a preponderance of the evidence," "a substantial composite of Native Americans found the term REDSKINS to be disparaging in connection with respondent's services during the relevant time frame of 1967–1990." TTAB Order at *29.

4.     As recognized by the dissenting judge, and as detailed below, the TTAB erred in numerous respects in taking this extraordinary action, which deprives Pro-Football of its long-held,

extremely valuable rights in its federal registrations for the Redskins Marks. The record evidence considered by the Board is insufficient to support a finding of disparagement in the pertinent years (1967, 1974, 1978, and 1990). As articulated by the dissent: "It is astounding that the petitioners did not submit any evidence regarding the Native American population during the relevant time frame, nor did they introduce any evidence or argument as to what comprises a substantial composite of that population thereby leaving it to the majority to make petitioners' case have some semblance of meaning." *Id.* at \*36 (Bergsman, A.T.J., dissenting).

5.      Indeed, another federal district court has already reviewed and reversed a similar order of the TTAB, based on a virtually identical record. In *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96 (D.D.C. 2003) ("*Harjo*"), Judge Kollar-Kotelly held that "the TTAB did not have what would be considered 'direct' or circumstantial evidence before it, or evidence from which it could draw reasonable inferences for such a conclusion." *Id.* at 127. "Ultimately, the evidence in the case does not answer the legal question of whether the trademarks, in the context of their use during the relevant time frames, may have disparaged Native Americans. The evidence chips away at the sides of this legal question but never helps answer it directly." *Id.* at 145. The *Harjo* court also ruled that the defense of laches applies to Section 2(a) disparagement claims and was met where the petitioners knew of the existence of the Redskins Marks, yet waited to bring their case. *Id.* at 136-45. The U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") ultimately upheld the district court's ruling on laches.[1] Thus, examining the same facts, a sister district court has already ruled that there is insufficient evidence to show disparagement in the 1967–1990 time period, and both the

---

[1]     *See Harjo*, 415 F.3d 44, 50 (D.C. Cir. 2005) (remanding to district court for findings on application of laches to youngest petitioner, without ruling on disparagement), *on remand to* 567 F. Supp. 2d 46, 62 (D.D.C. 2008) (youngest petitioner's claim barred by laches), *aff'd*, 565 F.3d 880, 883-86 (D.C. Cir. 2009).

district and circuit courts have found that even the shortest applicable delay period of less than two-and-a-half years gave rise to a sustainable laches defense by Pro-Football. *See Harjo*, 567 F. Supp. 2d at 54-56; *Harjo*, 565 F.3d at 885-86.

6. Regardless of the TTAB's errors here and the posture of this case as an appeal from an administrative agency, the Court need not even consider the Board's findings and conclusions. If either party, as is highly likely, introduces into the record any piece of new evidence, Fourth Circuit precedent mandates that this Court engage in *de novo* review of the entire record. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014). Under a *de novo* standard, the Court owes no deference to the TTAB's Order.[2]

7. This case also raises serious constitutional issues that the TTAB—because it is not an Article III court—properly did not address. For example, the Redskins Marks are extraordinarily powerful and valuable communicators of information, embodying in a single word or two-word phrase the entirety of the Redskins' long history and rich tradition in the arena of professional football. The TTAB's action penalizes the Redskins for communicating to the public based on their marks' content. The cancellation of the Redskins' valuable registrations carries practical and financial impact, as discussed *infra*. The many benefits to a trademark owner that result from federal registration are meaningful, and their loss comes at a high price. Section 2(a) of the Lanham Act thus effectively chills constitutionally protected speech. Moreover, Section 2(a) is overly vague and ambiguous. Finally, the TTAB Order deprives Pro-Football of its due-process rights and is an unconstitutional taking of Pro-Football's property without just compensation. The Board's actions,

---

[2]   In *Harjo*, where the "substantial evidence" standard applied, the district court held, without qualification that "the decision of the TTAB cannot withstand even the deferential level of judicial scrutiny provided by the substantial evidence test." 284 F. Supp. 2d at 128.

therefore, amount to governmental action in violation of Pro-Football's First and Fifth Amendment rights under the Constitution of the United States.

8.        Pro-Football seeks an Order of this Court: (1) reversing the TTAB Order scheduling the cancellation of the Redskins Marks; (2) declaring that the word "Redskins" or derivations thereof contained in the Redskins Marks, as identifiers of the Washington, D.C. professional football team, do not consist of or comprise matter that may disparage Native Americans; (3) declaring that Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), is unconstitutional, both on its face and as applied to Pro-Football by the TTAB, under the First Amendment of the U.S. Constitution, and is void for vagueness; (4) declaring that the TTAB Order violates Pro-Football's rights under the Fifth Amendment of the U.S. Constitution; and (5) declaring that Defendants' petition for cancellation in the TTAB challenging the Redskins Marks under Section 2(a) was barred at the time it was brought by the doctrine of laches.

## PARTIES

9.        Plaintiff Pro-Football, Inc. owns and operates the Washington Redskins football club, one of the thirty-two (32) National Football League ("NFL") member clubs (the "Member Clubs") whose teams play professional football games.  Pro-Football is a Maryland corporation with its principal place of business at 21300 Redskin Park Drive, Ashburn, Virginia.

10.      Upon information and belief, Defendant Amanda Blackhorse resides in Tucson, Arizona.

11.      Upon information and belief, Defendant Marcus Briggs-Cloud resides in Okmulgee, Oklahoma.

12.      Upon information and belief, Defendant Philip Gover resides in Lebanon, New Hampshire.

13.      Upon information and belief, Defendant Jillian Pappan resides in Sioux City, Iowa.

14.     Upon information and belief, Defendant Courtney Tsotigh resides in Moore, Oklahoma.

<b>JURISDICTION AND VENUE</b>

15.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1071(b)(1), which provides that a party dissatisfied with a final decision of the TTAB may institute a new civil proceeding challenging such a decision. Because Defendants are adverse parties who reside "in a plurality of districts not embraced within the same State," subject matter jurisdiction, personal jurisdiction and venue is proper in this Court pursuant to the Leahy-Smith America Invents Act, Pub. L. No. 112-29 § 9(a), 125 Stat. 284 (enacted Sept. 16, 2011) (amending 15 U.S.C. § 1071(b)(1) and (4) by changing the applicable venue from the U.S. District Court for Washington, D.C. to the U.S. District Court for the Eastern District of Virginia). This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and declaratory judgment jurisdiction pursuant to 28 U.S.C. § 2201.

<b>BACKGROUND</b>

<b>A.     PROCEDURAL HISTORY</b>

16.     In September 1992, a group of Native American petitioners filed a petition with the TTAB to cancel the Redskins Marks. *Harjo v. Pro-Football, Inc.*, Cancellation No. 21,069 (T.T.A.B.). The grounds for the *Harjo* action included claims that the Redskins Marks are scandalous, may disparage Native Americans, and may bring Native Americans into contempt or disrepute, in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).

17.     On April 2, 1999, the Board ordered the cancellation of the federal registrations for the Redskins Marks, finding them to have been disparaging at the time they were registered, during the time period of 1967–1990. *Harjo*, 1999 WL 375907, at *38-48 (T.T.A.B. 1999).

- 6 -

18.     On September 30, 2003, a U.S. District Court for the District of Columbia (Kollar-Kotelly, J.) reversed the TTAB, ruling that the record evidence did not support a finding of disparagement during the 1967–1990 time frame. *Harjo*, 284 F. Supp. 2d at 135-36. The district court also held that laches was an available defense in Section 2(a) disparagement-cancellation actions and that the petitioners had waited too long to bring their claims, causing prejudice to Pro-Football sufficient to support its laches defense. *Id.* at 139, 144.

19.     On July 15, 2005, the D.C. Circuit remanded the case back to the district court for further factual findings as to the youngest petitioner's delay. *Harjo*, 415 F.3d at 50. The D.C. Circuit never addressed the district court's disparagement ruling.

20.     On August 11, 2006, Defendants Amanda Blackhorse, Marcus Briggs-Cloud, Philip Gover, Jillian Pappan, and Courtney Tsotigh petitioned the TTAB to cancel the federal registrations of the Redskins Marks. *Blackhorse*, Dkt. No. 1 (the "Petition"). The basis for Defendants' Petition, as in *Harjo*, was the claim that the Redskins Marks are scandalous, may disparage Native Americans, and may bring Native Americans into contempt or disrepute in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).

21.     The registrations of the Redskins Marks that Defendants sought to cancel cover entertainment services in the form of the performance of professional football games, which are seen and followed by millions of football fans. The Redskins Marks at issue all contain the word "Redskins" or a derivation thereof:

- THE REDSKINS, stylized, Registration No. 836,122, issued September 26, 1967;

- WASHINGTON REDSKINS, Registration No. 978,824, issued February 12, 1974;

- THE WASHINGTON REDSKINS & DESIGN, Registration No. 986,668, issued June 18, 1974;

- THE REDSKINS & DESIGN, Registration No. 987,127, issued June 25, 1974;

- REDSKINS, Registration No. 1,085,092, issued February 7, 1978; and

- REDSKINETTES, Registration No. 1,606,810, issued July 17, 1990.

Copies of the registrations are attached hereto as **Exhibits 1 – 6**.

22.     On September 26, 2006, Pro-Football filed an answer denying all of the allegations contained in the Petition, and asserted twelve affirmative defenses, including, *inter alia*, defenses that granting the Petition would result in the violation of Pro-Football's constitutional rights under the First and Fifth Amendments. *Blackhorse*, Dkt. No. 4.

23.     On September 28, 2006, the Board agreed to suspend proceedings in *Blackhorse* pending final disposition of the related *Harjo* case. *Id.*, Dkt. No. 6.

24.     On June 25, 2008, the district court in *Harjo* ruled in favor of Pro-Football on its laches defense as to the remaining petitioner, whose delay period spanned twenty-nine months to seven years, nine months, depending on the specific registration at issue. *Harjo*, 567 F. Supp. 2d at 62.

25.     On May 15, 2009, the D.C. Circuit upheld the district court's decision, explicitly noting that, given the facts present and that the petitioner had been aware of the Redskins Marks during his delay period, "no reason" existed for even the twenty-nine month delay. *Harjo*, 565 F.3d at 885.

26.     On November 16, 2009, the Supreme Court of the United States denied the *Harjo* petitioners' petition for writ of certiorari, officially ending the *Harjo* case.

27.     In March 2010, the *Blackhorse* proceedings resumed. Dkt. No. 23.

28.     During discovery, the parties entered into two joint stipulations. The first joint stipulation, dated March 11, 2011, stated in relevant part that the evidentiary record from the *Harjo* TTAB case would be admissible in the *Blackhorse* proceeding, subject to limited objections such as relevance. *Id.*, Dkt. No. 31. The second joint stipulation, dated December 22, 2011, set forth

various financial figures concerning the NFL's and the Redskins' revenues, expenditures, and valuations pertinent to Pro-Football's laches defense. *Id.*, Dkt. No. 45.

29.     By interlocutory order, *Blackhorse*, Dkt. No. 39 (T.T.A.B. May 5, 2011) (the "May 5, 2011 Order"), the TTAB, relying on its status as an administrative agency and not an Article III court, decided that it was not empowered to entertain the Redskins' constitutional defenses. The TTAB, therefore, did not attempt to reconcile its decision or findings with the U.S. Constitution. In that Order, the Board also struck several of the affirmative defenses asserted by the Redskins. The TTAB specifically noted, however, that "[f]or purposes of clarity, our decision is intended to preserve [Pro-Football's] option to argue for application of the relevant defenses," including the constitutional defenses, "on appeal." *Id.* at 18; *see also* TTAB Order at *1 n.1 (Pro-Football's "Constitutional challenges ... are preserved for appeal").

30.     Also by interlocutory order, *Blackhorse*, Dkt. No. 40 (May 31, 2011) (the May 31, 2011 Order"), the TTAB ruled that the inquiry into disparagement properly looks to the perceptions of the targeted or referenced group, as measured by a substantial composite thereof, and that the views of the general public are not relevant. *Id.* at 8-9.[3] The Board also held that the relevant time frame for assessing whether the Redskins Marks violate Section 2(a) is the date of the issuance of each registration, as opposed to the filing date of the Petition in 2006, and that the requisite proof for each of those years is the preponderance-of-the-evidence standard. *Id.* at 11, 3. The TTAB further

---

[3]     The TTAB Order uses the terms "disparaging" and "disparage" to encompass the full statutory language "may disparage ... or bring them into contempt or disrepute." In the May 31, 2011 Order, at 4, the TTAB held that the analysis for assessing whether a mark is disparaging is virtually the same as that for evaluating whether the mark "brings [Native Americans] into contempt or disrepute." As set forth *infra*, in addition to disparagement, Pro-Football seeks *de novo* review on the statutory grounds of "contempt" and "disrepute."

ruled that the question of disparagement is to be answered in view of the context of the marks' use and the services they identify. *Id.* at 10.

31.     Also in the May 31, 2011 Order, the TTAB held that for calculating laches, the operative date is the date of registration and the laches inquiry must balance the length and the reasonableness of the delay against the detriment resulting from the delay. *Id.* at 12-18. The TTAB also ruled that economic prejudice can result from mere the investment in and promotion of a mark during the period of delay. *Id.* at 16-17.

32.     Although having raised in their Petition claims that the Redskins Marks "consist[s] of or comprise[s] scandalous matter" and that the symbols contained in Registration Nos. 986,668 and 987,127, are scandalous, disparaging, or bring Native Americans into contempt or disrepute, *see* Petition ¶ 1, Defendants never presented evidence or argument in support of these claims before the TTAB and thus have waived them.[4]

33.     Following several years of discovery, motion practice, submissions of evidence, final briefing, and oral argument, on June 18, 2014 the TTAB scheduled the cancellation of the registrations for the Redskins Marks based on an improper finding that "a substantial composite of Native Americans found the term REDSKINS to be disparaging in connection with respondent's services during the relevant time frame of 1967–1990." TTAB Order at *29.

## B.     HISTORY AND FAME OF THE VALUABLE WASHINGTON REDSKINS MARKS

34.     The team name "Redskins" was adopted by the NFL franchise over eighty years ago, and is among the oldest of team names in any professional sports league. In 1932, George Preston Marshall purchased the NFL franchise now named the Redskins. The following year the team, then

---

[4]     In the TTAB Order, the Board noted that the claim of scandalousness and all claims relating to the Native American imagery in the Redskins Marks were not part of the case before it. *Id.* at *7.

located in Boston and called the "Braves," moved from Braves Field to Fenway Park and was renamed "The Redskins" by Marshall to distinguish it from the professional baseball team playing in Boston. At the time the name "Redskins" was chosen for the team, four players—Louis Weller, John Orien Crow, David Ward and Larry Johnson—and the team's head coach William "Lone Star" Dietz identified themselves as Native Americans. Since 1933, the Club has been known as the Washington Redskins or the Redskins, and has built tremendous recognition in the Redskins Marks.

35.     The Redskins have been leaders in the entertainment of the public through professional football games, broadcast via television and radio nationwide to millions of fans. The Redskins have appeared in eleven NFL championship games (including five Super Bowls), and won five of them (including three Super Bowls)—the first following the 1937 season and the most recent following the 1991 season.

36.     Completely ignored by the TTAB Order are the history and fame of the Redskins and the longstanding fame of the Redskins Marks—in nationwide use for almost three-and-a-half decades before being registered. This renown is perhaps best demonstrated by the level of interest in the Redskins expressed by members of the public nationwide. On any given Sunday during football season, many D.C. metropolitan-area residents unite for several hours to follow the Redskins game. Throughout the country, Redskins fans, including Native Americans, follow the team through newspaper sports pages, electronic media, local and national television and radio broadcasts of Redskins games, and, increasingly, broadcasts delivered via NFL satellite and mobile streaming packages, which allow participating households to view games not televised nationally. Corporate sponsors vie to associate their companies and products with the Redskins Marks, and merchandise bearing the Redskins Marks is widely sold, purchased, and recognized.

- 11 -

37.     The history of the Redskins' success and contribution to the community and the public at large is not limited to football-related activities.  Redskins' owners, players, coaches, and other personnel have been involved in civic and charitable activities in the Washington, D.C. community and the nation at large.  The Club's national renown is also demonstrated by the historical and continuing recognition of the Club and attendance at games and team events by prominent political leaders.

38.     The Redskins Marks are inherently valuable communicative symbols through which the public identifies the team and its players, both past and present, and the Club's storied history. The Redskins Marks do not merely identify the current team, but incorporate and communicate the entirety of the team's history and fame.  They do so not only today, but since the dates each registration issued, the first of which was thirty-four years after the mark's first commercial use.

## C.     THE VALUABLE BENEFITS OF FEDERAL REGISTRATION OF THE REDSKINS MARKS

39.     Pro-Football's federal trademark registrations confer valuable substantive and procedural rights and substantial government benefits, including but not limited to those described below.

40.     A federal registration, as evidence of the trademark owner's constructive use of its mark, confers nationwide priority—from the filing date of the registration—upon a registrant, as against any third party claiming first use of an identical or similar mark.

41.     A certificate of registration of a mark on the principal trademark register is *prima facie* evidence of: (1) the validity of the registered mark; (2) the registrant's ownership of the mark; and (3) the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the certificate.

42.     Because the Redskins Marks have been federally registered for well over five years, the marks are "incontestable" as that term is defined in Section 15 of the Lanham Act, 15 U.S.C. § 1065.  To the extent the right to use a registered mark has become incontestable under Section 15, the registration is conclusive evidence of:  (1) the validity of the mark; (2) the registration of the mark; (3) the registrant's ownership of the mark; and (4) the registrant's exclusive right to use the mark in commerce.

43.     In a federal trademark-infringement action, the owner of a registered trademark may be entitled to treble profits and damages and attorneys' fees, if successful against the defendant infringer.

44.     The owner of a federally registered trademark, upon *ex parte* application, may be granted a court order authorizing the seizure of counterfeit goods and an award of treble profits and damages or statutory damages, as well as attorneys' fees.

45.     Under the federal anti-dilution statute, registration affords several significant, tangible benefits to owners of distinctive and famous marks such as the Redskins Marks. *First,* a trademark owner cannot obtain monetary relief under federal anti-dilution law without a registration.  By contrast, a registrant who prevails on a dilution claim can recover treble profits and damages and attorneys' fees. *Second,* the existence of a registration is a factor to be considered in determining whether a mark is distinctive and famous—a threshold inquiry for dilution.  Federal registration therefore helps trademark owners prove a mark's strength so as to sustain a dilution claim. *Third,* ownership of a federal registration immunizes the registrant from suit under state anti-dilution law.

46.     A federal trademark registration gives the registrant the right to use the symbol "®", which affords notice to the public that the designation is being used as a trademark and thus permits

the registrant, in any suit for infringement, to collect profits and damages without proof of actual notice.

47.     No article of imported merchandise that copies or simulates a registered trademark without authorization of the trademark owner may be admitted into the United States by the United States Customs Service. In order to aid the Customs Service in enforcing this regulation, trademark registrants may record their trademark-registration certificates with the Customs Service, pursuant to 15 U.S.C. § 1124.

48.     The owner of a federal trademark registration may invoke the dispute policy of Network Solutions, Inc. in order to prevent the adoption and use of unauthorized and infringing Internet domain names.

49.     The TTAB's ordered cancellation of the Redskins Marks would deprive Pro-Football of the valuable benefits it has enjoyed for decades as a federal trademark registrant.

**D.     SECTION 2(a) OF THE LANHAM ACT**

50.     Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), provides, in relevant part, that no trademark shall be registered on the principal register that "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."

51.     Neither the Lanham Act nor its legislative history provides any guidance for defining the term "disparage" as used in Section 2(a).

52.     The term "disparage" as used in Section 2(a) was explicitly acknowledged by the U.S. Patent and Trademark Office and the legislators debating the enactment of this section of the Lanham Act to be a highly subjective term that would result in severe problems in its application. In the words of Leslie Frazer, Assistant Commissioner of Patents during the congressional hearings on

- 14 -

Section 2(a): "the use of [the word 'disparage'] in this connection is going to cause a great deal of difficulty in the Patent Office, because, as someone else has suggested, that is a very comprehensive word, and it is always going to be just a matter of the personal opinion of the individual parties as to whether they think it is disparaging."

53.     As the TTAB has explicitly acknowledged in an unrelated case, assessing whether any mark, including the Redskins Marks, may be disparaging "is necessarily a highly subjective" determination. *In re Hines*, 32 U.S.P.Q.2d 1376, 1994 WL 587037, at *2 (T.T.A.B. Sept. 23, 1994).

54.     The inclusion of the term "may" in conjunction with the word "disparage" adds to the vagueness of the term.

## THE REDSKINS MARKS SHOULD NOT BE CANCELLED

### A.     ERRORS AND OMISSIONS IN THE TTAB ORDER

55.     For the TTAB to cancel, based on the disparagement, contempt or disrepute provisions of Section 2(a) of the Lanham Act, an incontestable mark that has been in use for more than eight decades and validly registered for over four-and-a-half decades, is an exceedingly rare and drastic measure—indeed, the TTAB has never before cancelled such a long-registered mark.

### 1.     Under The Applicable *De Novo* Standard Of Review, The Court Does Not Give Any Weight To The TTAB's Factual Or Legal Findings

56.     Under controlling precedent, *see Swatch*, 739 F.3d 150, the standard of review in this case will be *de novo* if, as is exceedingly likely, any party opts to introduce into the record any new evidence. *See also, e.g., Timex Group USA, Inc. v. Focarino*, No. 1:12-cv-1080, 2014 WL 130977, at *1-2 (E.D. Va. Jan. 13, 2014) (applying *Swatch*); *ZAO Odessky Konjatschnyi Zawod v. SIA "Baltmark Invest"*, No. 1:12-cv-515, 2014 WL 785295, at *11 n.7 (E.D. Va. Feb. 21, 2014) (same). Under a *de novo* standard, the Court reviews the entire evidentiary record anew, as if the case were

filed as one of original jurisdiction. The Court thus would not give any weight to the factual or legal findings in the TTAB Order.

57.     This review differs from that in *Harjo*, where the district court reversed the TTAB's factual findings under a "substantial evidence" standard. 284 F. Supp. 2d at 119-20. The "substantial evidence" standard would be applicable here only in the remote event that no party supplements the record with any new evidence. Notably, the *Harjo* court held that "the decision of the TTAB cannot withstand even the deferential level of judicial scrutiny provided by the substantial evidence test." 284 F. Supp. 2d at 128.

### 2.     The TTAB's Findings Regarding Disparagement Constitute Errors Of Law And Are Based On Erroneous Findings Of Fact

58.     Even under the "substantial evidence" standard, however, the errors of fact in the TTAB Order would not survive review. The errors of law, always reviewed *de novo*, would similarly be rejected. The TTAB's legal conclusions were in error and were based on factual findings that are not supported by substantial evidence, nor by a preponderance of the evidence, and are otherwise insufficient to support cancellation of the Redskins Marks under Section 2(a).

59.     For example, the TTAB was internally inconsistent by relying on evidence of the general public's perceptions of the term "Redskins," such as dictionary usage labels and media use, even though it had ruled that the viewpoint of Native Americans was the only relevant perspective from which to assess the Redskins Marks under Section 2(a). *Compare, e.g.*, TTAB Order at *4 n.15 *with* May 31, 2011 Order at 8.

60.     The Board erred by holding that the Club's intent in selecting and using the "Redskins" name is irrelevant in determining whether the meaning of the Redskins Marks is disparaging. TTAB Order at *10, *13.

61.     The TTAB erred by concluding that the relevant group for assessing whether a mark is disparaging is a "substantial composite" of Native Americans, but failing to define the term "substantial composite." *Id.* at *5; *see also id.* at *36 (Bergsman, A.T.J., dissenting) (petitioners did not "introduce any evidence or argument as to what comprises a substantial composite of that population").

62.     The TTAB erred by finding that 30% of the Native American population "without doubt" constituted a "substantial composite" thereof. *Id.* at *29. Highlighting this error is its direct conflict with the finding of the *Harjo* district court, having evaluated a virtually identical evidentiary record, that a conclusion that 36.6% of the Native American population amounted to a "substantial composite" was "difficult to support in the context of this case." 284 F. Supp. 2d at 133 n.32.

63.     The TTAB erred by relying on evidence of a resolution passed by the National Congress of American Indians ("NCAI") in 1993 that a district court had previously found to be "irrelevant to the calculus," *id.* at 135, as it fell outside the only time period that the Board itself determined was relevant. In the May 31, 2011 Order, at 11, the Board held that the only time period relevant to the disparagement question was the date of issuance of Pro-Football's registrations (1967, 1974, 1978, and 1990). Nonetheless, in the TTAB Order, the Board improperly relied on, and accorded undue probative weight to, the 1993 resolution, which cannot be used to ascertain public opinion in 1967 and the other dates of registration. TTAB Order at *17-18, *27-29. The 1993 resolution is not an accurate reflection of views held in 1967, 1974, 1978, and 1990, both because: (1) it post-dates the registration dates; and (2) it unnaturally captures sentiments manipulated by an intervening event—the 1992 filing of the *Harjo* petition to cancel the Redskins Marks. This inflammatory intervening occurrence distorted the perceptions of Native Americans and thus cannot

and does not accurately reflect the views of the Native American population before 1992, let alone during the 1967–1990 time frame.

64.    The Board erred in its finding that the 1993 resolution is evidence of the views of 30% of the Native American population. *Id.* *28-29. The Board relied upon a series of inferences to find that the NCAI member tribes comprised 30% of the Native American population in 1993. The Board then ignored evidence that the resolution at issue required that only one-third of all member tribes be present to pass it, with no evidence in the record of which member tribes were present for the vote. Further, there is no record evidence that a resolution required a unanimous vote to pass. (A mere majority vote, for instance, would translate to far less than 30% of the total Native American population.)

65.    The TTAB erred in assuming that the individuals occupying a leadership role in seven Native American organizations—who, in 1972, met with then-Redskins owner Edward Bennett Williams concerning the "Redskins" name—attended that meeting on behalf of their respective memberships. *Id.* at *18-20, *27-27. The record is devoid of any evidence showing that the views of these seven individuals accurately reflected the views of—or, indeed, were even shared by—the membership body of their respective groups. In improperly equating mere individual attendance with organizational support, the TTAB erred in assuming there to have been a substantial composite of Native Americans opposed to the "Redskins" name in 1972.

66.    The TTAB erred in considering the dictionary usage labels as reflecting a "clear trend" toward employing the terms "offensive" or "disparaging," despite record evidence showing that only two separate dictionaries before 1980 bore such usage labels.[5] *Id.* at *13. The Board's

---

[5]    The record contains copies of, or list-citations to, several editions of the same dictionaries, published in subsequent years with the same or similar usage labels.

characterization also squarely contradicts the district court's assessment of the identical evidence as "at best, equivocal." *Harjo*, 284 F. Supp. 2d at 130. The TTAB's erroneous characterization caused the Board improperly to accord "little weight" to the opinions of Pro-Football's linguistics expert witnesses, because they conflicted with the Board's own conclusion. TTAB Order at *12 n.184.

67. The TTAB erred in discounting the significance of the qualifier "often" in dictionary usage labels and the importance of context, as recognized by dictionary editors, in assessing the nature of the term "redskins." TTAB Order at *12, *26 n.179.

68. The TTAB erred in concluding, without record support, that the drop-off in general use of "redskins" from the 1960s forward indicates recognition by the general public that the use of the term "redskins" was in disfavor. *Id.* at *29; *see also id.* *39-40 (Bergsman, A.T.J., dissenting) (finding this conclusion "not supported by the record"). The district court in *Harjo* previously criticized the Board for having "merely assumed" this negative nexus: "There is no evidence in the record to support this finding one way or the other." 284. F. Supp. 2d at 131. The TTAB's erroneous conclusion caused the Board improperly to accord "little weight" to the opinions of Pro-Football linguistics expert witnesses, because they differed from the Board's own conclusion. TTAB Order at *26 n.184. It also improperly placed the burden of proving non-disparagement on Pro-Football.

69. The TTAB erred in holding that laches does not apply to a disparagement claim brought on behalf of a group, *id.* at *31-32, in direct contravention of the *Harjo* court's ruling that laches is an available defense to such claims, 284. F. Supp. 2d at 137-39.

70. The TTAB erred in concluding that there was no economic prejudice to the Club during the period of Defendants' delay because of the pendency of the *Harjo* case, seemingly

ignoring the fact that the delay period included years following judicial rulings in *Harjo* that favored Pro-Football.  TTAB Order at *33-34.

71.    As previously stated, the TTAB Order scheduling cancellation of the Redskins Marks deprives Pro-Football of its famous, long-held federal trademark registrations without sufficient basis under the Lanham Act, against both the plain meaning and underlying intent of that statute. The Redskins Marks, as designations of the professional football team, do not disparage Native Americans or bring them into contempt or disrepute under any analysis of the terms "disparage," "contempt," or "disrepute."  To the contrary, the name "Redskins," when used in association with professional football—as it has been for over eighty years—denotes only the team and connotes the history and tradition of the Club.  As such, it embodies positive attributes, such as strength, sportsmanship, and physical prowess, and evokes emotional reactions associated with the competition and entertainment provided by professional football.

### 3.    The Board Never Considered Pro-Football's Constitutional Arguments

72.    As previously stated, Pro-Football explicitly raised its constitutional arguments at several stages of the proceedings, brought under the First and Fifth Amendments to the U.S. Constitution, thereby preserving all such constitutional arguments for this action. *See* May 5, 2011 Order at 15-16.  The Board properly determined that it was not empowered to address Pro-Football's constitutional arguments, *id.* at 16, but expressly "intended to preserve [Pro-Football's] option to" present its constitutional arguments "on appeal." *Id.* at 17; *see also* TTAB Order at *1 n.1 (Pro-Football's "Constitutional challenges … are preserved for appeal").

**B.**   **THE REDSKINS MARKS DO NOT DISPARAGE NATIVE AMERICANS**[6]

73.   The Redskins Marks do not disparage Native Americans because, among other things: (1) there is insufficient evidence to prove that in 1967, 1974, 1978, or 1990 Native Americans viewed the team name "Redskins" as disparaging; (2) the word "redskin" itself is not disparaging *per se*, as its use by Native Americans during the relevant 1967–1990 time period illustrates; and (3) the Redskins Marks as used by Pro-Football have developed a distinctive, non-disparaging meaning in the context of professional sports that refers only to the football team in the Washington D.C. area, and this meaning was well established by 1967, more than thirty years after the adoption and first use of the "Redskins" name.

**1.**   **There Is No Record Evidence Showing That In 1967–1990 A Substantial Composite Of Native Americans Considered "Redskins" To Be Disparaging**

74.   The record is devoid of evidence as to how many Native American tribes there were in the United States in 1967, 1974, 1978, or 1990 and as to how many tribes considered the team name "Redskins" to be disparaging during the 1967–1990 time frame.

75.   The record is devoid of evidence as to how many Native Americans lived in the United States in 1967, 1974, 1978, or 1990 and as to how many Native Americans considered the team name "Redskins" to be disparaging during the 1967–1990 time frame.

---

[6]   The Court need not even reach Defendants' disparagement claim or Pro-Football's constitutional defenses in light of Pro-Football's laches defense, set forth *infra*. The D.C. Circuit in *Harjo* explicitly held that, in view of the circumstances, where a petitioner is on notice of a disparagement claim, it is his burden to file "immediately." 565 F.3d at 885. There, the D.C. Circuit upheld a laches claim based on a 29-month delay. *Id.* While the shortest delay period among Defendants is 11 months, the underlying rationale is the same. Defendants were each "fully aware of both the team's name and the cheerleaders' name," and thus there is "no reason" why they "failed to complain immediately about the registration[s]." *Id.*

2. **The Word "Redskin" Was Not In 1967–1990, And Is Not, Disparaging *Per Se***

76.     Even without considering the context of "Redskins," the word "redskin" was not and is not *per se* disparaging.

77.     Dictionary evidence indicates that the word "redskin" in general is not disparaging. Editorial designations in the form of dictionary usage labels can be valuable indicators of contemporary perceptions of a particular word at a particular point in time.  Dictionaries extant before 1980, when Pro-Football's earlier registrations issued, typically did not contain any usage label for the word "redskin," thus indicating the term in general to be unremarkable and not disparaging.  Further, the TTAB improperly discounted the significance of the qualifier "often" in those negative usage labels where it appeared, and the context-driven analysis demanded thereby. *See* TTAB Order at *12, *26 n.179.

78.     Literary and cinematographic uses of "redskin" as an ethnic denotator reflect usage of the term as a neutral term synonymous and interchangeable with "Native American" or "Indian."

79.     The TTAB erred by discounting evidence from Native American reservations showing that the word "redskin," when used in other contexts, is not disparaging.  Throughout the relevant 1967–1990 time period, Native Americans have used the word "redskin" and "Redskins," other than for the Washington, D.C. professional football team. *See, e.g., id.* *36-38 (Bergsman, A.T.J., dissenting).

3. **The Redskins Marks Do Not Disparage Native Americans When Viewed In The Context Of Professional Sports, Where The Word "Redskins" Has Developed A Distinctive Meaning Referring To The Washington, D.C. Professional Football Team**

80.     A mark's registrability under Section 2(a) must be considered in the context of the mark's overall use in commerce.

81.     A mark is not disparaging under Section 2(a) where the relationship between the mark and the goods or services used in connection with the mark is not in and of itself disparaging.

82.     Pro-Football uses the term "Redskins" in the context of professional football and has done so since 1933, thirty-four years before the registration date of the first of the Registered Marks.

83.     Professional football games are neither of questionable morality nor *per se* offensive to or prohibited by Native American religious or cultural practices.

84.     Professional football games enjoy nationwide recognition, including among Native Americans.

85.     When used in connection with professional football games, the word "Redskins" bears only positive associations.

86.     Neither Pro-Football, nor any team member, has ever engaged in behavior perceived as disparaging Native Americans.

87.     Even if the term "redskin," used in singular, lower case form, refers to an ethnic group, the term is not disparaging when employed as a proper noun, as a team name, in the context of professional football.

88.     The TTAB itself has recognized that the availability of an alternate meaning of a mark is important to the determination of whether the mark, as used, is disparaging.

89.     As stated previously, through long, substantial and widespread use, advertising, promotion, and media coverage nationwide over eight decades, Pro-Football's Redskins Marks have acquired a strong and distinctive denotative meaning identifying the Club's entertainment services in the context of professional football. This meaning had attached to the Redskins Marks by 1967, when the first registration issued—more than thirty years after the Club's first use of the "Redskins" team name.

90.     As a result of this strong secondary meaning, "Redskins" was perceived in 1967, and today, to be a distinct denominative word, entirely separate from "redskin" as denoting ethnicity. Even though deriving from the original, ethnic meaning of "redskin," "Redskins" had become, by 1967 at the latest, a separate, entirely positive term used in context solely to identify the professional Washington, D.C.-area football team.

91.     Today, more than four-and-a-half decades after its original registration, the use of "Redskins" as a denominative designation for the professional football team is even more deeply ingrained in popular culture, and the distinctive meaning of "Redskins" is even more firmly established in the English language.

92.     By failing to acknowledge the separate meaning in 1967, after more-than-three decades of popular use, of the term "Redskins" as identifying the professional football team— irrespective of the team's continued allusions to the core, ethnic meaning of "redskin"—the Board erred as a matter of law.

**4.     Native Americans Support The Team Name**

93.     The TTAB has recognized the value, to the ultimate determination of whether the challenged mark violates Section 2(a), of factual evidence comprising reactions of persons in the allegedly disparaged group.

94.     Native Americans recognize the goodwill and positive attributes that accompany the team name "Redskins" and advocate retention of the "Redskins" name and support the team.

95.     Defendants have conceded that they speak only for themselves and not on behalf of or with the support of any tribe.

96.     The TTAB erroneously discounted evidence that there are Native Americans, including tribal chiefs and recognized leaders, who react positively to "Redskins" as used to denote

the professional football team from Washington D.C., including during the relevant time period of 1967–1990, and have supported the team name.

### 5.      The Public Uses "Redskins" To Identify And Associate With The Club

97.     "Redskins" has been used extensively by the public to identify the professional football team from Washington D.C.

98.     Year after year, merchandise bearing the Redskins Marks has been purchased by consumers in large quantities, indicating that many members of the consuming public desire to associate themselves with the Washington Redskins by purchasing and wearing or using products bearing the Redskins Marks.

99.     Newspapers feature the team name "Redskins" in headlines and throughout sports articles, and have continued to do so, solely as a term of reference for the professional football team and not for persons of Native American descent.  As noted *supra*, corporate sponsors actively associate themselves each year with the Redskins brand.  Similarly, United States Presidents and Vice Presidents have openly and publicly associated themselves with the Washington Redskins.

### 6.      The Club's Positive Intent In The Selection And Usage Of The Team Name Precludes Disparagement Under Section 2(a)

100.     The TTAB erred by holding that the Club's positive intent in its use and selection of the team name "Redskins" was not relevant to the disparagement inquiry, despite testimony by experts retained by both sides that the word "disparage" requires intent on the part of the speaker.

101.     Disparagement has been defined as the utterance of a statement that the speaker intends to be understood as demeaning, deprecatory, or belittling.  The focus thus is on the intent of the speaker.  This focus on the speaker's intent is required by the First Amendment, which considers whether the speech itself is protected, regardless of the subjective feelings of listeners.

102.    Pro-Football's intent in adopting the team name was entirely positive.   As Pro-Football has publicly stated: "Over the long history of the Washington Redskins, the name has reflected positive attributes of the Native American such as dedication, courage and pride."   The Club has continuously represented Native Americans in a "reserved and tasteful" manner.

## C.    THE REDSKINS MARKS DO NOT BRING NATIVE AMERICANS INTO CONTEMPT OR DISREPUTE

103.    Defendants bear the burden of proving that the Redskins Marks as designations of the team may bring Native Americans into contempt or disrepute under Section 2(a).

104.    For the reasons stated *supra* regarding disparagement, the evidence does not support a *de novo* conclusion that, in 1967–1990, the Redskins Marks brought Native Americans into contempt or disrepute.

105.    Likewise, the TTAB's finding that the Redskins Marks "may bring Native Americans into contempt or disrepute" was based on the same evidence it considered to conclude that the Redskins Marks "may disparage" Native Americans.   TTAB Order at *7 n.33.  Because the TTAB's legal and factual conclusions were in error, and for the reasons set forth herein, there is not substantial evidence showing that the Redskins Marks bring Native Americans into contempt or disrepute.

## D.    CANCELLATION OF THE REDSKINS MARKS VIOLATES THE FIRST AND FIFTH AMENDMENTS OF THE U.S. CONSTITUTION

106.    The TTAB declined to consider Pro-Football's defenses brought under the U.S. Constitution in construing Section 2(a) of the Lanham Act.

### 1.    Cancellation Of The Redskins Marks Violates The First Amendment

107.    Trademarks are constitutionally protected commercial speech.   A trademark communicates a virtually unlimited range of messages.  In the complex commercial world that has developed over the past century, a trademark is a shortcut, a book reduced to a single word or phrase,

communicating the quality, value, producer, sponsor, and limitless other attributes of a product or service.

108.    The Redskins Marks, moreover, are deserving of even greater protection than pure commercial speech, which merely proposes a commercial transaction.  Trademarks—particularly marks that have been so long-held and are as indisputably famous as the Redskins Marks—are core speech, representing virtually infinite expression through a mere symbol, phrase, or individual word. Pro-Football and the general public use the Redskins Marks to invoke the history and storied success of the Club, and the marks evoke emotional responses from spectators and fans.  Thus, the Redskins Marks consist of speech more akin to a film, novel, or work of art than to a mere proposal to engage in a commercial transaction.

109.    The provisions of Section 2(a) of the Lanham Act relied upon by the TTAB stand apart from the general regulatory scheme of the Act, which is designed generally to review, register, and then accord protection to designations functioning as trademarks.  The disparagement and contempt/disrepute provisions of Section 2(a) do not test for basic trademark functionality.  Indeed, it cannot be disputed that the Redskins Marks have the necessary attributes to function as trademarks and therefore qualify for federal trademark registration:  they are famous marks that have been registered for up to forty-seven years and in which Pro-Football has worked to establish extremely valuable rights for over eighty years.

110.    Rather, because it targets the so-called "disparaging," "contempt[uous]," or "disreput[able]" aspects of a mark, Section 2(a) regulates the actual content of a mark's message and distinguishes between marks on the basis of content.

111.    Section 2(a) conditions the granting of the benefits of federal trademark registration upon the registrant not exercising constitutionally protected free speech rights.  Conditioning a

benefit on the basis of speech content disadvantages certain speech and is as offensive to the U.S. Constitution as a direct prohibition of speech. The government may not withhold a benefit from the Club or anyone else on a basis that impinges upon the right of free speech.

112.     Section 2(a), both on its face and as applied to Pro-Football by the TTAB Order, is an impermissible content-based restriction inherently violative of the First Amendment. The TTAB Order for the cancellation of the Redskins Marks would deny Pro-Football the valuable benefits of federal registration based solely on the content of the protected speech contained in the Redskins Marks.

113.     No governmental interest has been asserted to justify such severe, constitutionally offensive injury to Pro-Football.

114.     The terms "disparage," "may disparage," "contempt," "disrepute," and "may bring ... into contempt or disrepute"—which the TTAB acknowledges are not defined in the statute or in its legislative history—are unconstitutionally vague. The statutory language of Section 2(a) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, and therefore conveys no ascertainable standards for trademark owners to follow. The statutory language of Section 2(a) thereby encourages and authorizes arbitrary and discriminatory enforcement by leaving the Board with virtually unfettered discretion to deny registration or to cancel registrations, even in situations such as the one presented here, where for over eighty years Pro-Football has worked to establish valuable rights in its marks, and has owned its initial registration in the series of marks, for over forty years. Section 2(a) thus effectively chills First Amendment free speech rights.

115.     The terms "disparage," "may disparage," "contempt," "disrepute," and "may bring ... into contempt or disrepute" are unconstitutionally overbroad and sweep under their rubrics speech

that is not capable of being legitimately regulated by the government. There is no core of easily identifiable and constitutionally proscribable conduct prohibited by Section 2(a). Rather, to the extent there are any legitimate applications of Section 2(a), they are few in comparison to the substantial unconstitutional applications of the law that impermissibly restrict protected speech. Section 2(a) thus chills protected speech that falls within its overbroad language.

116.   A federal trademark registration does not confer any government endorsement or imprimatur.

117.   As applied to Pro-Football, Section 2(a) violates the First Amendment, because: (1) Pro-Football's trademarks constitute truthful, nonmisleading, lawful speech; (2) any asserted governmental interest in regulating the content of Pro-Football's registered trademarks is not substantial; (3) because Pro-Football may continue to use its marks absent federal registrations and because federal registration does not confer any official endorsement or imprimatur, any asserted state interests would not be advanced by cancellation, and thus Section 2(a) does not directly advance any such governmental interest; and (4) Section 2(a) is more extensive than necessary, in that it prohibits registration not just of obscene or fighting words, but of nonmisleading, lawful terms that communicate a message that some might perceive as offensive, while others might not.

**2.     Cancellation Of The Redskins Marks Violates The Due Process Clause of the Fifth Amendment**

118.   Because Section 2(a) is unconstitutionally vague, *see supra*, it operates to deprive trademark owners, such as Pro-Football, of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment.

119.   Because Pro-Football has enjoyed, relied on, and invested in its federal registrations for almost half a century, the TTAB Order for the cancellation of the Redskins Marks violates Pro-Football's due-process rights provided by the Fifth Amendment.

120.    In addition, Pro-Football was deprived of the right to a fair and impartial hearing before the TTAB, in violation of Pro-Football's due-process rights provided by the Fifth Amendment.

### 3.    Cancellation Of The Redskins Marks Violates The Takings Clause of the Fifth Amendment

121.    The federal trademark registrations for the Redskins Marks are federally granted property rights on which Pro-Football has relied for over four decades.  Since the registration of the first Redskins Mark in 1967, Pro-Football has invested millions of dollars in the use, promotion, registration, and protection of its registrations for the Redskin Marks.  Pro-Football has invested in its property in expectation of its continued use and enjoyment of the valuable rights and benefits, as alleged *supra*, afforded by its registrations.

122.    The cancellation of the federal registrations for the Redskins Marks deprives Pro-Football of these valuable rights and benefits, by wholly depriving Pro-Football of its property in the form of its federal registrations for the Redskins Marks.

123.    The TTAB Order for the cancellation of the Redskins Marks has also interfered with Pro-Football's use and enjoyment of its property in the form of the Redskins Marks and other REDSKINS marks.

124.    Pro-Football was not compensated by the TTAB or any other government actor for the deprivation of the Redskins Marks.

125.    The TTAB Order for the cancellation of the Redskins Marks constitutes an unconstitutional taking of Pro-Football's property without just compensation in violation of the Takings Clause of the Fifth Amendment.

E.     **DEFENDANTS' LONG DELAY IN SEEKING RELIEF**

126.    The Redskins Marks have been registered for as long as forty-seven years and were known to Defendants well before they reached the age of majority.  Defendants can offer no valid reason for waiting between the date(s) on which they reached the age of majority and August 11, 2006, the date on which they filed the Petition.

127.    Pro-Football has invested millions of dollars in the use, promotion, registration and protection of the Redskins Marks over the past eighty years, and, specifically, over the more-than-forty years since the initial registration issued for the Redskins Marks, and including every day that Defendants delayed before filing the Petition.  The substantial goodwill and value in the Redskins Marks developed by Pro-Football through such effort and expense was created and maintained prior to any complaint or objection by Defendants, including during the period subsequent to the *Harjo* district court's ruling in Pro-Football's favor.

128.    The Board erroneously ruled that the laches defense is not available to Pro-Football because laches does not apply to a disparagement claim brought on behalf of a group.  TTAB Order at *31-32.  The TTAB's holding is in direct contravention to a district court's ruling that laches was an available defense to such claims.  *Harjo*, 284 F. Supp. 2d at 137-39.

129.    Because of the tremendous value in the Redskins Marks developed by the Redskins over the better part of the past century, the period of Defendants' inexcusable delay in bringing their Petition has resulted in economic prejudice to Pro-Football.  Defendants, therefore, should have been barred from bringing their claims pursuant to the doctrine of laches.  The Board erroneously ruled that the economic prejudice suffered by Pro-Football is not attributable to Defendants' delay.

## FIRST CAUSE OF ACTION
### (Declaration of Non-Disparagement)

130.    Pro-Football repeats and realleges the allegations of Paragraphs 1 through 129 of the Complaint as if fully set forth herein.

131.    Pro-Football's Redskins Marks do not, and will not, disparage Native Americans in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).

## SECOND CAUSE OF ACTION
### (Declaration of Non-Contempt or Disrepute)

132.    Pro-Football repeats and realleges the allegations of Paragraphs 1 through 131 of the Complaint as if fully set forth herein.

133.    Pro-Football's Redskins Marks do not, and will not, bring Native Americans into contempt or disrepute in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).

## THIRD CAUSE OF ACTION
### (Declaration that Section 2(a) of the Lanham Act Violates the First Amendment)

134.    Pro-Football repeats and realleges the allegations of Paragraphs 1 through 133 of the Complaint as if fully set forth herein.

135.    Section 2(a) is a content-based restriction on speech that violates the First Amendment to the U.S. Constitution.

136.    Section 2(a) is facially overbroad, in violation of the First Amendment.

137.    Separately and independently, as applied to Pro-Football, Section 2(a) violates the First Amendment.

## FOURTH CAUSE OF ACTION
### (Declaration that Section 2(a) of the Lanham Act Is Void For Vagueness

138.    Pro-Football repeats and realleges the allegations of Paragraphs 1 through 137 of the Complaint as if fully set forth herein.

139.    Section 2(a) is unconstitutionally void for vagueness.

## FIFTH CAUSE OF ACTION
### (Declaration that the TTAB Order Violates the Due Process Clause of the Fifth Amendment)

140.   Pro-Football repeats and realleges the allegations of Paragraphs 1 through 139 of the Complaint as if fully set forth herein.

141.   The TTAB Order abridges Pro-Football's due-process rights provided by the Fifth Amendment to the U.S. Constitution.

142.   The cancellation of Pro-Football's registrations unreasonably deprives Pro-Football of federally granted property rights that it has relied on for almost half a century, in violation of its right to due process.  During the past forty-seven years, Pro-Football has invested millions of dollars in the use, promotion, continued registration, and protection of its registered marks based on its reasonable belief that its property interests would have full protection under the law.

143.   Because of the deprivation of Pro-Football's extremely long-held property rights, the TTAB Order for the cancellation of Pro-Football's registrations violates Pro-Football's due-process rights provided by the Fifth Amendment to the U.S. Constitution.

144.   In addition, Pro-Football was deprived of the right to a fair and impartial hearing before the TTAB, in violation of Pro-Football's due-process rights provided by the Fifth Amendment to the U.S. Constitution.

## SIXTH CAUSE OF ACTION
### (Declaration that the TTAB Order Violates the Takings Clause of the Fifth Amendment)

145.   Pro-Football repeats and realleges the allegations of Paragraphs 1 through 144 of the Complaint as if fully set forth herein.

146.   The TTAB Order constitutes an unconstitutional taking of Pro-Football's property without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

## SEVENTH CAUSE OF ACTION
### (Declaration that Defendants' Petition Was Barred by the Doctrine of Laches)

147.    Pro-Football repeats and realleges the allegations of Paragraphs 1 though 146 of the Complaint as if fully set forth herein.

148.    As a result of Defendants' inexcusable delay in filing the Petition for Cancellation of the Redskins Marks, and the undue prejudice suffered by Pro-Football, Defendants' Petition before the TTAB was barred by the doctrine of laches.

### PRAYER FOR RELIEF

WHEREFORE, Pro-Football requests this Court to enter judgment:

(a)    reversing the Order of the Trademark Trial and Appeal Board, dated June 18, 2014, scheduling the cancellation of Pro-Football's Washington Redskins trademark registrations;

(b)    ordering the Trademark Trial and Appeal Board to deny Defendant's Petition for Cancellation;

(c)    declaring that Pro-Football's Redskins Marks do not disparage Native Americans, in violation of Section 2(a) of the Lanham Act;

(d)    declaring that Pro-Football's Redskins Marks do not bring Native Americans into contempt or disrepute, in violation of Section 2(a) of the Lanham Act;

(e)    declaring that Section 2(a) of the Lanham Act, on its face is unconstitutional under the First Amendment to the U.S. Constitution;

(f)    declaring that Section 2(a) of the Lanham Act, as applied to Pro-Football, is unconstitutional under the First Amendment to the U.S. Constitution;

(f)    declaring that Section 2(a) of the Lanham Act  is unconstitutionally void for vagueness;

(h)    declaring that the TTAB Order is unconstitutional under the Due Process Clause of

the Fifth Amendment to the U.S. Constitution;

(h)    declaring that the TTAB Order is unconstitutional under the Takings Clause of the

Fifth Amendment to the U.S. Constitution;

(i)    ordering the Trademark Trial and Appeal Board to dismiss Defendants' Petition for

Cancellation challenging the Redskins Marks under Section 2(a), because the

Petition was barred by the doctrine of laches at the time it was brought before the

Trademark Trial and Appeal Board; and

(j)    awarding Pro-Football such other and further relief as this Court may deem proper.

Dated: Alexandria, Virginia
       August 14, 2014

Respectfully submitted,

Craig C. Reilly, Esq. (VSB # 20942)
craig.reilly@ccreillylaw.com
THE LAW OFFICE OF CRAIG C. REILLY
111 Oronoco Street
Alexandria, Virginia 22314
Tel:  (703) 549-5354
Fax:  (703) 549-5355

Robert L. Raskopf (*pro hac vice* forthcoming)
robertraskopf@quinnemanuel.com
Todd Anten (*pro hac vice* forthcoming)
toddanten@quinnemanuel.com
Claudia T. Bogdanos (*pro hac vice* forthcoming)
claudiabogdanos@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  (212) 849-7000
Fax:  (212) 849-7100

*Counsel for Plaintiff Pro-Football, Inc.*