**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

PRO-FOOTBALL, INC.,

   Plaintiff,

  v.         Civil Action No. 1:14-cv-01043-GBL-IDD

AMANDA BLACKHORSE, MARCUS
BRIGGS-CLOUD, PHILLIP GOVER,
JILLIAN PAPPAN, and COURTNEY
TSOTIGH,

   Defendants,

  and

UNITED STATES OF AMERICA,

   Intervenor.

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION and AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA**

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* file this Corporate Disclosure Statement, as required by Local Civil Rule 7.1(A)(1)(a).

The American Civil Liberties Union Foundation and the American Civil Liberties Union of Virginia are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in *amici curiae*. Therefore, amici have nothing to report under Local Civil Rule 7.1(A)(1)(a).

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

INTERESTS OF *AMICI CURIAE* ...................................................................................3

ARGUMENT ......................................................................................................................4

    I.    Section 2(a) of the Lanham Act Violates the First Amendment............................4

        A.    The Lanham Act regulates private expression protected by the First
        Amendment. ....................................................................................................4

        B.    Section 2(a) of the Lanham Act impermissibly mandates viewpoint
        discrimination. .................................................................................................7

        C.    Section 2(a) burdens private speech by placing an unconstitutional condition on the
        receipt of valuable government benefits....................................................................10

        D.    Section 2(a) is unconstitutionally vague and overbroad.................................13

            1.    *Vagueness*………………………………………………………………………………14

            2.    *Overbreadth*………………………………………………………………………………18

    II.    A Finding that Section 2(a) is Facially Unconstitutional Would Not Significantly
    Alter the Landscape of Trademark Law.......................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*ACLU of N.C. v. Tata*, 742 F.3d 563 (4th Cir. 2014), *petition for cert. filed
  sub nom. Berger v. ACLU of N.C.* (July 11, 2014) ..................................................... 3

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013) ................... 11

*Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218
  (2d Cir. 2011) *aff'd.*, 133 S. Ct. 2321 (2013) ............................................................. 11

*Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382 (1950) ................................................... 10

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ........................................ 10

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ..................................................................... 15

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ..................................................... 14

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668 (1996) ................ 11

*Bd. of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217 (2000). ............. 12

*Bd. of Regents v. Southworth*, 529 U.S. 217 (2000) ................................................... 7

*Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479 (Fed. Cir. 1987) ......... 12

*Boos v. Barry*, 485 U.S. 312 (1988) ........................................................................... 8

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376
  (4th Cir. 2006) ............................................................................................................. 7

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) ......................... 8, 9

*Erickson v. City of Topeka, Kan.*, 209 F. Supp. 2d 1131 (D. Kan. 2002) ..................... 9

*Ex parte Murphy*, 200 U.S.P.Q. (BNA) 801 (1977) ................................................... 20

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) ........... 14

*Fed. Commc'ns Comm'n v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) .......... 11

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992)............................................... 10

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................... 13, 14

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)........................................... 14

*In re Blvd. Entm't, Inc.*, 334 F.3d 1336 (Fed. Cir. 2003)...................................................... 9

*In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008)......................................... 7

*In re Hershey*, 6 U.S.P.Q.2d 1470 (T.T.A.B. 1988). ........................................................ 15

*In re Mavety Media Group, Ltd.*, 33 F.3d 1367 (Fed. Cir. 1994) .............................................. 8, 9

*In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981)................................................................ 10, 11, 13

*In re Old Glory Condom Corp*, 26 U.S.P.Q.2d 1216 (T.T.A.B. 1993) .................................... 4, 15

*In re Riverbank Canning Co.*, 95 F.2d 327 (C.C.P.A. 1938)......................................................... 16

*In re Shiao Tam*, 108 U.S.P.Q.2d 1305 (T.T.A.B. 2013), *appeal filed,* No. 14-1203
    (Fed. Cir. Jan. 7, 2014)................................................................................... 6, 9, 17

*In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*, 159 U.S.P.Q. 275
    (T.T.A.B. 1968)........................................................................................... 17

*In re Wilcher Corp.*, 40 U.S.P.Q.2d 1929 (T.T.A.B. 1996)........................................................ 15

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).................................................................. 13, 14

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)........................................................... 7, 12

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252
    (4th Cir. 2007) .......................................................................................... 5

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) .............................................. 5

*Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .................... 7, 8

*NAACP v. Button*, 371 U.S. 415 (1963)........................................................................... 14

*Perry v. Sindermann*, 408 U.S. 593 (1972)................................................................... 11

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)........................................................ 8

*Radiance Found., Inc. v. NAACP*, 25 F. Supp. 3d 865 (E.D. Va. 2014) ...................................... 6

*Regan v. Time, Inc.,* 468 U.S. 641 (1984) .................................................................. 20

*Reno v. ACLU,* 521 U.S. 844 (1997) ..................................................................... 3, 15

*Revision of Patent and Trademark Fees*, 56 Fed. Reg. 65142 (1991) ........................ 13

*Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989) ...................................................... 5

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ......................... 9, 12

*Rust v. Sullivan*, 500 U.S. 173 (1991) ....................................................................... 11

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) .................................................................................... 2, 9

*Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*,
    288 F.3d 610 (4th Cir. 2002) ............................................................................. 4

*Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388
    (5th Cir. 2014), *cert. granted sub nom. Walker v. Texas Div., Sons of Confederate Veterans,
    Inc.*, No. 14-144 (Dec. 5, 2014) ........................................................................ 3

*Texas v. Johnson*, 491 U.S. 397 (1989) ..................................................................... 2

*Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568 (1985) ......................... 15

*United States v. Alvarez*, 132 S. Ct. 2537 (2012) ........................................................ 5

*United States v. Alvarez*, 617 F.3d 1198, 1204 (9th Cir. 2010) ................................... 3

**Statutes**

15 U.S.C. § 1052(a) ................................................................................... passim

15 U.S.C. § 1125(c)(3) ..................................................................................... 5

**Other Authorities**

Jendi B. Reiter, *Redskins and Scarlet Letters: Why "Immoral" and "Scandalous"
    Trademarks Should Be Federally Registrable*, 8 Fed. Cir. B.J. 191 (1976) ............................ 20

Llewellyn Joseph Gibbons, *Semiotics of the Scandalous and the Immoral and
the Disparaging: Section 2(a) Trademark Law After Lawrence v. Texas*,
9 Marq. Intell. Prop. L. Rev. 187, 191 n. 18 (2005).............................................................. 6, 9

Press Release, Leadership Conference on Civil and Human Rights,
Nat'l Civil and Human Rights Coal. Calls for Wash. Football Team to
Drop Offensive Name (Dec. 12, 2013) ...................................................................................... 2

Sonia K. Katyal, *Trademark Intersectionality*, 57 UCLA L. Rev. 1601 (2010) ........................... 5

Stephen Pevar, The Rights of Indians and Tribes (2012) .............................................................. 2

Stephen Pevar, *Why Redskins is Wrong*, ACLU Blog of Rights (Nov. 25, 2013)......................... 2

Theodore H. Davis, Jr., *Registration of Scandalous, Immoral, and
Disparaging Matter Under Section 2(a) of the Lanham Act: Can One Man's
Vulgarity Be Another's Registered Trademark?*, 83 Trademark Rep. 801 (1993) ................... 13

Trademark Manual of Examining Procedure § 1203.01 ............................................................. 15

Trademark Manual of Examining Procedure § 1203.01 ............................................................. 16

**INTRODUCTION**

Few principles in constitutional law are as settled as the First Amendment's prohibition on government regulation of private speech based on viewpoint. The courts have never blessed a government program that permits government actors to determine the acceptability of a speaker's viewpoint and then condition benefits based on that determination. The First Amendment harms are magnified when such regulation of speech rests on vague and subjective terms that provide no meaningful notice to speakers as to which speech the government will find acceptable, and thereby risk—and in this case, *ensure*—inconsistent and discriminatory application.

These evergreen principles hold no less true simply because they arise in the context of trademark law. Yet Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), not only condones but *mandates* viewpoint-based discrimination in the provision of trademark registration. Section 2(a) prohibits the registration of any trademark interpreted by the U.S. Patent and Trademark Office ("PTO") to be immoral, scandalous, or disparaging to any persons, institutions, beliefs, or national symbols. It is indisputable that registration of a mark provides substantial benefits to a trademark holder; it is also true that many trademarks involve expressive speech and association. Therefore, by authorizing the government to deny registration of certain marks because of a viewpoint-based determination about the character of expressive speech, Section 2(a) violates the First Amendment.

This case arose when the PTO scheduled the registered trademark of the National Football League team the Washington Redskins—a mark that has been in use for decades—for cancellation in response to a petition from private individuals. In the administrative proceeding, the government agreed with the petitioners that the term "Redskins" is disparaging to Native Americans. This finding is eminently understandable. The term "Redskins" is frequently

1

criticized as outdated, racist language. Indeed, the ACLU has joined calls for the team to change the name and to stop using a word that perpetuates racism against Native Americans.[1] And there is little doubt that many Native Americans view the word "Redskins" as at least problematic, if not outright racist. *See* Stephen Pevar, *The Rights of Indians and Tribes* 237 (2012) (noting that "most national Indian organizations have issued policy statements urging the removal of all Indian mascots on the grounds that they are inherently demeaning, disrespectful, degrading, and reflect racial prejudice").

But the question of whether certain speech is distasteful is entirely distinct from the question of whether the government can constitutionally disadvantage it for that reason. Under the First Amendment, viewpoint-based regulation of private speech is never acceptable, regardless of the controversy of the viewpoint. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) (stating that a statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speech because of its content). The Lanham Act violates this bedrock principle by creating a formal system of government-provided benefits and then distributing those benefits based on a system of explicit viewpoint discrimination. It is simply not within the government's authority to determine what speech is too "scandalous" to merit trademark protection. The Lanham Act's determination of trademark propriety "is

---

[1] *See* Stephen Pevar, *Why Redskins is Wrong*, ACLU Blog of Rights (Nov. 25, 2013), https://www.aclu.org/blog/racial-justice/why-redskins-wrong ("Every dictionary defines "Redskins" as being offensive, derogatory and a racial epithet."); *see also* Press Release, Leadership Conference on Civil and Human Rights, Nat'l Civil and Human Rights Coal. Calls for Wash. Football Team to Drop Offensive Name (Dec. 12, 2013), www.civilrights.org/press/2013/washington-football-team-name-change-resolution.html.

inconsistent with the maintenance of a robust and uninhibited marketplace of ideas," *United States v. Alvarez*, 617 F.3d 1198, 1204 (9th Cir. 2010), *aff'd*, 132 S. Ct. 2537 (2012)—especially so in the trademark context, where a *literal* marketplace allows members of the public to register protest through boycotts or other traditional First Amendment means.

By scheduling the cancellation of the Redskins' trademark because the word expresses a disparaging viewpoint, the government violated the First Amendment. This Court should end this formal system of viewpoint discrimination by issuing a narrow ruling that strikes down those portions of Section 2(a) of the Lanham Act that prohibit registration of "immoral," "scandalous," or "disparag[ing]" marks.

## INTERESTS OF *AMICI CURIAE*

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with more than 500,000 members dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. Since its founding in 1920, the ACLU has vigorously defended free speech and racial justice, and has appeared before the federal courts in numerous First Amendment cases involving viewpoint discrimination, both as direct counsel and as *amicus curiae*, including *ACLU of N.C. v. Tata*, 742 F.3d 563 (4th Cir. 2014) (holding unconstitutional a state's decision to issue a "Choose Life" specialty license plate while refusing to issue a pro-choice specialty plate), *petition for cert. filed sub nom. Berger v. ACLU of N.C.*, No. 14-35 (July 11, 2014), *Reno v. ACLU,* 521 U.S. 844 (1997) (striking down statutory provisions censoring "indecent" and "patently offensive" communications on the Internet), and *Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388 (5th Cir. 2014), *cert. granted sub nom. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, No. 14-144 (Dec. 5, 2014) (hearing appeal of Fifth Circuit's ruling that Texas' viewpoint-based ban

on specialty license plates is unconstitutional). The proper resolution of this case is a matter of substantial interest to the ACLU and its members. The ACLU of Virginia and the ACLU of the National Capital Area are affiliates of the national ACLU.

## ARGUMENT

### I.      Section 2(a) of the Lanham Act Violates the First Amendment.

The Lanham Act regulates private speech that is protected by the First Amendment. Regardless of whether all proposed trademarks constitute expressive speech, many of them plainly communicate a particularized message entitled to First Amendment protection. And there is no question that proposed trademarks denied by the Patent and Trademark Office as scandalous, immoral, or disparaging under Section 2(a) of the Act, 15 U.S.C. § 1052(a), express a message. Indeed, Section 2(a) expressly conditions the provision of federal trademark registration on the government's own recognition that a proposed mark is expressive and its own understanding of the viewpoint expressed in the proposed mark. It is axiomatic that the government may not regulate private expression based on its viewpoint; in mandating such viewpoint-based discrimination, Section 2(a) of the Lanham Act is an unconstitutional regulation of speech.[2]

### A.  The Lanham Act regulates private expression protected by the First Amendment.

---

[2] It should be noted at the outset that trademarks registered in the Principal Register constitute private, rather than government, speech. Trademark registration provides no government imprimatur to the marked product or service. *See In re Old Glory Condom Corp*, 26 U.S.P.Q.2d 1216 at *5 n.3 (T.T.A.B. 1993) (rejecting the notion that registration constitutes the government's endorsement of the mark or the product to which it is affixed). The Public Register does not serve any expressive purpose for the government, and it is the trademark owner, not the government, that has editorial control over the mark and bears ultimate responsibility for its content. *See, e.g., Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 616–18 (4th Cir. 2002) (setting forth standards for determining identity of a speaker, including editorial control and responsibility for the speech).

Trademarks are diverse by their very nature. Some merely identify or brand a commercial product. However, in many cases, the expressive and commercial elements of trademarks are inextricably intertwined.[3] Some marks describe artistic or expressive endeavors. *Cf. Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) (noting that film titles are "of a hybrid nature, combining artistic expression and commercial promotion."). For example, a band's name can constitute an artistic or political message as well as a method of identifying the band in the marketplace. *See infra* (discussing "The Slants," an Asian-American band's name intended to communicate racial identity). Some trademarks even incorporate parody or statements on consumer culture. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, *LLC*, 507 F.3d 252, 261 (4th Cir. 2007) (concluding that the trademark for "Chewy Vuiton" dog toys was "a comment on the rich and famous, on the LOUIS VUITTON name and related marks, and on conspicuous consumption in general"); *see also* Sonia K. Katyal, *Trademark Intersectionality*, 57 UCLA L. Rev. 1601, 1606 (2010) ("Since trademarks inhabit a multiplicity of meanings, they can operate as devices of owned property . . . [as well] as devices of expression and culture.").

Marks can also serve as means of self-expression, and they can be a critical method of establishing and communicating group identity. Thus, "American Civil Liberties Union" and "ACLU" are federally registered trademarks that, among other things, convey a message about the values and identity of the group holding those marks and filing this brief. Similarly, the mark

---

[3] Indeed, trademark law has long recognized the intersection of trademarks and expressive speech. Federal courts have applied the fair-use doctrine to protect speakers who do not own a mark but who nonetheless use it for certain categories of protected expression. *See e.g.*, 15 U.S.C. § 1125(c)(3) (providing a complete fair-use defense to dilution liability for marks that serve as parody, criticism, or commentary); *Mattel, Inc. v. MCA Records, Inc*., 296 F.3d 894 (9th Cir. 2002) (protecting the use of a trademarked term in a literary title from liability under the Lanham Act); *see also, e.g.*, *United States v. Alvarez*, 132 S. Ct. 2537, 2554–55 (2012) (Breyer, J., concurring) (comparing trademark-infringement requirements to other government restrictions on expressive activity, such as perjury or impersonation).

utilized by the National Association for the Advancement of Colored People ("NAACP") conveys its mission as an organization that uses its longstanding and recognizable trademark "to identify its organization and services," which include "community outreach, informational, and educational services activities on a range of issues of importance to the African American community." *Radiance Found., Inc. v. NAACP*, 25 F. Supp. 3d 865, 872, 874 (E.D. Va. 2014).

In interpreting Section 2(a) of the Lanham Act, the PTO and reviewing courts have recognized that trademarks can and do communicate ideas about various individuals or social groups. For example, in *In re Shiao Tam*, 108 U.S.P.Q.2d 1305 (T.T.A.B. 2013), *appeal filed,* No. 14-1203 (Fed. Cir. Jan. 7, 2014), the Trademark Trial and Appeal Board ("T.T.A.B.") affirmed the PTO's rejection of the mark "The Slants" for the name of the applicant's rock band, on the ground that the mark was disparaging to people of Asian descent. The band comprises people of Asian descent who wished to "embrace [the derogatory slang meaning of the word slant] and to 'own' the stereotype represented by THE SLANTS." *In re Shiao Tam,* 108 U.S.P.Q.2d, at *5. The band's choice of name bears all the hallmarks of purely expressive speech, relying on wordplay, irony, ambiguity, and allusion to convey a political and deeply personal message from the trademark seeker.[4] *See also In re Heeb Media, LLC*, 89 U.S.P.Q.2d

---

[4] So-called "reappropriation" is a process whereby marginalized groups reclaim use of a word that has been used to disparage them, often in service of changing social attitudes about that group. *See* Llewellyn Joseph Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: Section 2(a) Trademark Law After Lawrence v. Texas*, 9 Marq. Intell. Prop. L. Rev. 187, 191 n. 18 (2005) ("Although 'queer' has historically denigrated homosexuals, it has evolved . . . to reflect the recent renunciation of its negative uses and the reclamation of the term by sexual minorities."). Reappropriation is a process that the PTO has itself recognized in certain instances, albeit inconsistently. *See, e.g.,* DYKES ON BIKES, Registration No. 3323803 (initially rejected on the ground that the term "dyke" was considered vulgar, offensive, or disparaging but later accepted for registration after the trademark holder submitted evidence that the term "dyke" can be used as a source of pride and identity for the LGBT community).

1071 (T.T.A.B. 2008) (rejecting the proposed trademark "Heeb" as used for a magazine that focuses on Jewish culture and is marketed to young Jewish people).

As these examples demonstrate, many trademark applicants propose marks explicitly intended to define a group identity, engage in parody, communicate a political opinion, convey artistic ideas, or spark controversy. In regulating such expression, the government is constrained by the First Amendment.

**B.  Section 2(a) of the Lanham Act impermissibly mandates viewpoint discrimination.**

Viewpoint discrimination is a particularly suspect form of content discrimination. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). As a result, government regulation of private speech based on viewpoint always receives strict scrutiny, and is always disfavored. *See, e.g.*, *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 384 (4th Cir. 2006) (explaining that "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints," citing *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000)). Moreover, the constitutional presumption against viewpoint-based discrimination is fully applicable even where the government does not *ban* private speech, but encumbers it, or refuses to fund it, based on the government's distaste for the speech. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").

The plain language of Section 2(a) *requires* viewpoint discrimination. Section 2(a) prohibits registration if the mark "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). Section 2(a)'s prohibition of "immoral," "scandalous," and "disparag[ing]" speech is aimed at avoiding controversy—any determination under the section explicitly turns on whether the public would consider the proposed mark offensive. *See, e.g.*, *In re Mavety Media Group, Ltd.*, 33 F.3d 1367, 1371 (Fed. Cir. 1994) (quotation marks and citation omitted) ("[W]hether the mark BLACK TAIL, including innuendo, comprises scandalous matter is to be ascertained . . . from the standpoint of . . . a substantial composite of the general public."). In particular, the disparagement clause permits the registration of trademarks that refer positively to a certain group, but prohibits the registration of those that refer negatively to the same group. In so doing, § 2(a) "regulate[s] speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers for Vincent*, 466 U.S. at 804. In this way, the prohibition in Section 2(a) goes far beyond other regulations struck down by the courts, which have repeatedly warned that prohibitions on "controversial" ideas might serve as cover for unlawful viewpoint-based discrimination. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812 (1985) ("[T]he purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 380, 391 (1992) (invalidating ordinance criminalizing the use of a symbol that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender . . . goes even beyond mere content discrimination, to actual viewpoint discrimination"); *Boos v. Barry*, 485 U.S. 312 (1988) (striking down statute that prohibited speech critical of

8

foreign governments near their embassies, while allowing favorable speech). These decisions, and others like them, demonstrate that a "desire to stem listeners' reactions to speech is simply not a viewpoint-neutral basis for regulation." *Erickson v. City of Topeka, Kan.*, 209 F. Supp. 2d 1131, 1145 (D. Kan. 2002) (citing *Cornelius,* 473 U.S. at 812).[5]

The cases that have considered the question have stated, without further analysis, that denial or cancellation of a trademark does not violate the First Amendment because it does not prevent anyone from speaking. *See In re Blvd. Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003) ("the refusal to register a mark does not proscribe any conduct or suppress any form of expression because it does not affect the applicant's right to use the mark in question."); *In re Mavety*, 33 F.3d at 1374 (same).

But the Supreme Court's First Amendment jurisprudence compels a different conclusion. Government action implicates the First Amendment not only when it directly prohibits speech, but also when it creates a financial disincentive to engage in speech. *See, e.g.*, *Simon & Schuster*, 502 U.S. at 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it

---

[5] In addition to Section 2(a)'s facial viewpoint discrimination, it appears that some trademark denials involve *speaker-based* discrimination, which is also constitutionally impermissible, *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). For example, in rejecting Simon Tam's mark "The Slants," the PTO predicated its rejection on its relation to the registrant's race (Asian-American). In rejecting the mark as scandalous, the examining attorney explained that the association between "slant" and the Asian-American community was unavoidable because "applicant is a founding member of a band (the Slants) that is self-described as being composed of members of Asian descent." *See In re Shiao Tam*, 108 U.S.P.Q.2d, at *6 (quoting examining attorney's brief). Meanwhile, many other registrations for "Slant" or variations on it have been registered. *See, e.g.*, "Slant," Registration Nos. 3437230 (serving ware for food); 2163769 (art and graphic design services); 2081228 (education services); 1511492 (insecticides).

The Courts should also be mindful of vague terms like "scandalous" and "immoral" that may serve as portals for discrimination against women and sexual minorities by permitting the application of outdated and subjective conceptions of gender roles and morality. *See, e.g.,* Gibbons, *supra* note 4 at 188 ("Since scandalousness in the United States is often loaded with connotations of sexuality, this is of particular interest to the Queer community.").

imposes a financial burden on speakers because of the content of their speech."). For example, a state may not require a convicted criminal who writes a book about his crimes to turn over profits to the victim, *id.,* nor may it impose a sales tax on some magazines but exempt "religious, professional, trade, and sports journals." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229–30 (1987). *See also Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134–35, (1992) (striking down ordinance that permitted county to charge controversial speakers for extra police protection because "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob"); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950) ("[U]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes."). As the benefits of federal registration are both uncontested and significant, *see, e.g.*, Pl.'s Br., Dkt. 56, at 8–10, the denial or cancellation of a trademark creates a direct and substantial burden on the speaker, and therefore the speech, in violation of the First Amendment.

## C.  Section 2(a) burdens private speech by placing an unconstitutional condition on the receipt of valuable government benefits.

Although the Court of Customs and Patent Appeals has held that Section 2(a) does not constitute an unconstitutional regulation of speech, that opinion is wrong as a matter of both fact and law. *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981). The *McGinley* court asserted that Section 2(a) was not "an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government." *Id.* at 486. But the proposition that the trademark regime is beyond the reach of the First Amendment because its administration involves the expenditure of government funds simply does not withstand scrutiny.

First, *McGinley* misstates the law in holding that the "time" and "services" of the federal government—to the extent they are expended in conferring a benefit upon applicants for trademark registration—are beyond the First Amendment's reach. Pursuant to the "unconstitutional conditions" doctrine, the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance. *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011) *aff'd.,* 133 S. Ct. 2321 (2013).[6] Specifically, the Supreme Court has explained that "the 'unconstitutional conditions' doctrine holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). Here, it is beyond question that the Lanham Act imposes a viewpoint-based burden that in any other context would be unlawful. *See Fed. Commc'ns Comm'n v. League of Women Voters of Cal.*, 468 U.S. 364, 383–84 (1984) (striking down ban on 'editorializing' attached to federal grant) ("A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a 'law . . . abridging the freedom of speech, or of the press.'") (internal citations omitted).

---

[6] Of course the government can restrict its financial support for the purpose of furthering its own programs even when those programs are themselves viewpoint-based. *See, e.g., Rust v. Sullivan*, 500 U.S. 173 (1991). But the registration of private speech in the nature of trademarks does not turn that private speech into a government program. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2332 (2013) ("The Policy Requirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program.").

While the government has some leeway to condition government spending based on content or even viewpoint, the Supreme Court has been clear that the government lacks the power to condense *private* speech into a spectrum approved by the government:

> The latitude which may exist for restrictions on speech where the government's own message is being delivered flows in part from our observation that, "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Bd. of Regents of Univ. of Wis. System v. Southworth,* [529 U.S. 217,] 235 [(2000)].

> Neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance, however. As we have pointed out, "[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger,* [515 U.S. at 834].

*Velazquez,* 531 U.S. at 541–42.

Section 2(a) of the Lanham Act cannot withstand this analysis. The plain text of Section 2(a) demonstrates Congress's intent to provide general access to owners of valid trademarks. *See* 15 U.S.C. § 1052(a) ("*No trademark shall be refused registration on the Principal Register* on account of its nature unless" it falls into certain enumerated categories) (emphasis added); *see also Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.,* 811 F.2d 1479, 1485 (Fed. Cir. 1987) ("One of the policies sought to be implemented by the [Lanham] Act was to encourage the presence on the register of trademarks of as many as possible of the marks in actual use."). By providing a generally-available forum for trademarks, Section 2(a) effectively allows a diversity of viewpoints to be expressed, *except* in the proscribed categories.

Furthermore, it is factually untrue that the registration of scandalous or disparaging marks creates a burden on the government's money or resources. Since 1991, user application fees, rather than public funds, have supported the PTO. *See Revision of Patent and Trademark Fees,*

56 Fed. Reg. 65142 (1991). This is true whether the trademark applicant is ultimately successful or not—the application fees are paid up front. Furthermore, "[m]ore 'public funds' are being expended in the prosecution of this appeal than would ever result from the registration of the mark." *McGinley*, 660 F.2d at 487 (Rich, J., dissenting); *see also* Theodore H. Davis, Jr., *Registration of Scandalous, Immoral, and Disparaging Matter Under Section 2(a) of the Lanham Act: Can One Man's Vulgarity Be Another's Registered Trademark?*, 83 Trademark Rep. 801, 833 (1993) ("[I]t is the PTO's opposition to a mark, rather than its approval, that is more likely to cause the expenditure of federal funds."). If the PTO grants a mark, the government's work is done—and enforcement occurs at the hands of private parties. When the PTO denies or cancels a mark, as this litigation makes clear, the government is likely to expend considerably more resources defending that decision.[7]

### D. Section 2(a) is unconstitutionally vague and overbroad.

Vague laws pose special problems in a First Amendment context because they enhance the risk of arbitrary enforcement and may lead to self-censorship. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).[8] Section 2(a) highlights both risks. As with many vague laws, Section

---

[7] The *McGinley* court's reasoning is therefore further flawed because the "time, services, and use of funds" it referred to is actually expended by the government in the process of *adjudicating* applications for trademark registration. 660 F.2d at 486. The analogous proposition that immoral, scandalous, or disparaging speech would be unprotected by the First Amendment if there were "a judgment by the Congress that such [speech] not occupy the time, services, and use of funds of the federal government" is unsupported and plainly incorrect. Indeed, such an argument would arguably prevent a court from considering any appeal of a PTO determination that a mark ran afoul of Section 2(a).

[8] The Court has also examined statutes that vest unbridled discretion to regulate speech under the Due Process Clause. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. As noted below, the requirement of clarity is especially stringent when a law interferes with First Amendment rights. *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967). The Constitution requires the State to define restrictions on speech with clarity *both* to ensure procedural fairness and avoid chilling speech.

2(a) also presents the risk of unconstitutional overbreadth, and thus it is appropriate for this court to consider the interests of other trademark holders or applicants in reviewing the constitutionality of the challenged language. *See, e.g.*, *Bates v. State Bar of Arizona*, 433 U.S. 350, 380 (1977); *NAACP v. Button*, 371 U.S. 415, 432 (1963).

    1.  *Vagueness*

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). In evaluating whether a law or regulation is unconstitutionally vague, the Supreme Court requires that courts consider both whether the "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and whether the "law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 108–109 (1972). Laws or regulations that are impermissibly vague must be invalidated. *Fox*, 132 S. Ct. at 2317.

The requirement of clarity is at its height when the government is regulating speech. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Keyishian*, 385 U.S. at 604 ("'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" (quoting *Button*, 371 U.S. at 432–33 (1963)). The Supreme Court has repeatedly emphasized that the vagueness doctrine is most powerful when dealing with potential infringements on the First Amendment because speakers "sensitive to the perils posed by . . . indefinite language[] avoid

the risk . . . only by restricting their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see Reno*, 521 U.S. at 871 ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect.").

Section 2(a) provides no guidance as to what constitutes scandalous or immoral subject matter; nor does any relevant legislative history provide such guidance. Even the Trademark Manual of Examining Procedure concedes that "[t]here is little legislative history concerning the intent of Congress with regard to the provision," TMEP § 1203.01. While it is sometimes the case that "[a] term that appears vague on its face may derive much meaningful content from the purpose of the Act, its factual background, and the statutory context," *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 593 (1985) (internal citation omitted), such purpose, background, or context is entirely absent in the Lanham Act.

This dearth of guidance has forced both the PTO and the courts to turn instead to a random sampling of period dictionaries in attempts to ascertain the meaning of the statutory requirement. *See, e.g.*, *In re Wilcher Corp.*, 40 U.S.P.Q.2d 1929, at *2, *5 (T.T.A.B. 1996); *In re Hershey*, 6 U.S.P.Q.2d 1470, at *2 (T.T.A.B. 1988). Indeed, the statute's prohibitions necessarily change as social mores shift over time with no warning to the public at large. "[W]hat was considered scandalous as a trademark or service mark twenty, thirty or fifty years ago may no longer be considered so, given the changes in societal attitudes." *In re Old Glory Condom Corp*., 26 U.S.P.Q.2d at *4. Or, as in this case, *vice versa*. But even if it were true that "immoral" or "scandalous" could be given a suitable definition based on dictionary entries, *what* qualifies as "immoral" or "scandalous" cannot, and no reliable indicia exist to make such a determination or

to alert the public to what is and what is not acceptable in the eyes of the PTO—or what will no longer be acceptable in twenty, thirty or fifty years.

The PTO's sole limiting principle requires an examining attorney who believes a rejection for scandalous matter is required to "consult with his or her supervisor" whenever they believe, "for whatever reason, that a mark may be considered to comprise such matter," in order to "ensure consistency in examination with respect to immoral or scandalous matter." TMEP § 1203.01. But that only assures that the supervisor's subjective beliefs will control, rather than the examiner's. There is little doubt that the only consistent result of the application of the disparagement clause is inconsistency.

The proof of the arbitrary application of Section 2(a) is in the regulatory pudding: the *very same* terms are frequently granted registration in one case and denied in another with no seeming continuity of logic. For example, the word "wanker" has sometimes been accepted and sometimes rejected, with no clear difference in meaning. *Compare, e.g.*, WANKER, U.S. Trademark Application Serial No. 78,610,369 (filed April 16, 2005) (rejected for use on clothing), *with* WANKER, Registration No. 2,036,108 (accepted for use on beer). Likewise, *compare* TITMOUSE, U.S. Trademark Application Serial No. 78,954,967 (filed August 18, 2006) (rejected for use on computer cursor control devices), *with* TITMOUSEINC., Registration No. 4,624,689 (accepted for use for animation production services); MADONNA, *In re Riverbank Canning Co.*, 95 F.2d 327 (C.C.P.A. 1938) (affirming rejection of mark for use on wines as scandalous), *with* MADONNA, Registration No. 3,545,635 (accepted for use on wine); PUSSY POWER, U.S. Trademark Application Serial No. 77,387,209 (filed February 2, 2008) (rejected for use for entertainment services), *with* PUSSYPOWERREVOLUTION, Registration No. 4,507,246 (accepted for use on clothing); COCAINE, U.S. Trademark Application Serial

No. 78,829,207 (filed March 3, 2006) (rejected for use on soft drinks and energy drinks), *with* COCAINE, Registration No. 1,340,874 (accepted for use on clothing); CUM, U.S. Trademark Application Serial No. 78,059,173 (filed April 19, 2001) (rejected for use on perfume), *with* CUM, Registration No. 1,044,903 (accepted for "no description entered"); THE COMPLETE A**HOLE'S GUIDE TO . . ., U.S. Trademark Application Serial No. 76,351,811 (filed December 21, 2001) (rejected for use on series of books providing information relating to advice, counseling, self-help, and humor), *with* MANAGING YOUR INNER A**HOLE, U.S. Trademark Application Serial No. 85,711,056 (filed August 23, 2012) (accepted for use on books on the development of emotional intelligence—not registered on other grounds); BIGCOCK, U.S. Trademark Application Serial No. 85,418,794 (filed September 9, 2011) (rejected for use on energy drinks), *with* ONEFOOTCOCK, Registration No. 4,544,038 (accepted for use on alcoholic beverages); MESSIAS, *In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*, 159 U.S.P.Q. 275 (T.T.A.B. 1968) (rejected for use on wine and brandy), *with* IL MESSIA, Registration No. 4,093,035 (accepted for use on wine).

The PTO's apparent attempts to protect minority groups from self-disparagement prove as arbitrary as any other action taken under the statute. As noted above, in rejecting Simon Tam's mark "The Slants," the PTO predicated its rejection on the mark's relation to the registrant's race. It was entirely due to the ethnic heritage of the band (both in membership and styling) that the examining attorney drew a negative connotation from the trademark—not from the term itself. *In re Simon Shiao Tam*, 108 U.S.P.Q. 2d at *2, *5. *Compare* UPPITY NEGRO, U.S. Trademark Application Serial No. 86,053,392 (filed August 31, 2013) (no Section 2(a) rejection ever made against the mark for use on apparel and mugs; rejected on other grounds), *with* UPPITY NEGRESS, U.S. Trademark Application Serial No. 78,468,362 (filed August 16, 2004) (rejected

for use on shirts) *and* Uppity Negro, U.S. Trademark Application Serial No. 78,312,525 (filed October 12, 2003) (rejected for use on apparel under Section 2(a) as "matter that may disparage or bring into contempt or disrepute African-Americans").

The bizarre, patchwork nature of these and other decisions means that no trademark applicant can ever be on notice as to what words or ideas will trigger the PTO censors—even when that speech is intended as a statement of racial solidarity or reappropriation. As such, Section 2(a) is impermissibly vague and grants government power to regulate without sufficient guidance, both risking and actually resulting in arbitrary and discriminatory administrative actions.

### 2. Overbreadth

The language of Section 2(a), coupled with its broad and inconsistent application, creates a chilling effect that increases the likelihood that constitutionally protected speech will be suppressed. The extent of the chill that Section 2(a) may have already caused is impossible to gauge. But it is reasonable to assume that a musical band would think twice before choosing a potentially race-reappropriating name after hearing about the Slants' rejection, and a sports team would think twice before adopting a cultural mascot after reading about the Redskins' trademark cancellation. More broadly, those choosing an expressive trademark are likely to steer far away from anything remotely controversial. The potential for chill is magnified because trademark applicants not only have to guess what the PTO may find scandalous, immoral, or disparaging *now,* but also what it may find objectionable years from now. As this case demonstrates, a mark may be cancelled decades after its initial use. Those who wish to register an expressive mark

must therefore make their best guess about how to survive the timeless gauntlet of Section 2(a)'s moral judgment—by self-censoring.[9] This is impermissible.

As applied to groups that use trademarks to self-identify, *see supra* at 5-6, the potential denial of a trademark may inhibit them from obtaining and enforcing their chosen symbol of association. The ability to self-identify demands exclusivity. If a group fears that its preferred method of self-identification will be denied federal trademark protection by the government's invocation of Section 2(a) of the Lanham Act, it will be less likely to adopt that name, at least in part because the associative value of the trademark itself is lessened when it is unlikely that a group will be the exclusive holder of that mark.

## II. A Finding that Section 2(a) is Facially Unconstitutional Would Not Significantly Alter the Landscape of Trademark Law

A finding of unconstitutionality in this case requires only a narrow remedy that will not create upheaval in existing trademark law. Indeed, a finding for Defendants in this case would cause immeasurably greater mischief in the PTO and the courts by ratifying a formal heckler's veto against any potentially controversial trademark in use today or tomorrow.

First and foremost, as noted above, terms sometimes considered "disparaging" and "scandalous" by the PTO are in fact granted trademarks, albeit in an inconsistent fashion. *See supra* at 16-17. Thus, as a practical matter, striking down Section 2(a)'s moralistic exclusions will not result in such trademarks being registered for the first time. As a legal matter, Plaintiff's constitutional claims require only the narrow holding that Section 2(a) may not include terms that are vague or viewpoint-discriminatory. The severability of specific terms—here, two

---

[9] As the inconsistencies in registration and denials demonstrate—even as applied to the very same words—it would be nearly impossible for anyone to predict with any degree of certainty whether any potentially sexual or racial trademark would be permitted at *any* given point in time. *See supra* at 16–17.

adjectives and a disparagement clause in an otherwise lawful statute—is favored. *Regan v. Time, Inc.,* 468 U.S. 641, 653 (1984) ("Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability.").

Furthermore, eliminating the outdated adjectives in the Lanham Act will bring trademark law more closely in compliance with copyright and patent practice. *See* Jendi B. Reiter, *Redskins and Scarlet Letters: Why "Immoral" and "Scandalous" Trademarks Should Be Federally Registrable*, 8 Fed. Cir. B.J. 191, 200 (1976) (noting that mere offensiveness is no bar to copyright protection, and that courts have been increasingly wary of denying patents on the basis of vague moral standards); *see also, e.g.*, *Ex parte Murphy*, 200 U.S.P.Q. (BNA) 801, 802–03 (1977) (reversing the immorality-based rejection of a patent for a slot machine).

The slipperiest of slopes awaits the PTO and the federal courts if a ruling from this Court empowers any individual to seek and obtain the cancellation of a registration that the PTO finds offensive. Section 2(a) results in broad self-censorship by potential mark applicants and the continued *ad hoc* determination of appropriate expressions of racial identity and sexuality by a handful of individuals at the Patent and Trademark Office. In no other area of doctrine do the courts permit the government to engage in this kind of standardless, *ad hoc* regulation of speech based on its perceived morality. Nor should this Court permit the impermissible viewpoint discrimination mandated by Section 2(a) of the Lanham Act.

## CONCLUSION

For all the above reasons, this Court should grant Plaintiff's motion and declare Section 2(a) of the Lanham Act facially unconstitutional to the extent that it mandates rejection of an application that "[c]onsists of or comprises immoral . . . or scandalous matter; or matter which

may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."

Respectfully submitted,

By:  /s/ *Rebecca Glenberg*

Rebecca K. Glenberg (VSB No. 44099)
rglenberg@acluva.org
American Civil Liberties Union Foundation
of Virginia, Inc.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Tel: 804-644-8080
Fax: 804-649-2733

Lee Rowland
lrowland@aclu.org
Esha Bhandari
ebhandari@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Tel: 212-549-2500
Fax: 212-549-2654

Brett Max Kaufman[10]
brettmaxkaufman@nyu.edu
Technology Law & Policy Clinic
New York University School of Law
245 Sullivan Street
New York, New York 10012
Tel: 212-998-6430
Fax: 212-995-4031

---

[10] Counsel for the *amici* wish to thank Joseph Ireland and Patrick Holvey, students in the Technology Law & Policy Clinic of the N.Y.U. Law School, for their invaluable contributions to this brief.