FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2015 APR 15 P 3: 15

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

PRO-FOOTBALL, INC.,

        Plaintiff,

    v.

AMANDA BLACKHORSE, MARCUS
BRIGGS-CLOUD, PHILLIP GOVER, JILLIAN
PAPPAN, and COURTNEY TSOTIGH,

        Defendants,

    and

UNITED STATES OF AMERICA,

        Intervenor.

Civil Action No. 1:14-cv-1043-GBL-IDD

**PRO-FOOTBALL, INC.'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT ON CLAIMS I, II, AND VII**

FILED UNDER SEAL

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT..........................................................................................................................1

I.  THIS COURT CAN, AND SHOULD, ADOPT *HARJO*'S ANALYSIS............................1

II. THE COURT SHOULD REJECT DEFENDANTS' ATTEMPT TO LOWER
    THE APPLICABLE STANDARD OF PROOF.................................................................2

    A.  Under The Heightened Inter Partes Standard, Defendants Cannot
    Extrapolate From Record Evidence To Meet Their Burden ...................................2

    B.  Defendants Must Establish That The Redskins Marks Are, In Fact,
    Actually Disparaging, Not Merely Capable Of Disparagement ............................4

    C.  A "Substantial Composite" Of The Referenced Group Is The Only
    Standard Applied In Disparagement Cases............................................................8

    D.  Defendants Must Present Evidence Of The Views Of Native Americans,
    Not The General Public .........................................................................................9

    E.  Evidence Regarding The Word "Redskin" Outside The Context Of Use As
    A Team Name Is Not Relevant.............................................................................10

III. DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN OF PROVING
    THAT A SUBSTANTIAL COMPOSITE OF NATIVE AMERICANS VIEWED
    THE REDSKINS MARKS AS DISPARAGING IN 1967-1990 ....................................11

    A.  Defendants Bear The Burden Of Proof By A Preponderance Of The
    Evidence...............................................................................................................11

    B.  PFI's Hearsay Objections To Defendants' Evidence Are Well-Founded .............12

    C.  Defendants Do Not Dispute That Riding In's Opinions Should Be
    Excluded ..............................................................................................................13

    D.  Defendants' Evidence Does Not Establish That A Substantial Composite
    Of Native Americans Viewed The Redskins Marks As Disparaging In
    1967-1990 ............................................................................................................13

        1.  There Is No Evidence That The Views Of NCAI's Leaders
        Aligned With Those Of The Native American Population........................13

        2.  Defendants' Remaining Evidence Is Irrelevant .......................................16

IV. PFI'S EVIDENCE DEMONSTRATES THAT THE REDSKINS MARKS DID
    *NOT* DISPARAGE A SUBSTANTIAL COMPOSITE OF NATIVE
    AMERICANS..............................................................................................................18

    A.  Mainstream Native Americans Used The Term "Redskins" To Describe
    Their Sports Teams...............................................................................................18

    B.  Mainstream Native American Individuals and Organizations Supported
    The 1977 Redskins Halftime Show Honoring Native American Culture.............19

V.  DEFENDANTS' CLAIMS ARE BARRED BY LACHES.............................................20

CONCLUSION.....................................................................................................................20

i

FILED UNDER SEAL

## TABLE OF AUTHORITIES

Page

### Cases

*Am. Library Ass'n v. FCC,*
   406 F.3d 689 (D.C. Cir. 2005) ......................................................................................6

*Ark. Valley Sugar Beet & Irrigated Land Co. v. Ft. Lyon Canal Co.,*
   173 F. 601 (8th Cir. 1909) ..........................................................................................12

*Bd. of Trs. of the Univ. of Ala. v. Pitts,*
   2010 WL 9597360 (TTAB Mar. 24, 2010) ...................................................................8

*Blackhorse v. Pro-Football, Inc.,*
   2014 WL 2757516 (TTAB June 18, 2014) ...........................................................8, 9, 12

*Boswell v. Mavety Media Grp. Ltd.,*
   1999 WL 1040108 (TTAB July 29, 1999) ...........................................................5, 8, 9

*Clark v. Martinez,*
   543 U.S. 371 (2005) .....................................................................................................7

*Davis v. Colvin,*
   2014 WL 4181025 (E.D. Va. Aug. 18, 2014) ..............................................................3

*Denn v. CSL Plasma,*
   2015 WL 881520 (W.D. Mo. Mar. 2, 2015) ................................................................2

*Emhart Indus., Inc. v. Home Ins. Co.,*
   515 F. Supp. 2d 228 (D.R.I. 2007) .......................................................................12, 13

*Hicks v. Charles Pfizer & Co. Inc.,*
   466 F. Supp. 2d 799 (E.D. Tex. 2005) .......................................................................12

*In re Anti-Communist World Freedom Congress, Inc.,*
   1969 WL 9040 (TTAB Feb. 24, 1969) .........................................................................5

*In re Beck,*
   2015 WL 1458229 (TTAB Mar. 19, 2015) .................................................3, 5, 8, 9, 10

*In re Geller,*
   751 F.3d 1355 (Fed. Cir. 2014) ...............................................................................5, 8
   2013 WL 2365001 (TTAB Feb. 7, 2013) ................................................................5, 8

*In re Heeb Media, LLC,*
   2008 WL 5065114 (TTAB Nov. 26, 2008) ...................................................3, 5, 8, 14

*In re Hines,*
   1994 WL 456841 (TTAB June 10, 1994) ..............................................................9, 10

*In re Mothers & Fathers Italian Ass'n,*
   2000 WL 158725 (TTAB Feb. 11, 2000) .....................................................................8

*In re Lebanese Arak Corp.,*
   2010 WL 766488 (TTAB Mar. 4, 2010) ..................................................................5, 8

*In re Prosynthesis Labs., Inc.,*
   2012 WL 1267929 (TTAB Mar. 23, 2012) ..............................................................5, 8

FILED UNDER SEAL

*In re Squaw Valley Dev. Co.*,
    2005 WL 2543626 (TTAB Sept. 26, 2005) ..........................................3, 9, 10, 11, 14
    2006 WL 1546500 (TTAB May 23, 2006) ....................................................3, 4, 5, 8

*In re Tam*,
    2013 WL 5498164 (TTAB Sept. 26, 2013) ............................................................5, 8

*In re Undeas, Inc.*,
    2000 WL 35456353 (TTAB Jan. 28, 2000) ................................................................8

*Kight v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*,
    34 F. Supp. 2d 334 (E.D. Va. 1999)  (Lee, J.) ..........................................................1

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991)...................................................................................................6

*McDermott v. San Fran. Women's Motorcycle Contingent*,
    2006 WL 2682345 (TTAB Sept. 13, 2006) ............................................................10

*Milner v. Dep't of Navy*,
    131 S. Ct. 1259 (2011)...............................................................................................7

*Nixon v. Mo. Mun. League*,
    541 U.S. 125 (2004)...................................................................................................6

*Pro-Football, Inc. v. Harjo*,
    284 F. Supp. 2d 96 (D.D.C. 2003) ................................................................. *passim*
    1999 WL 375907 (TTAB Apr. 2, 1999) ...............................................................4, 5

*Trailmobile Co. v. Whirls*,
    331 U.S. 40 (1947)....................................................................................................7

*Travelers Indem. Co. v. Bailey*,
    557 U.S. 137 (2009)...................................................................................................2

*U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*,
    675 F.3d 394 (4th Cir. 2012) ....................................................................................2

*U.S. v. Bullard*,
    645 F.3d 237 (4th Cir. 2011) ....................................................................................2

*U.S. v. Clements*,
    590 F. App'x 446 (6th Cir. 2014) ...........................................................................12

*U.S. v. Wood*,
    741 F.3d 417 (4th Cir. 2013) ..................................................................................16

## Statutes & Rules

18 U.S.C. §1715.................................................................................................................6

Fed. R. Evid. 403 ............................................................................................................12

Fed. R. Evid. 803(16)................................................................................................12, 13

Fed. R. Evid. 805 ............................................................................................................12

## Additional Authorities

Christine Haight Farley, *Stabilizing Morality in Trademark Law*,
    63 AM. U. L. REV. 1019 (2014)...............................................................................10

Kimberly A. Pace, *The Washington Redskins Case and the Doctrine of Disparagement:*
    *How Politically Correct Must a Trademark Be?*, 22 PEPP. L. REV. 7 (1994)...........6

# FILED UNDER SEAL

## INTRODUCTION

In their brief, Defendants do not dispute that none of their "evidence" demonstrates that (1) a substantial composite (2) of Native Americans (3) viewed the Redskins Marks, in the context of PFI's services, as disparaging (4) at the time each mark was registered (*i.e.*, 1967, 1974, 1978 and 1990). Instead, they ask the Court to lower the bar and require proof showing only that the word "redskin" may have had "the potential" to disparage Native Americans. The Court should decline to apply Defendants' novel legal standard: fifty-year-old registrations are not cancelled purely on the hypothetical possibility that someone might be offended by the trademarks. And no matter how earnestly a handful of activists may have felt about the Washington Redskins' name, Defendants have introduced no evidence that such views ever aligned with those of a substantial composite of Native Americans in 1967-1990. Indeed, such a stance cannot be squared with the *dozens* of Native American tribes, schools, and organizations that named their own sports teams the "Redskins" during that time and who proudly participated in the Redskins' 1977 halftime event celebrating Native American culture.

This Court should follow *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96 (D.D.C. 2003), which, in considering a near-identical record, rejected each of Defendants' arguments. Even though *Harjo* is not "binding" on this Court, Defendants don't argue that *Harjo* is wrong; instead, they pretend it doesn't exist. But *Harjo* does exist, and it is persuasive. There is no reason for this Court to create a circuit split and depart from *Harjo*'s thorough analysis. PFI's motion should be granted.

## ARGUMENT

### I.   THIS COURT CAN, AND SHOULD, ADOPT *HARJO*'S ANALYSIS

*Harjo* is directly on point and persuasive, and this Court should follow it. *See, e.g., Kight v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 34 F. Supp. 2d 334, 342 (E.D. Va. 1999)

**FILED UNDER SEAL**

(Lee, J.) (decision of sister district court persuasive that addressed identical claims and similar facts). Defendants' "supplemental" evidence here is the same in kind as what was already considered in *Harjo*. Defendants ask the Court (at 5) to "infer" that the D.C. Circuit *sub silentio* rejected *Harjo*'s analysis. Not so—appellate courts routinely resolve cases on one ground without ruling on alternative grounds.[1] *Harjo*'s analysis thus remains unchallenged.

## II.   THE COURT SHOULD REJECT DEFENDANTS' ATTEMPT TO LOWER THE APPLICABLE STANDARD OF PROOF

*Harjo* properly limited the scope of relevant evidence to that which demonstrates whether the use of "redskin(s)," as it appears in the Redskins Marks and in the *specific context* of PFI's services, would be viewed as disparaging by a substantial composite of Native Americans in 1967-1990. 284 F. Supp. 2d at 144. For example, no matter how much evidence Defendants introduce about the word "redskin" in the abstract, it is not relevant to the legal inquiry regarding PFI's marks. Irrelevant evidence does not become probative just because there is more of it.[2]

Recognizing their inability to satisfy this standard, Defendants ask the Court to lower their burden by changing the applicable standard of proof in multiple ways, none of which has been accepted by any Court. This Court should decline the invitation to become the first.

### A.   Under The Heightened Inter Partes Standard, Defendants Cannot Extrapolate From Record Evidence To Meet Their Burden

As the petitioners in an inter partes cancellation action, Defendants must satisfy the preponderance-of-the-evidence standard, and not the lower "scintilla of evidence" standard that

---

[1]   *See, e.g., U.S. v. Bullard*, 645 F.3d 237, 243 (4th Cir. 2011). This practice reflects the preference for courts to resolve appeals on narrow grounds, such as the laches claim in *Harjo*. *See, e.g., U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 411 (4th Cir. 2012) (Wynne, J., concurring in result) ("prudence and judicial restraint require that we address *only* those questions necessary to the disposition of an appeal"); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 155 (2009) (deciding on "narrow" ground, declining to resolve broader question).

[2]   "[S]imply combining all the evidence that is singly insufficient or irrelevant does not create a genuine issue for trial." *Denn v. CSL Plasma*, 2015 WL 881520, at *9 (W.D. Mo. Mar. 2, 2015).

2

FILED UNDER SEAL

applies in ex parte proceedings. *See In re Heeb Media, LLC*, 2008 WL 5065114, at *7 (TTAB Nov. 26, 2008); *Davis v. Colvin*, 2014 WL 4181025, at *2 (E.D. Va. Aug. 18, 2014) (Lee, J.); (*see also* PFI Br. 26-29) (ex parte standard lower due to PTO's limited resources).

In an ex parte proceeding, "in the absence of direct evidence, the [PTO] may meet its burden by extrapolating from the evidence of record." *In re Beck*, 2015 WL 1458229, at *8 (TTAB Mar. 19, 2015); *see also In re Heeb*, 2008 WL 5065114, at *7 (same); *In re Squaw Valley Dev. Co.*, 2006 WL 1546500, at *9 (TTAB May 23, 2006) (same). *Such extrapolation, however, is not permitted in inter partes proceedings.* For example, in *In re Squaw Valley*—an ex parte proceeding—the TTAB initially allowed registrations for the marks SQUAW and SQUAW ONE, even though the examining attorney presented evidence of: (1) dictionary definitions of "squaw" (as "-usu. used disparagingly"); (2) newspaper articles of Native Americans' perceptions of place names incorporating "squaw"; (3) statutes and resolutions defining "squaw" as offensive and banning or replacing its use in place names and landmarks; and (4) positions from Native American individuals and organizations, including the National Congress of American Indians (NCAI), about word and marks at issue. 2005 WL 2543626, at *3-13 (TTAB Sept. 26, 2005). The TTAB nonetheless concluded: "there is *no evidence* in the record that a substantial composite of Native Americans find applicant's use of its marks on its identified goods and services disparaging." *Id.* at *13 (emphasis added). As the TTAB reminded: "The ultimate legal inquiry here is not whether Native Americans find 'squaw' a pejorative term for Native American women." *Id.* But on reconsideration, the TTAB realized it incorrectly applied the *inter partes* standard, noting that "even though there was no direct evidence that a substantial composite of Native Americans" viewed the marks as disparaging, under "the appropriate [lower] standard of proof for an ex parte case" the examining attorney can

**FILED UNDER SEAL**

meet her burden by "extrapolating from the evidence of record." 2006 WL 1546500, at *9. In short, the standard made the difference.

The same principles apply here: Because this is an inter partes proceeding, Defendants cannot merely "extrapolate" from record evidence to satisfy their burden of proof; they must establish the relevance of their evidence at each step. For example, a dictionary definition of "redskin," or a statement from the leader of a Native American organization, is not probative unless Defendants *also* produce evidence that the definition or statement (1) reflects the views of a substantial composite of Native Americans (2) in the context of PFI's services in 1967-1990. Extrapolations alone are not enough; Defendants must justify such extrapolations with evidence.

With this understanding, Defendants' complaint (at 10-12) that PFI seeks to eliminate circumstantial evidence from this proceeding rings false; rather, PFI's point is that unsupported, *extrapolated* evidence (unlike "direct" evidence) does not satisfy the burden of proof.

### B.    Defendants Must Establish That The Redskins Marks Are, In Fact, Actually Disparaging, Not Merely Capable Of Disparagement

As noted in PFI's brief (at 32-33), the TTAB explained in detail why the term "may disparage" as it is used in Section 2(a) does *not* mean "hypothetically, possibly disparaging." Rather, because the word "disparage" by itself conveys an element of intent, Section 2(a)'s "use of the term 'may' is necessary … to avoid an interpretation of this statutory provision that would require a showing of intent to disparage." *Harjo*, 1999 WL 375907, at *36 (TTAB Apr. 2, 1999); *see also Harjo*, 284 F. Supp. 2d at 124-25 (applying same standard). This answers Defendants' assertion (at 6) that "disparage" is preceded by "may," but "scandalous" and "immoral" are not—those words, unlike "disparage," do not convey an element of intent.[3]

---

[3]    Defendants' flawed hypothesis (at 7-8) that, even without "may," the word "disparage" would not convey a requirement of intent is beside the point—"may" was included to "clarif[y]

*(footnote continued)*

4

**FILED UNDER SEAL**

Defendants fixate on the word "may" in isolation and insist that a petitioner need prove only that a mark has the "potential" to disparage. This is wrong for multiple reasons. *First*, no court has *ever* accepted Defendants' interpretation. "Board decisions require proof of disparagement, not merely capacity to disparage." Rose Ex. 144 at 7-8 (TTAB order); *In re Lebanese Arak Corp.*, 2010 WL 766488, at *8 (TTAB Mar. 4, 2010) (PTO must show "that the mark *does, in fact, disparage*"); *Boswell v. Mavety Media Grp. Ltd.*, 1999 WL 1040108, at *5 (TTAB July 29, 1999) (in inter partes proceeding: "we cannot find that opposers have proved that the mark *is* disparaging").[4] Even the earliest published decision addressing disparagement refers to actual, not conceivable, disparagement. *In re Anti-Communist World Freedom Congress, Inc.*, 1969 WL 9040, at *1 (TTAB Feb. 24, 1969) (record demonstrates "applicant's mark *is* disparaging"). Defendants' assertion (at 7) that *In re Beck* required a mark to be only capable of disparagement is wrong; that opinion articulated the standard as "whether a proposed mark *is* disparaging." 2015 WL 1458229 at *3; *see also id.* ("The burden of proving that a mark *is* disparaging rests with the USPTO."); *id.* at *4 (inquiry is "[w]hether a proposed mark *is* disparaging"); *id.* at *5 (same); *id.* at *8 (same).[5]

*Second*, Defendants concede (at 7) that Congress used "may" to clarify that a showing of intent to disparage is not required. Defendants nonetheless hypothesize (at 6-7) that Congress

---

that intent to disparage is not required." Rose Ex. 144 at 7. Such clarification "shifts the focus to whether the matter may be perceived as disparaging." *Harjo*, 1999 WL 375907, at *36.

[4] *See, e.g., Harjo*, 284 F. Supp. 2d at 125 (determining "if a trademark *is* disparaging"); *In re Tam*, 2013 WL 5498164, at *4-8 (TTAB Sept. 26, 2013) (stating 14 times that the test is whether the mark "*is* disparaging"); *In re Geller*, 2013 WL 2365001, at *7 (TTAB Feb. 7, 2013) (inquiry is whether the "mark *is* disparaging"), *aff'd* 751 F.3d 1355 (Fed. Cir. 2014); *In re Prosynthesis Labs., Inc.*, 2012 WL 1267929, at *3, *17-18 (TTAB Mar. 23, 2012) (same); *In re Heeb*, 2008 WL 5065114, at *4-6 (same); *In re Squaw Valley*, 2006 WL 1546500, at *3-5, *7 (same).

[5] Defendants' quotation of *In re Beck* (at 7) is misleading—the quoted portion addresses whether those other than Christians could be offended by the mark PORNO JESUS, not whether the "potential" to disparage, rather than actual disparagement, was the proper standard.

5

intended "may" to *also* mean "potential to disparage" because it did not use the terms "tends to disparage" or "does disparage." This is baseless—Congress did not harbor a secret agenda for a second meaning behind the word "may." *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 704 (D.C. Cir. 2005) ("Congress does not ... hide elephants in mouseholes.").[6]

*Third*, Defendants' reliance on its own preferred definition of "may," in isolation, violates the "cardinal rule" that the Court look at how a word is used in the context of the statute at issue. *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context").[7] Here, all agree that the full term "may disparage," as considered in the context of Section 2(a), clarifies that proof of intent is not required.[8]

*Fourth*, Defendants note (at 6) that an earlier draft of Section 2(a) used the term "tends to disparage," and summarily conclude that "'may disparage' is a lower standard than 'tends to disparage.'" This is both baseless and befuddling—"tends to" demonstrates just as much as "may" that intent to disparage would not be required. In any event, the Supreme Court instructs courts to not attribute any meaning to statutory language that is modified without explanation—

---

[6]   If Congress intended for mere potential to disparage to be sufficient, it just as easily could have used language such as "capable of disparaging." *See, e.g.*, 18 U.S.C. §1715 (regulating "firearms *capable of* being concealed on the person").

[7]   Context always matters, even for the most basic words. *See Nixon v. Mo. Mun. League*, 541 U.S. 125, 132 (2004) ("'any' can and does mean different things depending upon the setting").

[8]   Defendants' *only* cited authority for this point (at 6-7) is a law review article written by a law student in 1994 (before the TTAB or district court in *Harjo* addressed this issue) that simply repeats Defendants' flawed theory without citing any support. Notably, in the same article, that student (who is now Federal Circuit Judge Kimberly Moore) *agrees with PFI* that: (1) "Section 2(a) is unconstitutionally void for vagueness"; and (2) "Section 2(a) is unconstitutional because it abridges the trademark owners' freedom of speech." Kimberly A. Pace, *The Washington Redskins Case and the Doctrine of Disparagement: How Politically Correct Must a Trademark Be?*, 22 Pepp. L. Rev. 7, 48 (1994). She also notes that "[b]lanket reliance on ... *McGinley* would be inappropriate since the court glossed over the difficult constitutional challenges in a cursory manner, without articulating any analysis for its decision." *Id.*

6

FILED UNDER SEAL

to do so would be pure divination.[9]  If anything, the legislative history shows that Congress expected Section 2(a) to address actual, not potential, disparagement—in 1939, the Assistant Commissioner of the PTO voiced concern over Section 2(a) because "it is always going to be just a matter of personal opinion" whether a mark "*is* disparaging." [Dkt. 60-17 at 21].

*Fifth*, Defendants' proposed interpretation makes little sense in light of the rest of Section 2(a)—why would Congress bar from registration marks that are just potentially disparaging, yet require proof that scandalous marks (which are offensive to *everyone*) are, in fact, scandalous? Defendants do not explain how a court could be able to reliably determine that a mark is hypothetically capable of disparagement.

*Sixth*, even if Defendants presented a plausible construction of "may disparage," such interpretation invites a host of constitutional problems. Potential applicants would not have fair notice of whether their marks "may" disparage, so applicants would avoid using marks that come anywhere close to one that *might hypothetically* disparage, without any way to identify such marks. This chilling of protected speech renders Section 2(a) unconstitutionally vague. *See* Dkt. 119 at 29-31. The doctrine of constitutional avoidance mandates avoiding that interpretation:

> when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.

*Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). Defendants' reading should thus be rejected.[10]

---

[9]   *See Trailmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947) (unexplained modifications cannot be used in statutory construction because "the interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers"). This principle applies today. *See Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1266 (2011) ("The scant history concerning this word change as easily supports the inference that Congress merely swapped one synonym for another.").

[10]   In addition to constituting hearsay, Defendants' exhibit of "racist trademarks" (Def. Br. 8 & 2d Criss Ex. 5) contradicts the U.S.'s position that pre-1946 common law prohibited disparaging trademarks.

FILED UNDER SEAL

**C.    A "Substantial Composite" Of The Referenced Group Is The Only Standard Applied In Disparagement Cases**

Defendants also try to lower the applicable standard by claiming (at 8) that determining the views of a "substantial composite" of Native Americans is "one" way, "but not the only way" to determine disparagement. Defendants' position is both unprecedented and illogical. *First,* Defendants do not cite any case where a measure other than a "substantial composite" was used to determine whether a mark was disparaging to a referenced group. This is unsurprising—*every* court to consider a Section 2(a) disparagement challenge in recent history (including the TTAB below) has applied the "substantial composite" standard.[11] Even more confusingly, while Defendants claim that the "substantial composite" test is "not the only way" to demonstrate disparagement, they do not say what quantum of proof *would* be sufficient to cancel an otherwise valid registration.

*Second,* it is sensible that the tests for scandalous and disparaging matter use similar approaches—they are essentially identical inquiries, distinguished chiefly by the scope of the population whose views are relevant: the general public versus a particular referenced group. *Boswell,* 1999 WL 1040108, at *7 (so explaining). Defendants do not explain why a "substantial composite" is an appropriate standard for scandalous marks, but not for disparaging marks. Certainly, there must be *some* test for a court to gauge disparagement. Defendants offer none. To the contrary, it reinforces the vagueness of Section 2(a). *Cf.* Dkt. 119 at 31 & n.45.

---

[11]    *See, e.g., In re Geller,* 751 F.3d at 1358 (affirming 2013 WL 2365001, both applying "substantial composite" standard); *Harjo,* 284 F. Supp. 2d at 124 (applying "substantial composite" standard); *In re Beck,* 2015 WL 1458229, at *3-4; *Blackhorse,* 2014 WL 2757516, at *5; *In re Tam,* 2013 WL 5498164, at *4-5 (TTAB Sept. 26, 2013); *In re Prosynthesis Labs.,* 2012 WL 1267929, at *3, *7; *Bd. of Trs. of the Univ. of Ala. v. Pitts,* 2010 WL 9597360, at *4 (TTAB Mar. 24, 2010); *In re Lebanese Arak,* 2010 WL 766488, at *3-4; *In re Heeb,* 2008 WL 5065114, at *4-5; *In re Squaw Valley,* 2006 WL 1546500, at *3-4, *9-10; *In re Mothers & Fathers Italian Ass'n,* 2000 WL 158725, at *2-3 (TTAB Feb. 11, 2000); *In re Undeas, Inc.,* 2000 WL 35456353, at *3 (TTAB Jan. 28, 2000); *Boswell,* 1999 WL 1040108, at *7.

FILED UNDER SEAL

***Third***, Defendants *still* refuse to identify what they believe comprises a "substantial composite" in this case. This stunning failure to satisfy their burden of proof is sufficient ground alone to grant PFI's motion. *Blackhorse v. Pro-Football, Inc.*, 2014 WL 2757516, at *36 (TTAB June 18, 2014) (Bergsman, J., dissenting) (describing this failure as "astounding").[12] And as PFI already noted (at 29-30), the length of use of the Redskins Marks, the inter partes nature of the proceeding, and the widespread exposure of the marks to Native Americans all weigh in favor in this particular case of a "substantial composite" comprising at least a majority of Native Americans.

### D. Defendants Must Present Evidence Of The Views Of Native Americans, Not The General Public

Defendants argue (at 12) that evidence of the general public's view of the term "redskins" is relevant to how Native Americans understood the term in relation to the Redskins Marks. This is wrong. As *Harjo* recognized after addressing this argument at length, "the perceptions of the general public are ***irrelevant***." 284 F. Supp. 2d at 128-29 (emphasis added).[13] Indeed, *Harjo* reversed the TTAB for committing this very error. 284 F. Supp. 2d at 129.[14] For the view of the general public to have any relevance, Defendants must first establish that views of Native Americans are, in fact, congruent with those of the general public. Defendants do not even

---

[12] Defendants apparently do not dispute that a substantial composite should, at minimum, comprise 36.6% to remain consistent with *Harjo*. 284 F. Supp. 2d at 133 n.32; PFI Br. 30 n.42.
[13] *See also, e.g., In re Beck*, 2015 WL 1458229, at *6 ("we must focus our determination of the issue of disparagement on the referenced group"); *In re Squaw Valley*, 2005 WL 2543626, at *9 (inter partes standard: "We do not take into consideration the perceptions of the general public."); *In re Hines*, 1994 WL 456841, at *2 (TTAB June 10, 1994) ("In determining whether or not a mark is disparaging, the perceptions of the general public are irrelevant.") (citing cases).
[14] The three TTAB cases cited by Defendants (at 12) are all ex parte proceedings, where the PTO was permitted to extrapolate. *See supra* Part II.A. Defendants cite *no* disparagement case where any court extrapolated in an inter partes proceeding. *See Boswell*, 1999 WL 1040108, at *9 (in inter partes proceeding: dictionary definitions not evidence of views of referenced group).

**FILED UNDER SEAL**

attempt to make such a showing.[15] To the contrary, their own survey shows that those views are *not* congruent. *See Harjo*, 284 F. Supp. 2d at 129.

## E. Evidence Regarding The Word "Redskin" Outside The Context Of Use As A Team Name Is Not Relevant

Defendants claim (at 12) that evidence about the word "redskin" outside of the context of PFI's use is relevant. Not so. As *Harjo* explained, the Court must "consider the relationship between the subject matter in question and the other elements that make up the mark in its entirety; the nature of the goods and/or services; and the manner in which the mark is used in the marketplace in connection with the goods and/or services." 284 F. Supp. 2d at 125.

Courts repeatedly warn that "[w]hether a mark is found to be disparaging depends on the context." *McDermott v. San Fran. Women's Motorcycle Contingent*, 2006 WL 2682345, at *3 (TTAB Sept. 13, 2006); *In re Hines*, 1994 WL 456841, at *5 (must look to "the context of this mark"). This is because even "a disparaging term ... may have a nondisparaging meaning in a specific context." *In re Beck*, 2015 WL 1458229, at *4. Thus, "the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with [PFI's] services and during the relevant time frame. ***The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans.***" *Harjo*, 284 F. Supp. 2d at 131; *In re Squaw Valley*, 2005 WL 2543626, at *13 (same). Defendants' own cited article (at 13) confirms this. *See* Christine Haight Farley, *Stabilizing Morality in Trademark Law*, 63 AM. U. L. REV. 1019, 1027 (2014) ("[T]he issue is not whether a word is offensive in the abstract

---

[15] Defendants' only response (at 12) is that Native Americans speak English. This, however, is not evidence of Native Americans' *views*. The TTAB Order below made the same error—it assumed Native Americans' views are the same as the general public's, but without any evidence that they're the same. It is not PFI's burden to disprove such an assumption; that would "completely shift[] the burden of proof." *Harjo*, 284 F. Supp. 2d at 129. Further, assuming all English speakers share the same views about words would render the inquiry for disparagement indistinguishable from scandalousness, even though they address different populations.

FILED UNDER SEAL

(or 'per se'), but rather whether it is offensive when used as a trademark for particular goods or services to which the mark is applied.").

Defendants try to avoid this outcome by arguing (at 12-13) that evidence that "redskin" is disparaging necessarily means that the Redskins Marks are disparaging. *Harjo* rejected this exact argument. *See* 284 F. Supp. 2d at 133-35 (criticizing TTAB for "stating that because it found the name to be pejorative, the marks must be disparaging"); *see also In re Squaw Valley*, 2005 WL 2543626, at *13 (applying inter partes standard, concluding that "[t]he evidence ... does not establish whether a substantial composite of Native Americans find applicant's use of SQUAW in its *marks* on applicant's identified *goods and services* to be disparaging") (emphasis in original). As the party carrying the burden of proof, Defendants cannot rely on such unfounded extrapolation. *See supra* Part II.A.

## III.   DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN OF PROVING THAT A SUBSTANTIAL COMPOSITE OF NATIVE AMERICANS VIEWED THE REDSKINS MARKS AS DISPARAGING IN 1967-1990

### A.   Defendants Bear The Burden Of Proof By A Preponderance Of The Evidence

Defendants must establish "by a preponderance of the evidence" that each Redskin Mark, when registered, was disparaging to a substantial composite of Native Americans in the context of PFI's services. *Harjo*, 284 F. Supp. 2d at 122-23. Defendants do not dispute that because these marks were registered for decades before the Petition was filed, the Court must "pay even closer attention to the proof adduced." *Id.* at 123. And because each registration is an independent target, this Court must assess the sufficiency of the evidence as to each Redskins Mark separately—*e.g.*, evidence from 1990 is not relevant to assessment of the 1967 registration.

11

**FILED UNDER SEAL**

## B. PFI's Hearsay Objections To Defendants' Evidence Are Well-Founded

Defendants challenge (at 13-15) certain of PFI's hearsay objections.[16] *First*, Defendants' assertion that PFI waived its hearsay objections to all evidence in the *Harjo* record misreads the stipulation. The parties agreed that such documents are admissible, and they are—to show *what* they said. But these documents were never offered for the *truth* of their contents. Thus, PFI had no reason to assert hearsay objections.[17] It was the *TTAB*, not Defendants, that relied on these documents for the truth of their contents. Such use was not fairly encompassed within the scope of the stipulation. *See U.S. v. Clements*, 590 F. App'x 446, 449 (6th Cir. 2014).[18] In any event, the stipulation does not reach instances of double hearsay (as these documents are) or relieve the Court of its duty to consider the reliability of the information. *Blackhorse*, 2014 WL 2757516, at *42 (Bergsman, J., dissenting) (stipulation did not waive objections to double hearsay).

*Second*, Defendants argue that certain documents[19] are "ancient documents" under Fed. R. Evid. 803(16). But if such documents contain hearsay within hearsay, Rule 805 requires that Defendants assert "[an]other hearsay exception[] … to render each individual layer of hearsay admissible." *Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 799, 806-7 (E.D. Tex. 2005); *Emhart Indus., Inc. v. Home Ins. Co.*, 515 F. Supp. 2d 228, 268 (D.R.I. 2007) (newspaper articles within Rule 803(16) still inadmissible as double hearsay).[20] Otherwise, the most outrageous

---

[16]   These documents also are irrelevant (PFI Br. 11-25), so the Court need not address hearsay.

[17]   This is confirmed by the stipulation's language, which specifically turns on whether evidence was or was not ruled inadmissible in *Harjo*. 1st Criss Ex. 2 at ¶1.

[18]   *Ark. Valley Sugar Beet & Irrigated Land Co. v. Ft. Lyon Canal Co.*, 173 F. 601, 603 (8th Cir. 1909) ("stipulation … ought not to be discouraged by a narrow and unreasonable construction").

[19]   Defendants (at 14) raise this defense to 1st Criss Exs. 4, 55, 61, 72, 73, 76 & 78 only. They do not invoke Fed. R. Evid. 803(16) to documents it claims are covered by the stipulation.

[20]   Defendants' cited cases (at 15) are inapposite—neither involves double hearsay. In any event, these documents should be excluded under Fed. R. Evid. 403 because, as PFI explained (at

*(footnote continued)*

FILED UNDER SEAL

statement repeated in an authentic 1995 copy of the *National Enquirer*, for example, would be admitted as *fact*. Here, each of the cited documents contains double hearsay, yet Defendants do not raise a separate hearsay exception for the second layer. This evidence is thus inadmissible.[21]

### C.   Defendants Do Not Dispute That Riding In's Opinions Should Be Excluded

As PFI explained (at 16), Riding In's opinions should be excluded because they are unsound and biased—he intentionally limited his research to examples supporting his desired conclusion, and intentionally excluded those that did not. Defendants do not contest, and thus concede, the exclusion of his opinions.

### D.   Defendants' Evidence Does Not Establish That A Substantial Composite Of Native Americans Viewed The Redskins Marks As Disparaging In 1967-1990

Defendants wrongly state (at 16) that "evidence that a substantial composite of Native Americans views [*sic*] 'redskins' as disparaging demonstrates that the mark contains matter that 'may disparage.'" The inquiry is *not* whether Native Americans view "redskins" in a vacuum as disparaging; rather, Defendants must present evidence that: (1) a substantial composite (2) of Native Americans (3) viewed the use of "redskins" in the Redskins Marks, *in the context of PFI's name of a football team*, as disparaging (4) in 1967-1990. *Harjo*, 284 F. Supp. 2d at 144; *see supra* Part II. None of Defendants' evidence satisfies this requisite standard.

#### 1.   There Is No Evidence That The Views Of NCAI's Leaders Aligned With Those Of The Native American Population

Defendants claim (at 17-18) that certain acts of representatives of NCAI establishes that the Redskins Marks were disparaging to a substantial composite of Native Americans in 1967-

---

11-25), they are more prejudicial than probative. *See Emhart*, 515 F. Supp. 2d at 268 (excluding "ancient" newspaper articles as "prejudicial … with little probative value").

[21]   If, however, this Court should disagree, Defendants' own hearsay objections must be rejected on the same ground. *E.g.*, the 1988 *Pueblo Chieftain* article in which Senator Campbell described the Redskins' name as used with "dignity and respect," Rose Ex. 32, would be admissible under Rule 803(16).

FILED UNDER SEAL

1990. Defendants, however, provide *no evidence* that acts of these executives represented the views of NCAI's members, let alone those of the broader population of Native Americans. Defendants bear the burden of proving such views were aligned; their failure to do so renders these acts irrelevant.

*First*, Defendants rely on *In re Heeb* (at 17) for the proposition that "views and actions of organizations like NCAI provides evidence of the views of a substantial composite." But *In re Heeb* was an ex parte case, where the PTO could extrapolate.[22] In this inter partes proceeding, Defendants offer *no proof* that the views or acts of any NCAI leaders (or those of other organizations) regarding the Redskins Marks aligned with *any* of its members, let alone a substantial composite of Native Americans.[23] Further, Defendants do not dispute Dr. Blanton's expert opinion that extrapolating the views of a broader population from the behaviors of a few leaders, or even a membership, would be "critically flawed." *See* Dkt. 82-1 – 82-2 at 19-36. Just as public opinion cannot be reliably inferred from every act of Congress, this Court cannot simply assume that the acts of a few NCAI leaders reflect the views of other Native Americans.

*Second*, Defendants claim (at 17) that NCAI was the "largest and most prominent" Native American organization is suspect. (Naturally, this is how three of its former leaders describe it.)[24] In fact, NCAI was just one of several influential Native American organizations.

---

[22] In contrast, in inter partes proceedings, statements of Native American organizations are *not* sufficient evidence of the views of a substantial composite Native Americans absent evidence that those views are shared by others. *In re Squaw Valley*, for example, held that, when applying an inter partes standard, statements from *NCAI* and other Native American organizations were not sufficient to establish disparagement. 2005 WL 2543626, at *10-11.

[23] The history of this dispute proves this—complaints about the Redskins' team name come largely from the same few Native Americans.

[24] As noted, the evidence Defendants rely on for their estimates of the number of tribes is hearsay and/or unreliable, largely based on decades-old memories, and Defendants provide no evidence of the number of individual Native Americans who were members of NCAI.

FILED UNDER SEAL

For example, in 1971 the National Tribal Chairmen's Association (NTCA) was created specifically because NCAI was "financially-troubled" and "not fully serv[ing] the needs of reservation Indian people." 2d Rose Ex. 169. By 1972, NTCA "was made up of elected leaders of the country's 750,000 Indians on reservations." 2d Rose Ex. 161; *see also id.* Ex. 166 (by 1975, NTCA represented a majority of tribes "who live on reservations with significant land, water and other natural resources"); *id.* Ex. 170 (by 1978, NTCA was one of "the two major Indian groups"); *id.* Ex. 162 (by 1979, NTCA "can fairly be said to represent the American Indian establishment"); *id.* Ex. 163 (referring to NTCA as politically "moderate"). The National Indian Education Association (NIEA) likewise was a prominent group, described as "the largest national Indian organization" in the country, with representatives from 266 tribes.[25] *Id.* Exs. 164 & 165. NTCA, NIEA, and Bureau of Indian Affairs (BIA) all endorsed the Redskins' 1977 All-Indian event—NTCA even passed a formal resolution of support. (PFI SMF ¶¶3-9). NCAI's views, even if credited, are not representative of the spectrum of Native American opinions.

*Third*, as noted (PFI Br. at 17-18), the 1972 meeting[26] between seven Native American activists and Mr. Williams represented only the views of the attendees, not a substantial composite of Native Americans. *Harjo*, 284 F. Supp. 2d at 135.

*Fourth*, although Defendants claim NCAI passed a resolution in 1973, there is no written record of its existence, despite the fact that Defendants' own witnesses testified that there should be. (PFI Br. at 18 & n.22, 21-23). Defendants offer no admissible evidence of what this purported resolution said, who was present at the convention to vote on it, or how many votes

---

[25] Apodaca describes NIEA as a "reputable" and "influential" organization, and testified that its positions reflected those of mainstream Native Americans. Rose Ex. 30 at 17:7-18:21; *see also id.* Ex. 40 at 100:18-101:10 (Riding In).

[26] This is the first alleged activity by NCAI (or any other organization) identified by Defendants; thus, it certainly cannot be relevant regarding views of the 1967 Redskin Mark.

15

FILED UNDER SEAL

were allegedly cast. Nor do Defendants offer proof that whoever purportedly "voted" represented a substantial composite of Native Americans. In any event, the forty-year-old inconsistent memories of these two purported attendees are inherently unreliable evidence.

*Fifth*, Defendants claim (at 17) that Ms. Harjo started "efforts to re-engage" in the 1980s. This concedes that NCAI dropped the issue from entirely 1972 until some point in the 1980s. In any event, Defendants offer no proof that the membership of NCAI, or the larger Native American population, shared her views.[27] While Ms. Harjo undoubtedly has strong personal opinions about the name, there is no evidence her views are shared by a substantial composite.[28]

### 2. Defendants' Remaining Evidence Is Irrelevant

**Haskell 1962 Article & Ross Survey:** Defendants do not address any of PFI's substantive critiques of these materials, nor do they contest Dr. Blanton's and Dr. Jacoby's expert opinions on these subjects. (*See* PFI Br. 16-17, 24). For example, neither the article nor the survey addresses perceptions of the Redskins' team name. *Harjo*, 284 F. Supp. 2d at 127.[29]

**Four Individuals' Views:** The testimony of four individuals' experiences with the term

---

[27] Ms. Harjo's views regarding the Washington Redskins are deeply personal and certainly cannot be imputed to the broader population of Native Americans. For example, she claims that PFI has threatened her life, 2d Rose Ex. 158 (at 11:11-12:10), and has encouraged others to threaten her life, *id.* (at 16:4-24). And the Morning Star Institute referenced in ¶18 of Ms. Harjo's declaration, which she described to Congress as a "national" organization, is in fact operated out her living room and has no paid employees. *Id.* at 30:20-31:18.

[28] Similarly, that a "succession" (at 17) of NCAI's elected Presidents objected to the Redskins' team name (aside from being premised entirely on hearsay) merely represents their own, individual views, and is not evidence of the views of a substantial composite.

[29] Ross's survey is also irrelevant because, *inter alia*, it purports to reflect Native American views in 1996, not 1967-1990. But if this Court considers extraneous surveys, it certainly may consider the Annenberg survey of 2004 in which 90% of surveyed Native Americans did not find the Washington Redskins' name offensive. Rose Ex. 19; Dkt. 82-1 at 18-19. While Defendants criticize (at 4) Blanton's use of the survey as hearsay, he may consider it "if experts in the field would reasonably rely on such evidence in forming their opinions." *U.S. v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013). Defendants offer no argument that they would not.

16

FILED UNDER SEAL

"redskin" does not reflect the views of a substantial composite. *Harjo*, 284 F. Supp. 2d at 129.

**University of Utah:** The evidence shows that the University of Utah decided to drop the team name "Redskins" in 1972 at the request of *one* individual. Rose Ex. 40 at 169:5-25. There is no evidence that "many" Native Americans (at 19) sought, or even supported, this change.

**Post-*Harjo* Evidence:** Defendants' reliance (at 17) on two NCAI resolutions from 1993 is misplaced not only because they fall outside of the relevant time period, but also because the views expressed were irreparably influenced by the intervening *Harjo* petition and its media exposure. Indeed, the resolutions were passed *to express support for* the lawsuit, 1st Criss Ex. 108, and thus cannot reliably indicate Native Americans' perceptions before that intervening event. *See Harjo*, 284 F. Supp. 2d at 135 (evidence from after 1990 is "irrelevant to the calculus," and, in any event, these resolutions were adopted after the petition was filed).

**Dictionary Usage Labels:** Dictionary usage labels for the word "redskin" denoting a North American Indian are not relevant because they: (1) do not relate to the word "Redskins" as the team name; and (2) reflect the perceptions of dictionary editors, not Native Americans. *See Harjo*, 284 F. Supp. 2d at 124, 128, 130, 134; *supra* Part II.D & E.[30] The best evidence of record for this analysis is not dictionaries, but actions of Native Americans themselves. *See infra* Part IV. However, even if the Court looked to dictionary usage labels, this evidence supports PFI, not Defendants. (PFI Br. 12 n.12) (97% of entries had no label/entry or were qualified).[31]

**"Sentiment Analysis" and Evidence of "Other" Writings By Non-Native Americans:** Articles and literary works written by *non*-Native Americans also are not relevant because, *inter*

---

[30] Defendants cite (at 17) only ex parte decisions that relied on dictionary usage labels. Again, inter partes proceedings do not permit such extrapolation. *See supra* Part II.A.

[31] The "numerous dictionaries" (at 2) that employ *unqualifiedly* negative usage labels (or qualified with "usually") in fact represent only 9% of the dictionaries cited, and 0% in 1967-1978, when five of PFI's six registrations issued. Dkt. 81-2 at 2-3.

FILED UNDER SEAL

*alia*, they do not reflect: (1) Native Americans' views; or (2) the context of PFI's use. *Harjo*, 284 F. Supp. 2d at 134; *id.* at 124; *supra* Part II.D & E. Further, Defendants' examples merely show that "redskin" was a neutral, informal, dated counterpart to (and used interchangeably with) the more formal word "Indian."[32]

## IV. PFI'S EVIDENCE DEMONSTRATES THAT THE REDSKINS MARKS DID *NOT* DISPARAGE A SUBSTANTIAL COMPOSITE OF NATIVE AMERICANS

Because Defendants' proffered evidence does not satisfy their burden of proof, the Court should grant PFI's motion. Although it had no burden to do so, PFI voluntarily introduced extensive evidence demonstrating that Native Americans did not take issue with the Redskins' name in 1967-1990. This is not evidence of "different opinions" (Def. Br. 19-20); rather, it calls into question Defendants' evidence that a substantial composite were disparaged by the name.

### A. Mainstream Native Americans Used The Term "Redskins" To Describe Their Sports Teams

Far from regarding it as "disparaging," between 1967-1990 many Native Americans used "Redskins" as the name for their own sports teams. *See* Rose Exs. 46-91; Dkt. 84-1 at 32-34 & Ex. D. Many of these "Redskins" teams represented some of the largest and most influential tribes, including the Navajo, Apache, Cherokee, and Seminole tribes.[33] This evidence confirms

---

[32] *See* Dkt. 83-2 at 3-5; *id.* Ex. 3 at 9-11, 14, 17-32; Rose Exs. 38 (at 128:3-11), 44 (at 69:2-7), 147 (at 171:3-172:17). The word "Indian" can be substituted for—and frequently appeared alongside—"redskin" in Defendants' examples, with no alteration in meaning. Dkt. 84-1 at 17. Defendants' erroneous position is that when "redskin" is found in a *context*, at a time of violence and conflict, in which Native Americans may have been viewed negatively, the word *itself* indicates disparagement. *Id.* at 10-11, 17, 25; 2d Rose Ex. 159 (at 85:20-21) ("guilt by association"). But, as *Harjo* found, "the history of Native Americans has *nothing to do* with whether the trademarks at issue may disparage Native Americans in the context of [PFI's] services and during the relevant time frame." 284 F. Supp. 2d at 132 n.29. Nunberg admits his failure to control his results for their point of time in history. 2d Rose Ex. 160 (at 160:22-161:8).

[33] *See, e.g.*, Rose Ex. 59 ("The Navajo Nation Redskins basketball team composed of Navajos will make their scene to the National Indian Activities Association finals ...." The article implores members of Navajo Nation to fund the team, stating "from your support you will help
*(footnote continued)*

18

that, when used in the context of the name of a sports team, "Redskins" was not disparaging to Native Americans in 1967-1990. In fact, the casual, almost banal, manner in which the Native American press reported on these teams (*see, e.g.*, Rose Exs. 46-91) is itself evidence of just how unremarkable use of the term was to Native Americans at the time.

Defendants essentially ignore this powerful evidence, and simply posit (at 3) that perhaps these Native Americans used the team name "ironically" as an act of "reappropriation." But there is no hint of irony in these uses, and Defendants present no such evidence. Nor is it plausible that Native Americans used the name "Redskins" "facetiously" in connection with children's sports teams and organizations, such as a Native American little league football team, 6th-grade baseball team, or youth "Redskins 4-H Club." Rose Exs. 90, 79, 52. A photograph from the July 27, 1978 *Apache Scout* of the Apache Redskins little league baseball team is anything but "ironic." 2d Rose Ex. 171. Further, ***Defendants identify no protests, controversies, or complaints over these uses.*** These team name uses are not mere "differing opinions"; they undermine the very foundation of Defendants' claim that "Redskins," in the context of sports teams, was disparaging to a substantial composite of Native Americans in 1967-1990.[34]

### B.    Mainstream Native American Individuals and Organizations Supported The 1977 Redskins Halftime Show Honoring Native American Culture

Defendants argue (at 2-3 & 19) that Native American participation in the All-Indian Half-Time Marching Band and Pageant, held at a 1977 Redskins game on Thanksgiving Day, is not

---

make another important mark among our Navajo People and Nation"); *id.* 79 ("Seminole Tribe of Florida has sponsored its own team called the Redskins."); 2d Rose Ex. 172 (Apache: "The Redskins will still represent the tribe in another tournament to take place in Flagstaff."); *id.* Ex. 173 (Cherokee).

[34] Native American newspapers also used the term "redskin" to refer to Native Americans in 1967-1990, without any evidence of complaints from Native Americans. (PFI's SMF ¶19).

19

## FILED UNDER SEAL

proof that Native Americans did not object to the Redskins' name.   While PFI disagrees, Defendants miss the larger point: a major event like this, involving so many prominent Native American organizations and individuals—including NTCA, NIEA, the BIA, Haskell University, and various tribes and schools—would not have happened without objection if a substantial composite of Native Americans regarded the Washington Redskins' team name as disparaging. The record contains no evidence that any Native American individual or group, *including NCAI*, objected to Native American participation in the event—no op-ed pieces, letters to the editor, press releases, protests, or statements.   Defendants' expert Riding In admitted he searched for such evidence, but didn't find any. Rose Ex. 40 at 52:10-25, 91:8-92:2; *id.* 33:5-20, 78:8-79:1.

Defendants also try (at 18) to downplay the fact that NTCA and NIEA—two of the most prominent and well-respected Native American organizations (among many) endorsed Native American participation in the Redskins' halftime event by claiming that these organizations "lack the national prominence or significance of the NCAI." To the contrary, NTCA and NIEA were highly influential national Native American organizations that were, at minimum, on par with NCAI. *See supra* Part III.D.1 (describing nationwide prominence of NTCA and NIEA at the time). But this is largely academic—again, not even NCAI registered any objections.

## V.   DEFENDANTS' CLAIMS ARE BARRED BY LACHES

Finally, Defendants claim (at 20) that PFI ignored three "key arguments" on laches. Not so—PFI directly disposed of each. *See* PFI Br. 38 & nn.48-49 ("public interest" arguments do not apply to cancellation proceedings); *id.* 39 n.50 (no Defendant relied on pending *Harjo* proceeding); *id.* 40 & n.52 (*Bridgestone* standard, approved in *Ray*, is "continued investment in the late-attacked mark alone").

## CONCLUSION

PFI's motion should be granted and Defendants' motion should be denied.

## FILED UNDER SEAL

Dated: April 14, 2015

Respectfully submitted,

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
craig.reilly@ccreillylaw.com
THE LAW OFFICE OF CRAIG C. REILLY
111 Oronoco Street
Alexandria, Virginia 22314
Tel: (703) 549-5354
Fax: (703) 549-5355

Robert L. Raskopf (*pro hac vice*)
robertraskopf@quinnemanuel.com
Todd Anten (*pro hac vice*)
toddanten@quinnemanuel.com
Claudia T. Bogdanos (*pro hac vice*)
claudiabogdanos@quinnemanuel.com
Jessica A. Rose (*pro hac vice*)
jessicarose@quinnemanuel.com
Jennifer D. Bishop (*pro hac vice*)
jenniferbishop@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: (212) 849-7000
Fax: (212) 849-7100

*Counsel for Plaintiff Pro-Football, Inc.*

21

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2015, I caused the foregoing pleading or paper to be

filed and served electronically by the Court's CM/ECF system upon all registered users in this

action, including the following counsel of record:

Jesse A. Witten
Jeffrey J. Lopez
Adam Scott Kunz
Tore T. DeBella
Jennifer Criss
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Tel : (202) 842-8800
Fax : (202) 842-8465
Jesse.Witten@dbr.com
Jeffrey.Lopez@dbr.com
Adam.Kunz@dbr.com
Tore.DeBella@dbr.com
Jennifer.Criss@dbr.com


Dated: April 14, 2015
                              /s/  Craig C. Reilly
                              Craig C. Reilly, Esq. (VSB # 20942)
                              craig.reilly@ccreillylaw.com
                              THE LAW OFFICE OF CRAIG C. REILLY
                              111 Oronoco Street
                              Alexandria, Virginia 22314
                              Tel:  (703) 549-5354
                              Fax:  (703) 549-5355


FILED UNDER SEAL