IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

PRO-FOOTBALL, INC.,                     )
                                        )
    Plaintiff,                          )
                                        )
    v.                                  )     Case No. 1:14-cv-01043-GBL-IDD
                                        )
AMANDA BLACKHORSE, *et al.*,            )
                                        )
    Defendants.                         )

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on two sets of cross-motions for summary judgment. First, Plaintiff Pro-Football, Inc. ("PFI"), Defendants Amanda Blackhorse, Marcus Briggs-Cloud, Phillip Gover, Jillian Pappan, and Courtney Tsotigh ("Blackhorse Defendants"), and the United States of America filed cross-motions for summary judgment on PFI's claims challenging the constitutionality of Section 2(a) of the Lanham Act (Counts III–VI) (Docs. 54, 105, and 108). Second, Blackhorse Defendants and PFI filed cross-motions for summary judgment on PFI's claims contesting the Trademark Trial and Appeal Board's ("TTAB") Order cancelling the registrations of six of PFI's trademarks on the grounds that they consisted of matter that "may disparage" Native Americans and bring them into contempt or disrepute, and that the defense of laches does not bar the claims (Counts I, II, and VII) (Docs. 69 and 79). This case concerns Blackhorse Defendants' petition to cancel the registration of six trademarks owned by PFI on the grounds that the marks consisted of matter that "may disparage" a substantial composite of Native Americans and bring them into contempt or disrepute under Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), at the time of their registrations (1967, 1974, 1978, and 1990).

There are two issues before the Court. The first issue is whether the Court should grant PFI's Motion for Summary Judgment on Constitutional Claims and deny the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America. PFI makes the following arguments: (1) Section 2(a) of the Lanham Act violates the First Amendment by restricting protected speech, imposing burdens on trademark holders, and conditioning access to federal benefits on restrictions of trademark owners' speech; (2) Section 2(a) of the Lanham Act is unconstitutionally vague in violation of the Fifth Amendment because it does not provide notice as to which marks "may disparage," it authorizes arbitrary and discriminatory enforcement, and it is impermissibly vague as-applied to PFI; and (3) the TTAB Order violates the Due Process and Takings Clauses of the Fifth Amendment because it deprives PFI of its property without due process and constitutes an unconstitutional taking of PFI's property.

The second issue is whether the Court should grant PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and deny Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint where PFI argues that (1) the record does not establish by a preponderance of the evidence that a substantial composite of Native Americans believe that the Redskins Marks consisted of matter that "may disparage" them at the time of their registrations (1967, 1974, 1978, and 1990), and (2) the defense of laches bars Blackhorse Defendants' claims.

The Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America. With regard to PFI's First Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions

for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act does not implicate the First Amendment. Second, the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny.

With regard to PFI's Fifth Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act is not void for vagueness because (1) PFI cannot show that Section 2(a) is unconstitutional in all of its applications; (2) Section 2(a) gives fair warning of what conduct is prohibited; (3) Section 2(a) does not authorize or encourage "arbitrary and discriminatory enforcement"; and (4) Section 2(a) is not impermissibly vague as applied to PFI. Second, the Takings Clause and Due Process Clause claims fail because a trademark registration is not considered property under the Fifth Amendment.

The Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint. With regard to PFI's "may disparage" claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint because the (1) dictionary evidence; (2) literary, scholarly, and media references; and (3) statements of individuals and groups in the referenced group show that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period.

With regard to PFI's laches claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary

3

Judgment on Counts I, II, and VII of Complaint for two reasons. First, the "may disparage" claim is not barred by laches because Blackhorse Defendants did not unreasonably delay in petitioning the TTAB. Second, laches does not apply because of the public interest at stake.

## BACKGROUND

The "Washington Redskins" are a well-known professional football team. The "Redskins" mark was first used by the "Washington Redskins" National Football League ("NFL") franchise in 1933 when then-owner George Preston Marshall selected the name while the team was located in Boston, Massachusetts. "Redskins" was chosen to distinguish the football team from the Boston Braves professional baseball team.[1] (Compl. ¶ 35.) The team has used the name ever since. (*Id.* ¶ 34; Doc. 41 ¶ 34.) The United States Patent and Trademark Office ("PTO") approved and registered the mark in 1967. (Doc. 56 at 1.) Five additional variations of "Redskins" trademarks were approved and registered between 1974 and 1990 (collectively "Redskins Marks"). The registrations of the Redskins Marks have been renewed repeatedly since 1967, with the most recent renewal occurring in 2015.[2] (Doc. 51 ¶ 8(a)–(f)). PFI owns, and has always owned, the Redskins Marks. (*Id.*) The Redskins Marks are:

1. Registration No. 0836122 (registered September 26, 1967) for the mark THE REDSKINS (stylized), shown below, for "entertainment services—namely, football exhibitions rendered in stadia and through the media of radio and television broadcasts," in Class 41;

---

[1] "At the time the name 'Redskins' was chosen for the team, four players—Louis Weller, John Orien Crow, David Ward and Larry Johnson—and the team's head coach William "Lone Star" Dietz identified themselves as Native Americans." (Compl. ¶ 34.)

[2] Renewal is not a meritorious review of the registrability of trademark; instead it is merely an administrative mechanism to ensure that the trademark is current. To renew a trademark, the mark's owner must file a combined declaration of use and application for renewal with the PTO under Sections 8 and 9 of the Lanham Act, 15 U.S.C. §§ 1058–1059.



2. Registration No. 0978824 (registered February 12, 1974) for the mark WASHINGTON REDSKINS, in typed drawing form, for "entertainment services—namely, presentations of professional football contests," in Class 41;

3. Registration No. 0986668 (registered June 18, 1974) for the mark WASHINGTON REDSKINS and design, shown below, for "entertainment services—namely, presentations of professional football contests," in Class 41;



4. Registration No. 0987127 (registered June 25, 1974) for the mark THE REDSKINS and design, shown below, for "entertainment services—namely, presentations of professional football contests," in Class 41;



5. Registration No. 1085092 (registered February 7, 1978) for the mark REDSKINS, in typed drawing form, for "entertainment services—namely, presentations of professional football contests," in Class 41; and

6. Registration No. 1606810 (registered July 17, 1990) for the mark REDSKINETTES, in typed drawing form, for "entertainment services, namely, cheerleaders who perform dance routines at professional football games and exhibitions and other personal appearances," in Class 41.

The Redskins Marks have not evaded controversy. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2262 (2015) (Alito, J., dissenting) (describing the "Washington Redskins" as a controversial team name). For example, in 1971 and 1972, there were a host of newspaper articles detailing opposition to the name "Redskins" by some Native Americans. (Docs. 73-12–73-14; 73-29–73-38.) Similarly, in 1972 Leon Cook, President of the National Congress of American Indians ("NCAI"), among others, met with Edward Bennett Williams, the president of PFI, to explain that the team name was a slur; Williams reported the meeting to the NFL Commissioner the following day. (Doc. 71-3 at 5–6; Doc. 73-24 at 12–14; Doc. 73-25.) Also, a 1972 official game program referenced the controversy surrounding the team's name. (Doc. 72-5 at 6.)

The registrability of the Redskins Marks has been litigated for over two decades. In 1992, Susan Harjo and six other Native Americans filed a petition to cancel the registrations of the Redskins Marks under Section 2(a) of the Lanham Act. Seven years later, the TTAB ruled that the Redskins Marks "may disparage" Native Americans when registered and ordered that the registrations of the marks be cancelled. *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1999 WL 375907 (T.T.A.B. 1999). On appeal, the United States District Court for the District of Columbia reversed the TTAB, holding that (1) the TTAB's finding of disparagement was unsubstantiated, and (2) the doctrine of laches precluded consideration of the case.

The case traversed back and forth between the district court and the D.C. Circuit, with the final outcome being that D.C. Circuit affirmed the district court's ruling that laches barred the

claim.[3] *Pro-Football, Inc. v. Harjo*, 565 F.3d 880 (D.C. Cir. 2009). The D.C. Circuit never addressed the TTAB's finding of disparagement on the merits.

On August 11, 2006, while *Harjo* was pending, Amanda Blackhorse, Marcus Briggs-Cloud, Phillip Cover, Jillian Pappan, and Courtney Tsotigh ("Blackhorse Defendants") filed a petition to cancel the same six registrations of the Redskins Marks. The TTAB suspended action in the *Blackhorse* case until the *Harjo* litigation concluded in 2009. The parties here have agreed that the entire *Harjo* record could be entered into evidence in the case before the TTAB. The parties also waived all non-relevance evidentiary objections to that evidence.

On June 18, 2014, the TTAB scheduled the cancellation of the registrations of the Redskins Marks under Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), finding that at the time of their registrations the marks consisted of matter that both "may disparage" a substantial composite of Native Americans and bring them into contempt or disrepute. *See Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080, 2014 WL 2757516 (T.T.A.B. 2014). This action seeks a *de novo* review, pursuant to 15 U.S.C. § 1071(b), of the TTAB's decision, based on the TTAB *Blackhorse* record and the additional evidence the parties have submitted to this Court.

PFI asserts the following seven causes of action. In Count I, PFI seeks a declaration of non-disparagement. In Count II, PFI seeks a declaration of non-contempt or disrepute. Count III concerns PFI's claim that Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), violates the First Amendment. Count IV is PFI's claim that Section 2(a) of the Lanham Act is void for vagueness. Count V is PFI's claim that the TTAB Order violates the Due Process Clause of the Fifth Amendment. In Count VI, PFI claims that the TTAB Order violates the Takings Clause of the

---

[3] See *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96 (D.D.C. 2003), for the district court case initially reversing the TTAB; *Pro-Football, Inc. v. Harjo*, 415 F.3d 44 (D.C. Cir. 2005), for the D.C. Circuit case holding that the district court applied the wrong laches standard to at least one defendant; and *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46 (D.D.C. 2008), for the district court case holding that laches barred the disparagement claim.

Fifth Amendment. Lastly, Count VII is PFI's claim that Blackhorse's petition to cancel the registrations of the Redskins Marks was barred by the doctrine of laches.

PFI and Blackhorse Defendants filed cross-motions for summary judgment on PFI's constitutional claims (Counts III–VI) (Docs. 54 & 105). The United States of America intervened and filed a motion for summary judgment on PFI's constitutional claims (Doc. 108), defending the constitutionality of Section 2(a) of the Lanham Act. Additionally, PFI and Blackhorse Defendants filed cross-motions for summary judgment on PFI's Lanham Act and laches claims (Counts I, II, and VII) (Docs. 69 & 79). Each motion is now before the Court.

## STANDARDS OF REVIEW

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine issue of material fact for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247–48).

A "material fact" is a fact that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## B. Review of TTAB Decision

15 U.S.C. § 1071(b)(1) "permits a party in a trademark suit to initiate a civil action in the place of an appeal of the TTAB's determination to the Federal Circuit." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014). "In a § 1071(b) action, the district court reviews the record *de novo* and acts as the finder of fact. The district court has authority independent of the PTO to grant or cancel registrations and to decide any related matters such as infringement and unfair competition claims." *Id.* (citing 15 U.S.C. § 1071(b)(1); *Durox Co. v. Duron Paint Mfg. Co.*, 320 F.2d 882, 883–84 (4th Cir. 1963)). Where a party to such an action exercises its right to supplement the TTAB record, the Court gives no deference to the TTAB's findings. *Swatch*, 739 F.3d at 156.

## ANALYSIS

The Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America. With regard to PFI's First Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act does not implicate the First Amendment. Second, the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny.

With regard to PFI's Fifth Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act is not void for vagueness because (1) PFI cannot show that Section 2(a) is unconstitutional in all of its applications; (2) Section 2(a) gives fair warning of what conduct is prohibited; (3) Section 2(a) does not authorize or encourage "arbitrary and discriminatory enforcement"; and (4) Section 2(a) is not impermissibly vague as applied to PFI. Second, the Takings Clause and Due Process Clause claims fail because a trademark registration is not considered property under the Fifth Amendment.

The Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint. With regard to PFI's "may disparage" claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint because the (1) dictionary

10

evidence; (2) literary, scholarly, and media references; and (3) statements of individuals and groups in the referenced group show that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period.

With regard to PFI's laches claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint for two reasons. First, the "may disparage" claim is not barred by laches because Blackhorse Defendants did not unreasonably delay in petitioning the TTAB. Second, laches does not apply because of the public interest at stake.

## A. Trademark Registration vs. Trademarks Themselves

As a threshold matter, throughout the pleadings the parties conflated the legal principles surrounding trademarks with those surrounding trademark *registration*. Just as Allen Iverson once reminded the media that they were wasting time at the end of the Philadelphia 76ers' season "talking about *practice*" and not an actual professional basketball game,[4] the Court is similarly compelled to highlight what is at issue in this case—trademark registration, not the trademarks themselves. It is the registrations of the Redskins Marks that were scheduled for cancellation by the TTAB's decision, not the trademarks. In fact, the TTAB itself pointed out that it is only empowered to cancel the statutory *registration* of the marks under Section 2(a); it cannot cancel the trademarks themselves. *See Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080, 2014 WL 2757516, at *1 (T.T.A.B. 2014) (citation omitted). Thus, regardless of this Court's ruling, PFI can still use the Redskins Marks in commerce.

It is also important to identify the effect of federal trademark registration. A trademark is "any word, name, symbol, or device or any combination thereof used by any person to identify

---

[4] *See* ESPN, *Original Allen Iverson Practice Rant*, YOUTUBE (May 7, 2012), https://www.youtube.com/watch?v= d29VsG35DQM (emphasis in original).

and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Federal law does not create trademarks. *See In re Trade-Mark Cases*, 100 U.S. 82, 92 (1879). Regardless of whether a mark is registered, the "right to a particular mark grows out of its use, not its mere adoption . . . ." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) (citation omitted); *see also Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003) ("To acquire ownership of a trademark it is not enough to have invented the mark first *or even to have registered it first*; the party claiming ownership must have been the first to *actually use the mark* in the sale of goods or services." (emphasis added) (citation and internal quotation marks omitted)); 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 16:1 (4th ed. 2014) (same). Thus, use of a mark in commerce, by itself, creates a host of common law rights. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) (explaining scope of common law trademark rights); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 230 (4th Cir. 2002) ("Generally speaking, trademark protection is a common law right that arises from the use of a mark to identify the source of certain goods or services." (citation omitted)); *see also Spartan Food Sys. v. HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir. 1987); *Armand's Subway, Inc. v. Doctor's Assocs.*, 604 F.2d 849, 849 (4th Cir. 1979). The Lanham Act does, however, contain a cause of action for the enforcement of unregistered trademarks. *See* 15 U.S.C. § 1125(a).

The owner of a trademark can apply to register it with the PTO under the Lanham Act. *See* 15 U.S.C. § 1051. After reviewing an application, "[if] a trademark examiner believes that registration is warranted, the mark is published in the Official Gazette of the PTO" as well as the Principal Register. *B & B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1300 (2015) (citing

15 U.S.C. § 1062); *see also* 15 U.S.C. § 1057. Registration confers several benefits upon the owner of a mark in addition to those available at common law:

> (1) constructive notice of the registrant's claim of ownership of the trademark; (2) *prima facie* evidence of the validity of the registration, of the registrant's ownership of the mark, and of his exclusive right to use the mark in commerce as specified in the certificate; (3) the possibility that, after five years, registration will become [incontestable] and constitute conclusive evidence of the registrant's right to use the mark; (4) the right to request customs officials to bar the importation of goods bearing infringing trademarks; (5) the right to institute trademark actions in federal courts without regard to diversity of citizenship or the amount in controversy; and (6) treble damage actions against infringing trademarks and other remedies.

*Georator Corp. v. United States*, 485 F.2d 283, 285 (4th Cir. 1973) (citing 15 U.S.C. § 1051 *et seq.*), *abrogated on other grounds by NCNB Corp. v. United States*, 684 F.2d 285 (4th Cir. 1982). Incontestability and proof of ownership are among the most significant advantages of registration. *See Brittingham v. Jenkins*, 914 F.2d 447, 452 (4th Cir. 1990); *see also B & B Hardware*, 135 S. Ct. at 1300 ("The Lanham Act confers important legal rights and benefits on trademark owners who register their marks." (citation and internal quotation marks omitted)).

What is at issue here is the registration of the Redskins Marks and the benefits associated with registration, not the use of the marks.

## B. Constitutional Challenges

### 1. PFI's First Amendment Challenge Fails

With regard to PFI's First Amendment challenge (Count III), the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act does not implicate the First Amendment. Second, under the Supreme Court's decision in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), the Fourth Circuit's mixed/hybrid speech test, and *Rust v. Sullivan*, 500

U.S. 173 (1991), the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny.

### a. Cancellation of Trademark Registration Does Not Implicate PFI's First Amendment Rights

The Court GRANTS Blackhorse Defendants and the United States' cross-motions for summary judgment on the constitutional claims and DENIES PFI's Motion for Summary Judgment on Constitutional Claims as to PFI's First Amendment claim (Count III) because Section 2(a) of the Lanham Act does not implicate the First Amendment. Section 2(a) provides, in pertinent part, that a trademark shall be refused registration if it "consists of or comprises immoral, deceptive, or scandalous matter; or matter which *may disparage* or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute . . . ." 15 U.S.C. § 1052(a) (emphasis added).

The Federal Circuit and Fifth Circuit have both held that the PTO's refusal to register an applicant's mark does not infringe upon the mark owner's First Amendment rights as "[no] conduct is proscribed[] and no tangible form of expression is suppressed." *In re McGinley*, 660 F.2d 481, 484 (C.C.P.A. 1981); *see Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 578 n.9 (5th Cir. 2005); *see also In re Fox*, 702 F.3d 633, 640 (Fed. Cir. 2012) (affirming refusal to register mark under Section 2(a) because it was vulgar); *In re Boulevard Ent., Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003) (affirming refusal to register marks under Section 2(a) because they were immoral or scandalous); *Ritchie v. Simpson*, 170 F.3d 1092, 1099 (Fed. Cir. 1999) ("denial of federal registration of a mark does not prohibit the use of that mark"); *In re Mavety Media Grp.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994).

Nothing about Section 2(a) impedes the ability of members of society to discuss a trademark that was not registered by the PTO. Simply put, the Court holds that cancelling the

registrations of the Redskins Marks under Section 2(a) of the Lanham Act does not implicate the First Amendment as the cancellations do not burden, restrict, or prohibit PFI's ability to use the marks.

In support of its contention that Section 2(a) of the Lanham Act restricts speech, PFI cited a panoply of First Amendment cases in varying degrees of depth. The Court finds that many of the cases are distinguishable from the issue presented here as they involved a situation where speech was prohibited or burdened. For example, in *Clatterbuck v. City of Charlottesville*, 708 F.3d 549 (4th Cir. 2013), the Fourth Circuit held that a city ordinance which prohibited individuals from begging for money on Charlottesville's Downtown Mall was an unconstitutional restriction of protected speech. The present case does not concern a statute that prohibits or penalizes any speech as Section 2(a) of the Lanham Act does not restrict one's ability to engage in a particular form of speech.

PFI also cited *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), to argue that Section 2(a) burdens the speech of trademark holders. At issue in that case was a Vermont statute that prohibited, absent the prescriber's consent, pharmacies from selling prescriber-identifying information, pharmacies from disclosing that information for marketing purposes, and pharmaceutical manufacturers from using the information for marketing purposes. *See id.* at 2359–61. The Supreme Court found the statute was unconstitutional because the restrictions were content and speaker-based burdens on protected expression. This case is distinguishable from *Sorrell* for the same reason that is distinguishable from *Clatterbuck*: Section 2(a) does not restrict any protected expression.

PFI argues that the cancellation of the registrations of the Redskins Marks "affects PFI's message in the ongoing public debate about the Washington Redskins' team name," and what

PFI has to say in the debate is entitled to special protection under the First Amendment. (Doc.

56 at 7) (citing *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011)). *Snyder* is inapposite. *Snyder*

involved a question of whether the First Amendment protected Westboro Baptist Church's

("Westboro") notorious picketing of soldiers' funerals. A jury had previously found Westboro

liable under several state tort law claims for its picketing. The issue was whether the First

Amendment shielded Westboro from tort liability. The Court held that the First Amendment

precluded liability, explaining that Westboro's speech was in a public place on a matter of public

concern and that the First Amendment prohibited finding Westboro liable for its speech. Here,

there is no tort suit against PFI finding it liable for its speech. Section 2(a) does not so authorize.

The only remedy being sought is the cancellation of the registrations of the Redskins Marks. An

owner's ability to use the unregistered mark is unaffected.

PFI further contends that Section 2(a) of the Lanham Act should be closely scrutinized

because although it may not prohibit speech outright, it may drive ideas from the marketplace.

(Doc. 57 at 9) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502

U.S. 105, 116 (1991)). *Simon & Schuster* is distinguishable from this case as it involved a New

York statute that required publishers to pay a fee to the State Crime Victims Board for any

monies derived from the sales of books where criminals spoke of their conduct. *See Simon &*

*Schuster*, 502 U.S. at 116. Because statutes that impose a financial burden on a speaker based on

the content of their speech are unconstitutional, *see Leathers v. Medlock*, 499 U.S. 439, 447

(1991), the Supreme Court declared this New York Son of Sam law unconstitutional. The Court

finds PFI's unsuccessful attempt to map incongruent First Amendment jurisprudence onto the

Lanham Act unpersuasive as Section 2(a) imposes no financial penalty on speech—it simply

cancels a trademark's registration; the speech itself is uninhibited.

Explaining the importance of the First Amendment, the Supreme Court declared:

> The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern *without previous restraint or fear of subsequent punishment* . . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.

*Thornhill v. Alabama*, 310 U.S. 88, 101 (1940) (emphasis added). In this nation under our Constitution, there is a "profound national commitment to the principle that debate on public issues should be *uninhibited, robust, and wide-open* . . . ." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added) (citations omitted). It is axiomatic that the "constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . ." *Leathers*, 499 U.S. at 448–49 (citation and internal quotation marks omitted). Section 2(a) does nothing to offend these core constitutional principles.

Cancelling the registration of a mark under Section 2(a) of the Lanham Act does not restrict the public debate on public issues as the mark owner is still able to use the mark in commerce.[5] Accordingly, the Court agrees with the Federal Circuit and Fifth Circuit and holds that Section 2(a) of the Lanham Act does not implicate the First Amendment.

---

[5] The United States compared this issue to the common-law right to call one's self by a name of one's own choosing. (*See* Doc. 110 at 10–11.) Courts in California and New Mexico have both held that the denial of a name change request does not implicate the First Amendment as the petitioner may continue to call themselves whatever they please, regardless of whether the name warrants official approval. *See Petition of Variable for Change of Name v. Nash*, 144 N.M. 633, 635 (N.M. Ct. App. 2008); *Lee v. Superior Court*, 9 Cal. App. 4th 510 (Cal. 1992). The United States also cited another state court case, *In re Bacharach*, 344 N.J. Super. 126 (2001), where the court held that courts may reject name change requests on the ground that the name may be considered racist. *Id.* at 132. While certainly not binding, the Court finds these cases persuasive.

### b. The Federal Trademark Registration Program is Government Speech and is Exempt from First Amendment Scrutiny

The Court GRANTS Blackhorse Defendants and the United States' cross-motions for summary judgment on the constitutional claims and DENIES PFI's Motion for Summary Judgment on Constitutional Claims as to PFI's First Amendment claim (Count III) because the federal trademark registration program is government speech and is thus exempt from First Amendment scrutiny.

As an initial matter, the Court finds that the federal trademark registration program is not commercial speech. Commercial speech is defined as "speech that does no more than propose a commercial transaction." *Harris v. Quinn*, 134 S. Ct. 2618, 2639 (2014) (citations and internal quotation marks omitted); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (noting that the proposal of a commercial transaction is "*the test* for identifying commercial speech" (citation and internal quotation marks omitted)); *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915, 917–18 (7th Cir. 1984) (explaining that the "hallmark of commercial speech" is that it "pertains to commercial transactions," including those "facilitated through the use of a trademark"). Marks approved through the federal trademark registration program are published in the Official Gazette of the PTO and the Principal Register in order to inform the public of marks registered with the federal government. The Principal Register does not propose a commercial transaction and therefore is not commercial speech.[6]

Both Blackhorse Defendants and the United States argue that the federal trademark registration program is government speech, while PFI contends that the program is a restriction of private speech. The Court holds that the program is government speech for three reasons.

---

[6] A trademark, however, is commercial speech. Because trademarks are source-identifiers that "reduce the customer's cost of shopping and making purchasing decisions," *Dastar Corp. v. Twentieth Century Film Corp.*, 539 U.S. 23, 34 (2003), they necessarily pertain to commercial transactions and are thus commercial speech under *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993).

The Court finds that the factors articulated in the Supreme Court's decision in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), and the Fourth Circuit's mixed/hybrid speech test in *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles (SCV)*, 288 F.3d 610, 616 (4th Cir. 2002), weigh in favor of a finding that the federal trademark registration program is government speech. Furthermore, under *Rust v. Sullivan*, 500 U.S. 173 (1991), the federal trademark registration program is constitutional because the federal government may determine the contents and limits of programs that it creates and manages.

i. *Walker* Test

The Court finds that the federal trademark registration program is government speech under the Supreme Court's decision in *Walker*. *Walker* involved Texas' specialty license plate program. Groups may propose license plate designs with a slogan, graphic, or both, to the Department of Motor Vehicles Board ("the Board"). *Walker*, 135 S. Ct. at 2243. The Board "may refuse to create a new specialty license plate" for many reasons, including "if the design might be offensive to any member of the public . . . or for any other reason established by rule." TEX. TRANSP. CODE ANN. § 504.801(c). If approved, the license plate design becomes available for Texans to select and place on their vehicles. *See Walker*, 135 S. Ct. at 2243.

In 2009, the Sons of Confederate Veterans, Texas Division ("S.C.V. Texas"), applied to sponsor a specialty plate with a design that included a picture of the Confederate flag. *Id.* at 2245. The Board rejected the design because many members of the general public found the Confederate flag portion of the design to be offensive. *Id.* In 2012, S.C.V. Texas filed a federal lawsuit against the Board, claiming that its decision violated the First Amendment's Free Speech Clause. The district court entered judgment for the Board, while a Fifth Circuit panel held that

license plate designs are private speech and by rejecting S.C.V. Texas' design, the Board engaged in constitutionally forbidden viewpoint discrimination. *See id.*

The Supreme Court reversed the Fifth Circuit and held that Texas' specialty license plate program is government speech. The Court found that the program was government speech for three reasons. First, history shows that "insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States." *Id.* at 2248 (citation omitted). Second, the public closely associates official state license plate designs with the state. *Id.* The Court further explained that Texas license plates "are[] essentially government IDs" and issuers of IDs "'typically do not permit' the placement on their IDs of 'messages with which they do not wish to be associated.'" *Id.* at 2249 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 471 (2009)). Third, Texas maintains "direct control" over the message conveyed on the plates as the Board must approve every specialty plate design. The Board has "actively exercised this authority" by rejecting designs. *Walker*, 135 S. Ct. at 2249. "This final approval authority allows Texas to choose how to present itself and its constituency." *Id.*

Here, the federal trademark program is government speech under the Supreme Court's analysis in *Walker*. The first *Walker* factor weighs in favor of government speech as registry with the federal trademark registration program communicates the message that the federal government has approved the trademark. *See* 15 U.S.C. §§ 1072, 1127. The second *Walker* factor weighs in favor of government speech because the public closely associates federal trademark registration with the federal government as the insignia for federal trademark registration, ®,[7] is a manifestation of the federal government's recognition of the mark.

---

[7] The owner of a federally registered trademark is not required to display the ® symbol with the trademark. *See* 15 U.S.C. § 1111.

Finally, the third *Walker* factor weighs in favor of government speech because the federal government exercises editorial control over the federal trademark registration program. Section 2 of the Lanham Act empowers the PTO to deny or cancel a mark's registration, and thus control what appears on the Principal Register, on a number of grounds, including any mark that:

> (b) Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof;
>
> (c) Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States . . .;
>
> (d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely . . . to cause confusion . . . ;
>
> (e) Consists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them, (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive . . . . (4) is primarily merely a surname, or (5) comprises any matter that, as a whole, is functional.

15 U.S.C. § 1052(b)–(e).[8] Parties constantly litigate whether the TTAB properly exercised its discretion in cancelling or denying a mark's registration under § 1052. *See, e.g., Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960 (Fed. Cir. 2015); *In re Trivita, Inc.*, 783 F.3d 872 (Fed. Cir. 2015); *In re Geller*, 751 F.3d 1355 (Fed. Cir. 2014).

Sitting en banc, the Fifth Circuit held that, "[T]he First Amendment does not prohibit the government, itself, from speaking, nor require the government to speak. Similarly, the First Amendment does not preclude the government from exercising editorial discretion over its own

---

[8] Section 2(a) allows the PTO to cancel the registration of a mark that, among other things, "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute . . . ." Because the constitutionality of Section 2(a) is at issue, it was omitted from the Court's analysis.

medium of expression." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1044 (5th Cir. 1982) (citations omitted). By approving or denying registrations under Section 2(a) of the Lanham Act, the government is merely exercising editorial discretion over what is published in the Official Gazette of the PTO and in the Principal Register. Accordingly, the Court finds that the third *Walker* factor weighs in favor of finding that the federal trademark registration program is government speech.

Because all three *Walker* factors weigh in favor of government speech, the Court finds that the federal trademark registration program is government speech.

### ii. Fourth Circuit's Mixed/Hybrid Speech Test

The federal trademark registration program also qualifies as government speech under the Fourth Circuit's mixed/hybrid speech test. In *SCV*, 288 F.3d 610 (4th Cir. 2002), the Fourth Circuit identified four instructive factors courts should look to in determining whether speech is that of the government:

(1) "the central purpose of the program in which the speech in question occurs";

(2) "the degree of editorial control exercised by the government or private entities over the content of the speech";

(3) "the identity of the literal speaker"; and

(4) "whether the government or the private entity bears the ultimate responsibility for the content of the speech[.]"

*SCV*, 288 F.3d at 618 (citations and internal quotation marks omitted).

The Court finds that the first factor, the central purpose of the program in which the speech in question occurs, weighs in favor of finding that the speech at issue here is government

speech. The government has long played a role in protecting trademarks.[9] *See B & B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1299 (2015). In 1946, Congress created the Lanham Act in order to protect trademarks used in interstate and foreign commerce. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985) (citation omitted). The Lanham Act's federal trademark registration program was created to help protect marks. *See B & B Hardware*, 135 S. Ct. at 1299–1300.

The Fourth Circuit's analysis of the "central purpose" factor in *ACLU v. Tata*, 742 F.3d 563 (4th Cir. 2014), *vacated, Berger v. ACLU of N.C.*, No. 14-35, 2015 WL 2473457 (U.S. June 29, 2015), is particularly instructive. *Tata* concerned a question of whether North Carolina's specialty license plate program, including a "Choose Life" license plate, was government or private speech. The court found that because the central purpose of the program was "to allow North Carolina drivers to *express* their affinity for various special interests," the purpose of the program weighed in favor of finding the speech at issue private. *Id.* at 572–73 (emphasis added); *see also SCV*, 288 F.3d at 619–20 (reasoning that the Virginia specialty plate program was in-part private speech because it allowed for "the private *expression* of various views" (emphasis

---

[9] Describing the government's role in administering the federal trademark registration program, the Court of Customs and Patent Appeals explained:

> Once a registration is granted, the responsibilities of the government with respect to a mark are not ended. The benefits of registration, in part with government assistance, include public notice of the mark in an official government publication and in official records which are distributed throughout the world, maintenance of permanent public records concerning the mark, availability of the Customs Service for blocking importation of infringing goods, access to federal courts where there is a presumption of validity of the registration (*e.g.*, that the mark is not immoral or scandalous), notices to the registrant concerning maintenance of the registration, and, to some extent, direct government protection of the mark in that the PTO searches its records and refuses registrations to others of conflicting marks. Apart from nominal fees, these costs are underwritten by public funds.

*In re McGinley*, 660 F.2d 481, 486 (C.C.P.A. 1981).

added)); *cf. Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 789–93 (4th Cir. 2004) (finding that the central purpose of South Carolina's "Choose Life" license plate program was to "promote [South Carolina's] preference for the pro-life position," rendering it government speech).

Here, the purpose of the program is not for the expression of private views or interests. Such expression would lay in the creation of the mark itself, which is done by the owner by using the mark in commerce. Instead, the purpose of the federal trademark registration program is to provide federal protection to trademarks, in part achieved by providing notice to the public of what trademarks are registered through the Principal Register. *See* 15 U.S.C. §§ 1072, 1127. When the symbol for a federally registered trademark, ®, is affixed to a mark, it is a declaration by the federal government that it has approved that mark. Accordingly, the Court finds that the purpose of the program weighs towards it being considered government speech.

The Eighth Circuit's decision in *Knights of the KKK v. Curators of the Univ. of Mo.*, 203 F.3d 1085 (8th Cir. 2000), supports this conclusion. That case involved an effort by the KKK to be recognized during the local National Public Radio ("NPR") station's underwriting acknowledgements. In finding that the underwriting acknowledgements are government speech, the court held that the acknowledgments are the station "speaking" by "airing its acknowledgments of funds received from certain parties to pay for specific" broadcasts. *Id.* at 1093. Just as the NPR station spoke by airing its acknowledgements, here the federal government speaks by declaring what trademarks it deems registrable.

The Court finds that the second factor, the degree of editorial control exercised by the government or private entities over the content of the speech, also weighs in favor of government speech. *SCV* is instructive here. In *SCV*, the Fourth Circuit found that Virginia did not assert

24

editorial control over the content of specialty plates because the Commissioner of the Virginia Department of Motor Vehicles rarely exercised his statutory discretion to reject a given plate design. 288 F.3d at 620–21. Also, courts have found that companies did not exercise editorial control over a sign erected by a city that thanked them, individually by name, for their sponsorship; the court instead found that editorial control was asserted by the city because the city decided which companies to place on the sign. *See Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1142 (10th Cir. 2001).

As explained above in the editorial control analysis under *Walker*, the PTO regularly rejects applications for registration on grounds enumerated in Section 2 of the Lanham Act. Accordingly, the Court finds that the second *SCV* factor weighs in favor of government speech.

The Court finds that the third factor, the identity of the literal speaker, weighs in favor of government speech. The Official Gazette of the PTO and the Principal Register are published by the PTO. Because the government is the literal speaker, this factor weighs in favor of finding the federal trademark registration program to be government speech.

The Court finds that the fourth factor, whether the government or the private entity bears the ultimate responsibility for the content of the speech, weighs in favor of private speech. When a trademark's federal registration is challenged, it is the mark owner, not the government, who must defend it. Moreover, in deciding this factor courts have considered whether the private entity had to apply or pay to avail itself to the benefits of a program. *See, e.g., ACLU v. Tata*, 742 F.3d 563, 574 (4th Cir. 2014), *vacated, Berger v. ACLU of N.C.*, No. 14-35, 2015 WL 2473457 (U.S. June 29, 2015); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 793–94 (4th Cir. 2004); *cf. Wells*, 257 F.3d at 1142 (finding that the fourth factor weighed in favor of a

sign being government speech because the city paid for security guards and video cameras to guard the display).

Here, the mark owners file an application for registration with the PTO. 15 U.S.C. § 1051. An application to register a mark must include, among other things, "the date of the applicant's first use of the mark, the date of the applicant's first use of the mark in commerce, the goods in connection with which the mark is used, and a drawing of the mark." § 1051(a)(2). If a party petitions to cancel the registration of a mark, it is the mark owner who must defend it in the subsequent litigation. *See Wells*, 257 F.3d at 1142 ("As to the final . . . factor, this litigation is itself an indication that the City bears the ultimate responsibility for the content of the display.").

Because the mark owners apply to avail themselves of the benefits of the federal trademark program and defend the registration of their marks in any subsequent litigation, the Court finds that the fourth factor weighs in favor of finding private speech.

Applying *SCV*'s instructive factors, the Court concludes that because three of the four factors weigh in favor of finding government speech, the federal trademark registration program is government speech. *Cf. ACLU v. Tata*, 742 F.3d 563, 574 (4th Cir. 2014) (concluding that speech was private after finding that three of the four *SCV* factors weighed in favor of finding the speech at issue to be private speech).

### iii. Government May Determine Contents and Limits of Its Programs

The Court holds that the federal trademark registration program is constitutional because under *Rust v. Sullivan*, 500 U.S. 173 (1991), the government may determine the contents and limits of its programs. In *Rust*, the Supreme Court considered whether regulations restricting the use of funds by grantees under Title X of the Public Health Act, 42 U.S.C. §§ 300–300a-6 violated the First Amendment. *Id.* The regulations prohibited doctors from engaging in abortion counseling, referral, and activities advocating abortion as a means of family planning in Title X

26

projects. *See* 42 U.S.C. § 300a-6. They were free to perform abortions and engage in abortion advocacy through programs that were independent from their Title X projects. 42 C.F.R. § 59.9 (1989).

After considering a viewpoint discrimination challenge to the regulations, the Court upheld them because they were "designed to ensure that the limits of the federal program are observed."[10] *Rust*, 500 U.S. at 193. The Court explained that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194. The Government can "selectively fund a program to encourage certain *activities it believes to be in the public interest*, without at the same time funding an alternative program" without violating the Constitution. *Id.* at 193 (emphasis added). Moreover, a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.* (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983) (internal quotation marks omitted)). "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *Rust*, 500 U.S. at 193 (quoting *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) (internal quotation marks omitted)).

According to the Fourth Circuit, "*Rust* stands for the principle that when the government creates and manages its own program, it may determine the contents and limits of that program" without violating the First Amendment. *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 796 (4th Cir. 2004) ("There is no First Amendment problem, for example, when a public school makes content-based decisions about its curriculum [] or when a public museum decides to display one work of art as opposed to another[.]" (citations omitted)). This is so because when

---

[10] "In *Rust* the Court 'did not place explicit reliance on the rationale that the counseling activities of the doctors . . . amounted to government speech; when interpreting the holding in later cases, however, [it] . . . explained *Rust* on this understanding.'" *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 796 (4th Cir. 2004) (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001)).

the government speaks to promote its own policies or advocate for a particular idea, it is ultimately the electorate who holds the government accountable. *See Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

The Supreme Court's decision in *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc. (Open Society)*, 133 S. Ct. 2321 (2013), also provides this Court with guidance. *Open Society* involved a federal grant program to help fund the fight against HIV/AIDS. Distribution of grant funds was contingent upon applicants adopting a "policy explicitly opposing prostitution and sex trafficking." *Id.* at 2324. In holding that requirement unconstitutional under the First Amendment, the Court stated that the mandate required the grantee to "pledge allegiance to the Government's policy of eradicating prostitution," even during times when grant funds were not being used. *Id.* at 2332. Because the requirement affected "protected conduct outside the scope of the federally funded program," *Rust*, 500 U.S. at 197, it was ruled unconstitutional.

Here, the federal trademark registration program's requirement that a mark cannot receive federal trademark protection if it "may disparage" is well within the constitutional boundaries set forth in *Rust* and reaffirmed in *Open Society*. PFI's suggestion that this requirement is beyond the scope of the program demonstrates a fundamental misunderstanding of the Supreme Court's decision in *Rust* and the Fourth Circuit's opinion in *Planned Parenthood*: when the government creates and manages its own program, it may determine the contents and limits of that program.[11] Congress has decided that marks that "may disparage" shall not receive the benefits of federal registration. It is well within its power to do so. Affirming the denial of federal registration of a mark under Section 2(a), the United States Court of Customs and Patent Appeals, the Federal Circuit's predecessor, stated:

---

[11] *See supra* n.9 (describing the responsibilities of the government in the trademark registration program).

> In providing that marks comprising scandalous matter not be registered, Congress expressed its will that such marks not be afforded the statutory benefits of registration. We do not see this as an attempt to legislate morality, but, rather, *a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government.*

*In re McGinley*, 660 F.2d 481, 486 (C.C.P.A. 1981) (emphasis added); *see also In re Fox*, 702 F.3d 633, 640 (Fed. Cir. 2012) (observing that the denial of registration means that the applicant will not be able to "to call upon the resources of the federal government in order to enforce that mark").

Similar to how the doctors in *Rust* could engage in abortion related-activities through programs independent of their Title X projects, mark owners are free to use marks that "may disparage" outside of the federal trademark registration program. Participation in the program is not compulsory. As stated earlier, the right to trademark protection arises in common law and is not a creature of the federal government. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 230 (4th Cir. 2002). Accordingly, the Court holds that it is within the discretion of the federal government to deny registration to marks that "may disparage."

In conclusion, the Court holds that the federal trademark registration program is government speech under the government speech tests set forth by the Supreme Court in *Walker* and the Fourth Circuit in *SCV*, and the Supreme Court's decision in *Rust*. The Free Speech clause does not regulate government speech, *see Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009), and government speech is exempt from First Amendment scrutiny. *See Johanns v. Livestock Mktg. Assn.*, 544 U.S. 550, 553 (2005). Because the federal trademark registration program is government speech, it is exempt from First Amendment scrutiny. Accordingly, the Court holds that as to PFI's First Amendment claim (Count III), PFI's Motion for Summary Judgment on Constitutional Claims must be DENIED and Blackhorse Defendants

and the United States' cross-motions for summary judgment on the constitutional claims must be GRANTED.

## 2. PFI's Fifth Amendment Challenge Fails

With regard to PFI's Fifth Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment on the constitutional claims filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act is not void for vagueness because (1) PFI cannot show that Section 2(a) is unconstitutional in all of its applications; (2) Section 2(a) gives fair warning of what conduct is prohibited; (3) Section 2(a) does not authorize or encourage "arbitrary and discriminatory enforcement"; and (4) Section 2(a) is not impermissibly vague as applied to PFI. Second, the Takings Clause and Due Process Clause claims fail because a trademark registration is not considered property under the Fifth Amendment.

### a. Section 2(a) of the Lanham Act is Not Void for Vagueness

The Court holds that Section 2(a) of the Lanham Act is not void for vagueness. PFI asserts both a "facial" and an "as-applied" constitutional challenge to Section 2(a) on the basis that it is vague. A statute is void for vagueness under the Fifth Amendment's Due Process Clause when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The void-for-vagueness doctrine ensures that statutes and regulations give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Economic regulation is "subject to a less strict vagueness test." *Id.* Moreover, "[t]he Court has also expressed greater tolerance of enactments with civil, rather than criminal, penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99; *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) (noting that criminal statutes are subject to more stringent void-for-vagueness reviews); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004) (citations omitted) ("vagueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation").

In this case, Section 2(a) of the Lanham Act does not prohibit speech, nor does it impose civil or criminal penalties. Accordingly, the Court now applies a relaxed vagueness review standard. *See Finley*, 524 U.S. at 589.

### i. Facial Void-for-Vagueness Challenge

The Court holds that PFI's facial void for vagueness challenge fails because PFI cannot show that Section 2(a) is unconstitutional in all of its applications. Under *United States v. Salerno*, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the [statute] would be valid." *Id.* at 745; *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Because PFI cannot possibly demonstrate that every conceivable set of words, symbols, or combination thereof would be invalid under Section 2(a), PFI's facial void-for-vagueness challenge must fail.

## ii. Fair Warning

The Court holds that Section 2(a) gives "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The Constitution does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Courts will look to dictionary definitions to help determine whether a statute is impermissibly vague. *See Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012).

Section 2(a) states that a mark "shall be refused registration on the principal register" if it "consists of or comprises . . . matter which may disparage . . . persons." 15 U.S.C. § 1052(a). The Court holds that this language gives fair warning as to what it governs. Not only do the parties agree that at the time the Lanham Act was enacted, multiple dictionaries contained "materially identical definitions of 'disparage,'" (Doc. 56 at 19 n.14), but the Supreme Court has used the term in its Establishment Clause jurisprudence. Setting forth the test under the Establishment Clause to determine the scope of prayer permitted to commence a legislative session, the Court held, "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, *or to disparage any other*, faith or belief." *Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983) (emphasis added); *see also Town of Greece v. Galloway*, 134 S. Ct. 1811, 1823–24 (2014) (applying *Marsh* disparagement test). If the Supreme Court found "disparage" to be an appropriate term to use in a test for the Establishment Clause as recently as last year, the Court declines PFI's invitation to now find the term vague in the context of trademark registration.

### iii. Arbitrary and Discriminatory Enforcement

The Court holds that the Lanham Act does not authorize or encourage "arbitrary and discriminatory enforcement" of Section 2(a). A statute authorizes or encourages arbitrary and discriminatory enforcement when there are minimal guidelines that indicate what the law applies to. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation and internal quotation marks omitted); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Contrary to PFI's contention, the Court finds that the PTO sets forth sufficient guidelines that identify which matters "may disparage" under Section 2(a). Among other things, the PTO publishes the letters of Examining Attorneys' decisions to approve or deny registration on its website. The PTO has also published instructions for Examining Attorneys in its Trademark Manual of Examining Procedure ("T.M.E.P."). (*See* Doc. 106 at 23.) T.M.E.P. § 1203(b) addresses the "may disparage" portion of Section 2(a). Furthermore, the PTO has published a definition of its test for disparagement in a precedential decision.[12] *See Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1999 WL 375907, at *35 (T.T.A.B. 1999).

The Court finds that these guidelines are sufficient to identify which matters "may disparage" under Section 2(a) and thus do not authorize or encourage arbitrary and discriminatory enforcement.

### iv. Vagueness as-applied to PFI

The Court holds that Section 2(a) is not impermissibly vague as applied to PFI because PFI had reason to know that its marks "may disparage" when they were initially registered. PFI argues that "[w]ith only the vague text of Section 2(a) to guide it, PFI could not have reasonably understood that the Redskins Marks would fall within the purview of Section 2(a)." (Doc. 56 at

---

[12] A trademark consists of matter that "may disparage" if the matter might "dishonor by comparison with what is inferior, slight, deprecate, degrade, or affect or injure by unjust comparison." *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1999 WL 375907, at *35 (T.T.A.B. 1999).

22.) However, when it applied to register the Redskins Marks, PFI was fully on notice that its marks contained matter that "may disparage." Several dictionaries before and during the time PFI obtained its registrations stated that "redskin" is an offensive term. (Doc. 56 at 2, ¶ 1.) In fact, PFI's expert linguist, David Barnhart, stated that in 1967, 1975, and 1985 the term "redskin" "certainly might be offensive." (*Id.* ¶ 5.)

Further, the PTO has shown no inconsistency regarding "redskins" as a term that "may disparage." Since 1992, Examining Attorneys have refused at least twelve applications because "redskins" "may disparage." *See* Thompson Decl. Exs. 1–12. Seven of the refusals involved PFI applications for registration. *See id.* Exs. 1–7.

Because PFI has known since 1967, based at least on contemporary dictionary definitions, that its marks using the term "redskin" "may disparage" and because it has failed to show a pattern of inconsistency at the PTO, the Court holds that Section 2(a) is not impermissibly vague as-applied to PFI.

In sum, the Court holds that Section 2(a) of the Lanham Act is not void for vagueness for four reasons. First, because PFI has not supported a facial void-for-vagueness challenge. Second, because Section 2(a) gives fair warning to the conduct under its purview. Third, because the PTO's guidelines concerning what "may disparage" neither encourage nor authorize arbitrary and discriminatory enforcement. Fourth, because PFI has not supported an as-applied vagueness challenge.

Accordingly, regarding PFI's claim that Section 2(a) of the Lanham Act is void for vagueness (Count IV), the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment on the constitutional claims filed by Blackhorse Defendants and the United States of America.

34

### b. PFI's Takings Clause and Due Process Clause Claims Fail

The Court holds that PFI's Takings Clause and Due Process Clause claims fail because PFI has no property interest in the registration of its marks. "The Takings Clause prohibits the taking of private property for public use, without just compensation." *Cherry v. Mayor of Baltimore City*, 762 F.3d 366, 374 (4th Cir. 2014) (citing U.S. CONST. AMENDS. V, XIV). The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST. AMEND. V.

In *In re Int'l Flavors & Fragrances Inc.*, 183 F.3d 1361, 1366 (Fed. Cir. 1999), the Federal Circuit held that a trademark registration (as opposed to the underlying trademark) does not constitute a property interest under the Fifth Amendment.[13] Because PFI has no property interest in the registration of its marks as the Redskins Marks' registrations are not property under the Fifth Amendment, PFI's Takings Clause and Due Process Clause claims must fail. Accordingly, as to PFI's Takings Clause (Count VI) and Due Process Clause (Count VII) claims, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America.

### C. Lanham Act Challenges

With regard to PFI's "may disparage" claim (Count I), the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint because the (1) dictionary evidence, (2) literary, scholarly, and media references, and (3) statements of individuals and groups in the referenced group show that the Redskins Marks consisted of matter that "may

---

[13] As has been repeated several times, mark owners retain ownership of their trademarks even once the registration has been cancelled. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

disparage" a substantial composite of Native Americans during the relevant time period (1967, 1974, 1978, and 1990).

Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), provides that registration should be denied to any mark that "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt or disrepute . . . ." *Id.* The TTAB has established a two-part test to determine whether a mark contains matter that "may disparage." The parties agree that the test in this case is as follows:

1. What is the meaning of the matter in question, as it appears in the marks and as those marks are used in connection with the goods and services identified in the registrations?

2. Is the meaning of the marks one that may disparage Native Americans?

*See Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080, 2014 WL 2757516, at *4 (T.T.A.B. 2014) (citations omitted); *see also In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014). This inquiry focuses on the registration dates of the marks at issue. *Blackhorse*, 2014 WL 2757516, at *4 (citations omitted). Here, the registration dates are 1967, 1974, 1978, and 1990.

When answering the second question, whether the term "redskins" "may disparage" Native Americans, courts should look to the views of Native Americans, not those of the general public. *Id.* Moreover, Blackhorse Defendants are only required to show that the marks "may disparage" a "substantial composite" of Native Americans. *See Geller*, 751 F.3d at 1358 (citations omitted). A substantial composite is not necessarily a majority. *See In re Boulevard Ent., Inc.*, 334 F.3d 1336, 1340 (Fed. Cir. 2003) (citing *In re McGinley*, 660 F.2d 481, 485 (C.C.P.A. 1981)); *In re Mavety Media Grp.*, 33 F.3d 1367, 1370 (Fed. Cir. 1994) (citation omitted).

Courts consider dictionary evidence when determining whether a term "may disparage" a substantial composite of the referenced group. In *In re Boulevard*, the Federal Circuit held that when a mark has only *"one pertinent meaning*[,] *a standard dictionary definition and an accompanying editorial designation alone* sufficiently demonstrate[] that a substantial composite of the general public" considers a term scandalous. 334 F.3d 1336, 1340–41 (Fed. Cir. 2003) (emphasis added) (citing 15 U.S.C. § 1052(a)) (finding that a mark had one "pertinent meaning" when all of the dictionaries consulted contained usage labels characterizing a term as "vulgar").

Courts can use usage labels to decide whether a term "may disparage" a specific referenced group, as opposed to the general public in Section 2(a) "scandalous" actions, because usage labels denote when words are disparaging or offensive to the group referenced in the underlying term. *See, e.g., Symbols and Labels Used in Oxford Learner's Dictionaries*, OXFORD LEARNER'S DICTIONARIES, http://www.oxfordlearnersdictionaries.com/us/about/labels (last visited July 6, 2015) ("offensive expressions are used by some people to address or refer to people in a way that is very insulting, especially in connection with their race, religion, sex or disabilities").

Thus, using a dictionary's usage labels to determine whether a term "may disparage" a substantial composite of Native Americans during the relevant time period is consistent with the Federal Circuit's holding in *Boulevard*. *See In re Fox*, 702 F.3d 633, 635 (Fed. Cir. 2012) ("But where it is clear from dictionary evidence that the mark as used by the applicant in connection with the products described in the application invokes a vulgar meaning to a substantial composite of the general public, the mark is unregistrable." (citation and internal quotation marks omitted)); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008) ("It has been held that, at least as to offensive matter, dictionary evidence alone

can be sufficient to satisfy the USPTO's burden, where the mark has only one pertinent meaning." (citing *Boulevard*, 334 F.3d at 1340–41)).

However, when dictionaries are not unanimous in their characterization of a term, additional evidence must be adduced to satisfy the PTO's burden. Reversing the TTAB's finding that a mark was scandalous based *solely* on discordant dictionary characterizations, the Federal Circuit explained:

> In view of the existence of such an alternate, *non-vulgar definition*, the Board, *without more*, erred in concluding that in the context of the adult entertainment magazine, the substantial composite of the general public would necessarily attach to the mark BLACK TAIL the vulgar meaning of "tail" as a female sexual partner, rather than the admittedly non-vulgar meaning of "tail" as rear end. *In the absence of evidence as to which of these definitions the substantial composite would choose*, the PTO failed to meet its burden of proving that Mavety's mark is within the scope of § 1052(a) prohibition.

*Mavety Media Grp.*, 33 F.3d at 1373–74 (emphasis added).

## 1. The Meaning of the Matter in Question is a Reference to Native Americans

The Court finds that the meaning of the matter in question in all six Redskins Marks—the term "redskins" and derivatives thereof—is a reference to Native Americans. PFI admits that "redskins" refers to Native Americans. The team has consistently associated itself with Native American imagery. First, two of the Redskins Marks contain an image of a man in profile that alludes to Native Americans, including one that also has a spear[14] that alludes to Native Americans. Registration No. 0986668 (left) and Registration No. 0987127 depict:

---

[14] *See generally How Native American Spears Have Been Used Through History*, INDIANS.ORG, http://www. indians.org/articles/native-american-spears.html (last visited July 6, 2015).

# WASHINGTON





# REDSKINS

Second, the team's football helmets contain an image of a Native American in profile:



*See Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080, 2014 WL 2757516, at *8 (T.T.A.B. 2014) (citation omitted). Third, the team's marching band wore Native American headdresses as part of their uniforms from at least 1967–1990:



*Id.; see also* Criss Decl. Ex. 118 at 0:51–1:30; Ex. 130, 132–37. Fourth, as shown below, the Redskins cheerleaders, the "Redskinettes," also dressed in Native American garb and wore stereotypical black braided-hair wigs:[15]

**DANCING INDIANS**



Here are the Redskinettes all decked out in their Indian garb and carrying Burgundy and Gold pom-poms. The girls were THE entertainment hit in their debut last Sunday

*Blackhorse*, 2014 WL 2757516, at \*8. Lastly, Washington Redskins' press guides displayed Native American imagery:





*Id.*

As stated by the TTAB in *Harjo* and confirmed by the D.C. District Court:

---

[15] *See generally* MAUREEN TRUNDLE SCHWARZ, FIGHTING COLONIALISM WITH HEGEMONIC CULTURE: NATIVE AMERICAN APPROPRIATION OF INDIAN STEREOTYPES (2013).

> This is not a case where, through usage, the word "redskin(s)" has lost its meaning, in the field of professional football, as a reference to Native Americans in favor of an entirely independent meaning as the name of a professional football team. Rather, when considered in relation to the other matter comprising at least two of the subject marks and as used in connection with respondent's services, "Redskins" clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word.

*Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 127 (D.D.C. 2003) (quoting *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1999 WL 375907, at *41 (T.T.A.B. 1999)). The Court agrees and finds that because PFI has made continuous efforts to associate its football team with Native Americans during the relevant time period, the meaning of the matter in question is a reference to Native Americans.

### 2. The Redskins Marks "May Disparage" a Substantial Composite of Native Americans During the Relevant Time Period

The Court finds that the meaning of the marks is one that "may disparage" a substantial composite of Native Americans in the context of the "Washington Redskins" football team. The relevant period for the disparagement inquiry is the time at which the marks were registered. *Blackhorse*, 2014 WL 2757516, at *4 (citations omitted). Here, the Court focuses on the time period between 1967 and 1990. When reviewing whether a mark "may disparage," the PTO does not, and practically cannot, conduct a poll to determine the views of the referenced group. *See In re Loew's Theatres, Inc.*, 769 F.2d 764, 768 (Fed. Cir. 1985). Instead, three categories of evidence are weighed to determine whether a term "may disparage": (1) dictionary definitions and accompanying editorial designations; (2) scholarly, literary, and media references; and (3) statements of individuals or group leaders of the referenced group regarding the term. *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 585 (1st Cir. 2015) (dictionaries); *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (dictionaries and news

reports/articles); *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, 2010 WL 766488, at *5 (T.T.A.B. 2010) (dictionary); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008) (dictionaries and individual and group sentiment); *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500, at *10–*14 (T.T.A.B. 2006) (dictionaries, literary and media references, and individual and group statements).

Furthermore, by using the term "may disparage," Section 2(a) does not require that the mark holder possess an intent to disparage in order to deny or cancel a registration. *See Harjo*, 284 F. Supp. 2d at 125; *Blackhorse*, 2014 WL 2757516, at *9–*10 (citing *Heeb Media*, 2008 WL 5065114, at *8; *Squaw Valley*, 2006 WL 1546500)). Also, in order to be cancelled or denied registration, the marks must consist of matter that "may disparage" in the context of the goods and services provided. *See In re McGinley*, 660 F.2d 481, 485 (C.C.P.A. 1981).

### a. Dictionary Evidence

First, the record evidence contains dictionary definitions and accompanying designations of "redskins" that weigh in favor of finding that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans when each of the six marks was registered. Dictionary evidence is commonly considered when deciding if a term is one that "may disparage." *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 585 (1st Cir. 2015); *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014); *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, 2010 WL 766488, at *5 (T.T.A.B. 2010); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008); *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500, at *10–*14 (T.T.A.B. 2006).

The record contains several dictionaries defining "redskins" as a term referring to North American Indians and characterizing "redskins" as offensive or contemptuous:

1. *Webster's Collegiate Dictionary* 682 (1898) ("often contemptuous");

2. *The Random House Dictionary of the English Language* 1204 (1966) ("Often Offensive");

3. *Random House Dictionary of the English Language* 1204 (1967) ("Often Offensive");

4. *Random House Dictionary of the English Language* 1204 (1973) ("Often Offensive");

5. *Thorndike-Barnhart Intermediate Dictionary* 702 (2d ed. 1974) ("a term often considered offensive");

6. *Oxford American Dictionary* 564 (1980) ("contemptuous");

7. *The American Heritage Dictionary of the English Language: Second College Edition* 1037 (1982) ("Offensive Slang");

8. *Webster's Ninth New Collegiate Dictionary* 987 (1983) ("usu[ally] taken to be offensive");

9. *Merriam-Webster Collegiate Dictionary* (1983) ("usu[ally] taken to be offensive");

10. *Collier's Dictionary* (1986) ("considered offensive"); and

11. *Oxford English Dictionary* 429 (2d ed. 1989) ("Not the preferred term").

PFI attempts to rebut Blackhorse Defendants' dictionary evidence by arguing that (1) that the usage label evidence is not relevant because none of the usage labels use the word "disparage"; (2) the modifiers "usually" or "often" make the labels conditional and thus irrelevant under Section 2(a); (3) usage labels are chosen at the dictionary editor-in-chief's discretion with no industry standards for selection; and (4) many dictionaries considered "redskin" a neutral term and only began affixing negative usage labels to it within the last few decades. These arguments fail as they ignore the great weight the Federal Circuit affords to dictionary usage labels.

The Court finds that PFI's argument that dictionary usage labels such as "offensive" and "contemptuous" do not implicate Section 2(a) because they do not label the term "disparaging" is unpersuasive for two reasons. First, the Federal Circuit and the TTAB use "offensive" and

"disparage" interchangeably when deciding whether a mark consists of matter that "may disparage." *See, e.g.*, *In re Geller*, 751 F.3d 1355 (Fed. Cir. 2014); *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, 2010 WL 766488 (T.T.A.B. 2010); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114 (T.T.A.B. 2008); *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500 (T.T.A.B. 2006). Furthermore, because the parties conceded that the test for "contempt or disrepute" under Section 2(a) is the same as the "may disparage" test, the distinction between "disparage" and "contemptuous" is one without a difference.

Second, the Court rejects PFI's argument that the modifiers on the usage labels made them conditional and thus irrelevant. In *In re Tinseltown, Inc.*, 212 U.S.P.Q. 863, 1981 WL 40474 (T.T.A.B. 1981), an applicant attempted to register the mark BULLSHIT for personal accessories. The Examiner relied dictionaries unanimously characterizing the mark as "usu[ally] considered vulgar" to conclude that it consisted of scandalous matter under Section 2(a). *See In re Mavety Media Grp.*, 33 F.3d 1367, 1372 (Fed. Cir. 1994) (citing *Tinseltown*, 1981 WL 40474, at *2). The TTAB affirmed the Examiner's decision.

The Federal Circuit cited *Tinseltown* with approval on the unanimous usage label issue in *In re Mavety Media Grp.*, 33 F.3d 1367 (Fed. Cir. 1994). Notably, that case involved Section 2(a)'s scandalous provision, which requires a showing that the mark consists of or comprises immoral or scandalous matter. Section 2(a)'s "may disparage" prohibition sets a lower bar as it only requires a showing that the mark consists of or comprises matter that "*may* disparage." Because the Federal Circuit cited *Tinseltown* with approval in *Mavety Media Grp.* and Section 2(a) only requires that a mark "*may* disparage," the Court finds PFI's argument regarding the relevance of usage labels unpersuasive.

Moreover, in the context of Section 2(a) scandalous actions, the Federal Circuit has found that dictionary definitions and their accompanying usage labels alone, if unanimous in their characterizations, sufficiently demonstrate that a substantial composite of the general public finds that a mark consists of or comprises scandalous matter.[16] *Boulevard*, 334 F.3d at 1340–41. The Federal Circuit finds usage labels probative, and even dispositive, on that issue. The TTAB has recognized that the Federal Circuit's approach to usage labels in scandalous matter actions is instructive when weighing usage labels in the "may disparage" context. *See In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008). Moreover, the TTAB looks to dictionary definitions and usage labels when determining whether a mark "may disparage" under Section 2(a). *See, e.g., In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, 2010 WL 766488, at *5 (T.T.A.B. 2010).

Furthermore, Dr. David Barnhart, one of PFI's linguistics experts, said that characterizing "redskins" as "disparaging" from 1967 to 1985 is too strong a term to apply. Criss Decl. Ex. 14 at 181:9–12. However, he did declare that in that same time period, the term "certainly might be offensive." *Id.* This weighs in favor of finding that "redskins" "may disparage" for two reasons. First, Dr. Barnhart stated that "disparage" required intent, Criss Decl. Ex. 14 at 181:13–182:3, and both parties agree that "may disparage," which is the standard posed by Section 2(a)—*not* does disparage—does not require intent. Second, as explained above, in Section 2(a) "may disparage" cases both the Federal Circuit and the TTAB use "disparage" and derivatives of "offend" interchangeably. Thus, the Court finds that Dr. Barnhart's declaration that "redskins"

---

[16] The Court acknowledges that under the "immoral, deceptive, or scandalous" part of Section 2(a), the determination must be made "in the context of contemporary attitudes." *See Boulevard*, 334 F.3d at 1340. While this is a different standard than what is required when determining whether a mark consists of or comprises matter that "may disparage," the Court holds that this difference is immaterial because in "may disparage" actions, the Court can only consider evidence regarding the referenced group's perception of a term that is contemporaneous with the mark's registration.

"certainly might be offensive" is highly probative and weighs in favor of finding that "redskins" "may disparage" a substantial composite of Native Americans during the relevant time period.

Finally, the expert linguists from both parties, Dr. Geoffrey Nunberg for Blackhorse Defendants and Ronald Butters for PFI, both agree that dictionaries tend to lag in updating usage labels for ethnic slurs. (Doc. 71 at 70.) This shows that *Webster's Collegiate Dictionary* (1898) ("often contemptuous"), *The Random House Dictionary of the English Language* (1966) ("Often Offensive"), and *The Random House Dictionary of the English Language* (1967) ("Often Offensive") were not inaccurate in recognizing that the term was "often contemptuous" or "often offensive." Instead, it suggests that the term "redskin" may have been viewed as offensive or contemptuous well in advance of the 1898 entry.

Because both Federal Circuit and TTAB precedent establish that usage labels are relevant, the Court rejects PFI's challenges and finds that the record evidence of eleven dictionary definitions and their usage labels describing "redskins" as "offensive" or "contemptuous," along with Dr. Barnhart's testimony that "redskins" "might be offensive," weigh towards finding that between 1967 and 1990, the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans.

### b. Scholarly, Literary, and Media References

Second, the record evidence contains scholarly, literary, and media references that weigh in favor of finding that "redskins" "may disparage" a substantial composite of Native Americans when each of the six Redskins Marks was registered.[17] Scholarly, literary, and media references evidence is often considered when evaluating whether a mark consists of or comprises matter that "may disparage." *See In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (citing articles

---

[17] See Criss Decl. Exs. 29–55 for newspaper articles discussing the controversy surrounding the team name "Washington Redskins."

from the Chicago Tribune and the Courier News to show that associating Islam with terrorism "may disparage" Muslims); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008) (referencing an article in the New York Observer to demonstrate that "heeb" "may disparage" the Jewish community); *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500, at *10–*14 (T.T.A.B. 2006) (holding that the record evidence, including articles from more than ten newspapers and periodicals, sufficiently demonstrated that "squaw" "may disparage" Native Americans).

Here, there are several examples of scholarly, literary, and media references, including:

1. *Encyclopedia Britannica* 452 (1911) ("Other popular terms for the American Indians which have more or less currency are 'red race,' 'Red man,' 'Redskin,' the last not in such good repute as the corresponding German Routhaüte, or French Peaux-rouges, which have scientific standing.");

2. Erdman B. Palmore, *Ethnophaulisms and Ethnocentrism*, 67 AM. J. SOCI. 442, 442 (1962) (noting that "redskin" is an ethnophaulism[18] used for Native Americans); [19]

3. Alan Dundes and C. Fayne Porter, *American Indian Student Slang*, 38 AM. SPEECH 270, 271 (1963) (stating that "[a]lmost all the students" at the Haskell Institute, a federally-operated post-secondary coeducational vocational training school for Native Americans, "resent being called redskins");[20]

4. Tom Quinn, *Redskins/Rednecks*, WASH. DAILY NEWS, Nov. 5, 1971 ("John Parker, . . . a Choctaw from Oklahoma who works for the Bureau of Indian Affairs, was indignant. 'They should change the name,' he said. 'It lacks dignity, a haphazard slang word that refers to Indians in general but on a lower scale. It is the white people's way of making a mockery, like they used to do to the blacks in the South.'");

---

[18] An ethnophaulism is a word used as an ethnic slur to refer to out-groups in hate speech. *See* Tirza Leader *et al.*, *Complexity and Valence in Ethnophaulisms and Exclusion of Ethnic Out-Groups: What Puts the "Hate" Into Hate Speech?*, 96 J. PERS'Y & SOC. PSYCHOL. 170, 170 (2009) (citations omitted).

[19] *See generally American Journal of Sociology*, U. CHI. PRESS J., http://www.press.uchicago.edu/ucp/ journals/ journal/ajs.html (last visited July 6, 2015) ("*Established in 1895 as the first U.S. scholarly journal in its field*, American Journal of Sociology remains a leading voice for analysis and research in the social sciences." (emphasis added)).

[20] *About the American Dialect Society*, AM. DIALECT SOC'Y, http://www.american dialect.org/ (last visited July 6, 2015) ("The American Dialect Society, founded in 1889, is dedicated to the study of the English language in North America" and publishes the *American Speech* as a quarterly journal).

5. Tom Quinn, *Indians Are Starting to Fight Back*, WASH. DAILY NEWS, Jan. 26, 1972, at 72 (reporting that Hal Gross, director of the Indian Legal Information Development Service ("ILIDS"), wrote a letter to PFI president Edward Bennett Williams decrying the team name as "derogatory" and a "racial epithet"; noting that Laura Wittstock, a Seneca leader in ILIDS, described a newspaper advertisement depicting former-coach George Allen in Native headdress, with the caption "Hail to the Redskins: Washington has gained pride . . . even if we lost a little scalp out west" as "degrading" and "insulting");



6. Russ White, *Williams' Answer: What's in a Name?*, WASH. POST, Jan. 27, 1972, at C1 ("Particularly annoying to 750,000 American Indians is the word 'redskin.' To them the word is a racist slur, no more acceptable than the word 'nigger' is to a black man and no more acceptable than the term 'white trash' is among the poor in the South.");

7. Tom Quinn, *Redskins Face Suit*, WASH. DAILY NEWS, Feb. 18, 1972, at 107 (quoting Laura Wittstock calling the "Washington Redskins" team name an ethnic slur);

8. Shelby Coffey III, *Indians Open War on Redskins*, WASH. POST, Mar. 30, 1972 (noting that a delegation of eleven people "representing a variety of Indian organizations" met with team president Edward Bennett Williams, including LaDonna Harris, president of Americans for Indian Opportunity ("AIO") and wife of Senator Fred Harris; the group sought to have Williams change the team name from the "derogatory" racial epithet "Washington Redskins");

9. Editorial, *The Double Eagle Ticket*, BALT. SUN, July 20, 1972, at A14 ("[F]or several years Indian organizations have been trying to get [the Redskins] to change their name[].");

10. Paul Kaplan, *Moral Question: Do We Defame Native Americans?*, WASH. SUNDAY STAR & DAILY NEWS, Aug. 13, 1972, at C6 (recognizing that the team name "Redskins . . . is considered offensive by many Indians"; quoting a Native American woman protesting the

team name because Native Americans are the only "living ethnic group . . . used as a symbol");

11. George Solomon, *Redskins Keep Name, Will Change Lyrics*, WASH. POST, July 18, 1972 (explaining that the Washington Redskins would retain their name but would change lyrics to their fight song, including references to "scalp 'em," because Native Americans groups had convinced the owner that the lyrics were offensive);

12. In 1972, the University of Utah dropped the nickname "Redskins" out of concern that it disparaged Native Americans. (*See* Doc. 71 at 20);

13. Alden Vaughan, *From White Man to Redskin: Changing Anglo-American Perceptions of the American Indian*, 87 AM. HIST. REV. 917, 942, 949 (1982) ("redskins" is an "epithet");

14. Haig Bosmajian, *Defining the 'American Indian': A Case Study in the Language of Suppression*, *in* EXPLORING LANGUAGE 295 (3d ed. 1983) ("Our language includes various phrases and words which relegate the Indian to an inferior status," including "Redskins");

15. Robert Keller, *Hostile Language: Bias in Historical Writing About American Indian Resistance*, 9 J. AM. CULTURE 9, 15 (1986) (using "redskin" as an example of "deprecatory language");

16. Rose Gutfeld, *A Native American Group Lobbies NFL's Redskins to Change Name*, WALL ST. J., 1987 (Phil St. John, a Sioux and leader of a Minneapolis group called "Concerned American Indian Parents," described "Redskins" as "probably the most racist Indian-related team name."). The group used the following poster:



"Pittsburgh Negroes, Kansas City Jews, San Diego Caucasians, Cleveland Indians. Maybe Now You Know How Native Americans Feel."[21]

17. Don Boxmeyer, *Humboldt Urged to Leave Indians in Peace*, ST. PAUL PIONEER DISPATCH, Nov. 29, 1987 ("'The Washington Redskins are the worst,' said Fred Veilleux, an Ujibway Indian . . . . 'There is nothing more disrespectful or demeaning than to call an Indian a redskin. It would be like calling a black man a nigger.'");

18. Mark Grossman, *'Redskins Irks Indians; Protests Planned*, FAIRFAX J., Jan. 21, 1988 (Russell Sacks of NCAI said the team name "Washington Redskins" is "blatantly racist" and provides a negative image of Native Americans);

19. Clarence Page, *It'll Be the Broncos v. a Racial Slur*, CHI. TRIB., Jan. 24, 1988 ("To Native Americans, 'redskin' is as offensive as . . . 'wetback [is to Mexicans] . . . . [G]ood intentions are no excuse for insulting the offspring of this land's original people.");

20. Paul Sand, *Do Not Continue to Smear American Indians in Team Names*, ST. PAUL PIONEER PRESS DISPATCH, Jan. 28, 1988, at 17A ("In American folklore the redskin was a savage who was believed to possess animal-like prowess, who killed innocent white settlers, who raped white women, who kidnapped white children. To white supremists, red-pigmented skin was synonymous with subhuman brutality. The richness of Indian culture . . . can never be communicated by the symbolic gesture of naming a team the Redskins . . . .");

21. Editorial, *'Redskins' is Racist*, STANFORD DAILY, Feb. 2, 1988 (explicating the derogatory nature of the "Washington Redskins" name);

22. Pat Helmberger, *Consider Religious Significance*, BEMIDJI PIONEER, Feb. 5, 1988 ("Why then is it so difficult to understand the feelings of Native American people? Why do we say, 'How ridiculous!' when we are asked to change the name of a team from the 'Redskins' to something that is non-offensive?");

23. Tim Giago,[22] Op-Ed., *If the Name Redskins Doesn't Bother Team Owner, How About Blackskins*, LAKTOA TIMES, reprinted in SIOUX FALLS ARGUS LEADER, Feb. 21, 1988 ("Redskins is, and was intended to be, a very strong racial epithet against American Indians . . . . A common usage in . . . newspaper history was Redskinned nigger.");

24. Erik Brady, *Indians: A People, Not a Nickname*, USA TODAY, Aug. 15, 1988 (Phil St. John and Susan Harjo (Cheyenne and Hodulgee Muscogee, respectively) explain how offensive "Washington Redskins" is to Native Americans);

25. Sam Thorp, *Mascot Could Be Part of a Bigger Problem*, THE PENN, Dec. 8, 1989, at 7 ("There have been groups that have tried to stop the professional sports teams [from using Native Americans as mascots]. The private owners have so far just been successful

---

[21] Bob Bernotas, *D.C. Group Tackles the Redskins*, BALT. JEWISH TIMES, Feb. 12, 1988, at 64–65.

[22] Author is an Oglala Lakota and served as the publisher of the Lakota Times.

at blocking their attempts. Let me say one thing about the word 'redskin.' It is the most derogatory word that can be used to describe an Indian. By actually calling an Indian a redskin you might get the same reaction from them as you would get if you called a black a nigger.");

26. JAY COAKLEY, SPORTS IN SOCIETY: ISSUES AND CONTROVERSIES 206 (1990) ("The use of the name Redskins cannot be justified under any conditions. To many Native Americans, redskin is as derogatory as 'nigger' is for black Americans."); and

27. IRVING LEWIS ALLEN, UNKIND WORDS: ETHNIC LABELING FROM REDSKIN TO WASP 3, 18 (1990) (identifying "redskin" as a slur for Native Americans).

Here, based on the evidence presented in *Geller, Heeb Media,* and *Squaw Valley,* the Court finds that the scholarly, literary, and media references evidence weighs in favor of finding that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans between 1967 and 1990. For example, as early as 1911, sources such as Encyclopedia Britannica contemplated the poor standing of the term "redskins." The Court finds that Encyclopedia Britannica is a well-respected source. The Supreme Court has referenced Encyclopedia Britannica entries approximately 40 times since 1846, with over 25 of those references occurring before the first Redskins Mark was registered in 1967. *See, e.g., Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 187 (1963) ("Magna Carta"); *Gaines v. Herman,* 65 U.S. 553, 581, 589 (1860) ("Inquisition"); *Moore v. Am. Transp. Co.,* 65 U.S. 1, 25 (1860) ("Navigation, Inland"). The Supreme Court has repeatedly relied on Encyclopedia Britannica as an authoritative source and this Court shall do the same.

Prior to the first mark's registration in 1967, there were two renowned journals and an Encyclopedia Britannica reference that illustrate the term's disfavor among Native Americans. Taken altogether, the Court finds that these three pieces of evidence establish that in 1967, the date of the first registration, evidence existed that showed that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period.

### c. Statements of Individuals or Group Leaders

Third, the record evidence contains statements of Native American individuals or leaders

of Native American groups that weigh in favor of finding that the Redskins Marks consisted of

matter that "may disparage" a substantial composite of Native Americans during the relevant

time period. The TTAB considers statements from individuals in the referenced group and

leaders of organizations within that referenced group when it makes its "may disparage" finding.

*See In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *5 (T.T.A.B. 2008); *In

re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500, at *10–*14 (T.T.A.B. 2006).

Blackhorse Defendants reference a 1972 meeting between PFI's president and a few

major Native American organizations about the "Washington Redskins" team name to show that

it "may disparage." In March 1972, a delegation of Native American leaders met with the then-

President of PFI, Edward Bennett Williams, to demand that the team change its name. The

group included: (1) Leon Cook, President of NCAI;[23] (2) Dennis Banks, National Director of the

American Indian Movement ("AIM");[24] (3) Ron Aguilar, District Representative of the National

Indian Youth Council ("NIYC");[25] (4) LaDonna Harris, President of AIO;[26] (5) Richard

---

[23] NCAI was established in 1944 "in response to the termination and assimilation policies that the U.S. government forced upon tribal governments in contradiction of their treaty rights and status of sovereign nations." The group is "one of the most important intertribal political organizations of the modern era. It has played a crucial role in stimulating Native political awareness and activism, provided a forum for debates on vital issues affecting reservations and tribes, overseeing litigation efforts, and organizing lobbying activities in Washington." *See generally* NATIONAL CONGRESS OF AMERICAN INDIANS, www.ncai.org (last visited July 6, 2015).

[24] AIM was founded in 1968 in response to police violence against Native Americans. By the early 1970s, AIM "had become the country's largest militant Indian organization with thousands of members, supporters and sympathizers from virtually all Indian tribes." (Doc. 71, Ex. C). *See generally* AMERICAN INDIAN MOVEMENT, www.aimovement.org (last visited July 6, 2015).

[25] NIYC was founded in 1961 and claims to be the second oldest national American Indian organization. NIYC advocates diligently and continuously to ensure that every American Indian has equitable access to educational opportunities, health and social services, employment and civil rights. *See generally* NATIONAL INDIAN YOUTH COUNCIL, INC., www.niyc-alb.org/ (last visited July 6, 2015).

LaCourse, News Director in the Washington Bureau of the American Indian Press Association ("AIPA");[27] (6) Laura Wittstock, Editor of Legislative Review for ILIDS;[28] (7) Hanay Geiogamah, Assistant to the Commissioner of Indian Affairs and the Youth Representative from the Bureau of Indian Affairs; and (8) Ron Petite, AIM. Criss Decl. Ex. 64 at 18:6–19:5; Ex. 66. Articles from the Washington Post and the Washington Daily News state that around the time of the meeting, NCAI's membership was approximately 300,000–350,000 members. *See Blackhorse*, 2014 WL 275716, at *19–*20.

The next day, Williams wrote to NFL Commissioner Pete Rozelle to inform him about the meeting, noting that the "delegation of American Indian leaders . . . vigorously object[ed] to the continued use of the name Redskins." Criss Decl. Ex. 3. Although Williams did not change the team name after the meeting, he did change the fight song and altered the cheerleaders' outfits so that they were less stereotypical. (Doc. 71 at 19.)

The Court finds this meeting probative on the issue of whether the mark consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period. Representatives of several prominent Native American organizations protesting the "Redskins" name is strong evidence that the term "may disparage." Williams himself regarded the Native Americans he met with as "leaders," rather than a group of individuals representing their own interests. (*Id.*)

---

[26] AIO was founded by LaDonna Harris in 1970 to advance the cultural, political, and economic lives of indigenous peoples in the United States and around the word. *See generally* AMERICANS FOR INDIAN OPPORTUNITY, www.aio.org (last visited July 6, 2015).

[27] AIPA was founded in 1970 to provide a news service and address issues common to Native American newspapers. *See* THEDA PERDUE *et al.*, NORTH AMERICAN INDIANS: A VERY SHORT INTRODUCTION 121 (2010).

[28] ILIDS was an educational and legislative oversight organization run by Harold Gross. (Doc. 71 at 17–18.)

In support of their argument that prominent Native American organizations and leaders in the Native American community have long opposed the use of the term "redskins" as the name of an NFL football team name, Blackhorse Defendants have submitted several declarations. Below are quotes from the declarations of four prominent Native Americans: Raymond Apodaca (former Area Vice President of NCAI and Governor for the Yselta Del Sur Pueblo); Leon Cook (former NCAI President and former Council Member and Tribal Administrator for the Red Lake Nation); Kevin Gover (prominent attorney, former Assistant Secretary of the Interior for Indian Affairs, and current Director of the Smithsonian Institution's National Museum of the American Indian); and Suzanne Harjo (former Executive Director of the NCAI and 2014 recipient of the Presidential Medal of Freedom for her work on behalf of Native Americans). Each declaration affirms Blackhorse Defendants' argument that from 1967 to 1990, the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans.

Raymond Apodaca was born in 1946 and is a member of the Yselta Del Sur Pueblo. Apodaca Decl. ¶ 2. Apodaca is a former Executive Director of the Texas Indian Commission, serving in that capacity from 1982–1989. *Id.* ¶ 7. From 1991–1992, he was the Tribal Administrator for the Yselta Del Sur Pueblo. *Id.* ¶ 5. At the time, Tribal Administrator was the highest administrative role within the tribe. *Id.* He also served as Tribal Governor for the same pueblo from 1990–1992. *Id.* Apodaca has been an active member of the NCAI since 1973. *Id.* ¶ 6. Apodaca declared that "NCAI is the oldest and the preeminent Native American organization, representing the majority of Native Americans on a variety of political, cultural, and social policy issues." *Id.* ¶ 7.

He further stated that because NCAI represents the majority of Native Americans in federally recognized tribes, NCAI is the best organization to consult to discern an understanding

of Native Americans' position on an issue. *Id.* ¶ 12. He held several leadership positions in NCAI, including Area Vice President. Apodaca has thought that "redskin," both the term and the professional football team name, was a racial slur against Native Americans since the 1960s. *Id.* ¶¶ 13–15.

Leon Cook was born in 1939 and is a member of the Red Lake Band of Chippewa Indians. Cook Decl. ¶ 2. Between 1970 and 1971, Cook worked for the Bureau of Indian Affairs. *Id.* ¶ 3. He has held various roles in the Red Lake Nation, including Tribal Council Representative, member of the tribal governing council, a Tribal Administrator, and Human Resources Director. *Id.* ¶ 4.

Cook has been an active member of NCAI since 1966 and was elected its president in 1971. *Id.* ¶¶ 5–6. While Cook was president of NCAI, 100–150 tribes were members. *Id.* ¶ 6. As president, Cook also served as the head of NCAI's Executive Council. *Id.* ¶ 8. Its role was to identify "issues of concern to the Native American membership and develop[] strategies to address those issues." *Id.* Cook invited representatives of AIM, NIYC, and AIO to a 1972 Executive Council meeting. At this meeting, the four groups concluded that they shared a common interest in opposing the "Washington Redskins" name as it was "bigoted, discriminatory, and offensive to Native Americans." *Id.* ¶ 10.

Cook further stated that in 1973, the NCAI General Assembly voted in favor of a resolution calling for the "Washington Redskins" to change the team name. *Id.* ¶ 14. According to Cook, NCAI has maintained its opposition to the name, formalizing the opposition with resolutions in the early 1990s. *Id.* ¶ 15. Finally, Cook declared, "Throughout my life, I have maintained my opposition to the Washington football team's name. I believe the use of the term

'redskin' in any context—professional athletics or otherwise—is derogatory, disparaging, and demeaning to Native Americans." *Id.* ¶ 16.

Kevin Gover was born in 1955 and is a citizen of the Pawnee Indian Nation. Gover Decl. ¶¶ 2–3. Gover grew up thinking that "redskin" was a racial slur. *Id.* ¶ 4. Gover was occasionally called a "redskin" during his upbringing. He stated:

> I vividly recall a time when I was in fourth grade when another child called me a "dirty redskin" on the playground. In addition, when I played for my junior high school football team, members of opposing teams sometimes would call me a "redskin" as a form of bullying or "trash talking" on the field.

*Id.* ¶ 5. Gover's parents moved to Washington, D.C. in 1971 so his father could work for the AIO. Gover claimed that he remembers his parents and other Native Americans in their social circle "expressing their dismay that the local NFL football team used an ethnic slur against Native Americans as its team name." *Id.* ¶ 6. This helped motivate Gover to write a letter to Edward Bennett Williams. In his letter, Gover noted that several hundred thousand Native Americans find the team name "Redskins" offensive and suggested that Williams change the team name to the "Washington Niggers" in order to stick with his "ethnic theme." Gover Decl. Ex. A.

Finally, Susan Harjo's declaration is also evidence of the disparaging nature of the "Washington Redskins" team name. Harjo was born in 1945 and is a citizen and enrolled member of the Cheyenne and Arapho Tribes of Oklahoma. Harjo Decl. ¶ 3. Harjo currently serves as the President and Executive Director of The Morning Star Institute, "a Native American cultural organization that is dedicated to Native Peoples' traditional and cultural rights, historical research and arts promotion." *Id.* ¶ 2. Growing up, Harjo and her family members often heard "redskin" being used as a slur. Harjo explained:

56

> In the 1950s, my brothers, cousins and Cheyenne friends were often called "redskins" by white children at school . . . and sometimes by their parents. On one especially upsetting and painful occasion, an elementary school teacher argued with me about our family history and the Battle of Little Big Horn, and he angrily called me names, including "redskin." He also slandered my great-great-grandfather, Chief Bull Bear, and called him a "redskin" and pushed me into a rosebush. I also remember shopkeepers calling me the epithet "redskin." Altogether, white people probably called me the slur "redskin," or called the group I was with "redskins," at least 100 times.

*Id.* ¶ 5.

In 1962, Harjo was selected by the Business Committee of the Cheyenne and Arapho Tribes of Oklahoma to be a part of a tribal delegation to federal meetings in Washington, D.C. *Id.* ¶ 10. She recalled members of the delegation complaining about the "Redskins" signage and promotion in Washington, with tribal leaders saying something to the effect of, "No wonder such bad Indian policy comes out of D.C.; look what bad things they call us." *Id.* Harjo also served as the Executive Director of the NCAI from 1984–1989. While in that role, Harjo "reflected and carried out the position of NCAI to oppose the name of the Washington NFL team and to call for its elimination." *Id.* ¶ 13. Lastly, Harjo noted that she has always regarded "redskin" as a racial slur and deems it "the most awful slur that can be used to refer to Native American nations, tribes, and persons." *Id.* ¶ 19.

The Court finds that the declarations from these prominent Native American individuals and leaders, replete with the actions of groups concerning the "Washington Redskins" football team and anecdotes of personal experiences with the term "redskin," show that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period.

Additional evidence that the marks consisted of matter that "may disparage" is found in the NCAI Resolution. In 1993, the Executive Council of the NCAI passed a resolution on the "Washington Redskins" team name. Founded in 1944, NCAI bills itself as "the oldest and largest intertribal organization nationwide representative of, and advocate for national, regional, and local tribal concerns." Criss Decl. Ex. 108. The resolution provided, in pertinent part, that, "[T]he term REDSKINS is not and has never been one of honor or respect, but instead *it has always been* and continues to be a pejorative, derogatory, denigrating, offensive, scandalous, contemptuous, disreputable, disparaging and racist designation for Native American[s]." Criss Decl. Ex. 108 (emphasis added). The Court finds that this resolution is probative of NCAI's constituent members' collective opinion of the term "redskin" and PFI's marks for many years, including when the last Redskins Mark was registered. *See In re Heeb Media LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *1 (T.T.A.B. 2008) (affirming denial of registration of a mark based in part on excerpts from "individuals representing Jewish groups or in their individual capacity," which provided that they "consider the term HEEB to be a disparaging").

PFI objects to this evidence on relevancy grounds because the resolution was passed outside of the relevant time period. However, as suggested by the TTAB in *Blackhorse*, this is just like any other testimony from individuals that was taken after the fact: witnesses testify about what they perceived in the past. PFI may challenge the weight this evidence is afforded but the words of the resolution are indisputable: this national organization of Native Americans declared that the term "REDSKINS" has always been derogatory, offensive, and disparaging. Because this evidence tends to prove or disprove a matter, *see* FED. R. EVID. 401, the Court overrules PFI's objection and finds that the resolution is probative of whether a substantial

composite of Native Americans thought "redskin" "may disparage" them during the relevant time period.

Throughout PFI's briefs it appears to suggest that the evidence of the 1972 meeting with former-PFI president Williams, NCAI's 1993 resolution on the team name, and any other evidence of Native American opposition is immaterial because "mainstream Native Americans" support the team name "Washington Redskins." Respondents in *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114 (T.T.A.B. 2008), and *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500 (T.T.A.B. 2006), also tried to dismiss the views of those finding a term offensive as out of the mainstream. The TTAB rejected this argument both times. The Court agrees with the TTAB's approach and similarly rejects PFI's attempted characterization of some of Blackhorse Defendants' witnesses and their respective testimony. That a "substantial composite" is not necessarily a majority further compels this result. Assuming the Court accepted PFI's proffered dichotomy of "mainstream" versus "avant-garde" members of a referenced group, as a matter of principle it is indisputable that those with "non-mainstream" views on whether a term is disparaging can certainly constitute a substantial composite of a referenced group. The Court finds that to be the case here.

PFI sought to rebut Blackhorse Defendants' evidence multiple ways. First, PFI relies upon the 1977 All-Indian Half-Time Marching Band and Pageant and Native Americans naming their own sports teams "Redskins" to argue that the term is not disparaging. (Doc. 100 at 37.) Hundreds of Native Americans participated in the half-time program and several-hundred more applied but were ultimately not able to partake in the event. (*Id.*) PFI contends that the "positive tone" of the Native American press reports on the event, among other things, shows that the mark did not consist of matter that "may disparage" a substantial composite Native Americans

59

during the relevant time period. (*Id.*) Additionally, PFI maintains that Native Americans' own extensive use of the term "Redskins" for different nicknames and the names of over twenty local sports teams precludes it from being considered as a term that "may disparage."

The Court finds these arguments unpersuasive because this evidence does not show that a there is <u>not</u> a substantial composite of Native Americans who find the matter was one that "may disparage." *Heeb* is again instructive. *Heeb* involved an effort to register the mark HEEB for apparel and the publication of magazines. *In re Heeb Media, LLC,* 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *1 (T.T.A.B. 2008). The TTAB acknowledged that there was a movement within the Jewish community to take command of the term "heeb" and not be offended by it. *Id.* at *5–*6. However, despite the fact that "many of this country's most established Jewish philanthropies and cultural organizations have openly and actively supported Applicant's magazine," *id.* at *3, the TTAB held that the evidence showed there was still a substantial composite of Jewish individuals who would find the term "heeb" to be one that "may disparage."

In *Heeb*, the TTAB explained that disparate views within the community of the referenced group countenance reliance on the rule that a substantial composite is not necessarily a majority. The TTAB wrote:

> With regard to applicant's argument that a minority opinion should not veto registration of a particular mark, this is not in keeping with the standard set forth by our primary reviewing court. While case law does not provide a fixed number or percentage, it is well established that a "substantial composite" is not necessarily a majority. Here we have clear evidence that a substantial composite of the referenced group considers HEEB to be a disparaging term. The examining attorney has presented evidence from various segments of the Jewish community, including the Anti-Defamation League, a university professor, rabbis, a talk-show host and ordinary citizens.

*Id.* at *8.

The current case mirrors the circumstances in *Heeb*. Similar to *Heeb*, segments of the Native American community have decried "redskin" as disparaging, including the NCAI, a former tribal leader, and an author. The Court recognizes PFI's evidence that some members of the Native American community did not ever, and do not now, find "redskin" disparaging, whether in the context of the "Washington Redskins" or not. As reinforced in *Heeb*, the substantial composite rule does not require that a *majority* of the referenced group find that a mark consists of matter that "may disparage." *Id.* Accordingly, PFI's argument that the 1977 halftime show and the use of "Redskins" as a nickname by Native Americans means that the term is not one that "may disparage" must fail because, consistent with *Heeb*, the record evidence shows that a substantial composite of Native Americans find that the term is offensive.

Accordingly, the Court finds that the record evidence of statements from Native American leaders and groups weighs in favor of finding that between 1967 and 1990, the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans.

Through Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), Congress has made a judgment that the federal trademark registration program will not register marks that "may disparage" different groups. A denial or cancellation of registration simply signifies that because a mark does not meet the requirements of the federal trademark registration program, the mark owner will not be able "to call upon the resources of the federal government in order to enforce that mark." *In re Fox*, 702 F.3d 633, 640 (Fed. Cir. 2012).

The determination of whether a substantial composite of the referenced group believes that a mark consists of a term that "may disparage" is not a mathematical equation requiring the parties to argue over whether the evidence shows that a specific threshold was met. *See Heeb*,

2008 WL 5065114, at *8 (citation omitted).  Instead, courts consider (1) dictionary definitions and accompanying editorial designations; (2) scholarly, literary, and media references; and (3) statements of individuals or group leaders of the referenced group on the term.

Here, the Court finds that the record contains evidence in all three categories demonstrating that between 1967 and 1990, the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans.  The dictionary evidence included multiple definitions describing the term "redskin" in a negative light, including one from 1898—almost *seventy years* prior to the registration of the first Redskins Mark—characterizing "redskin" as "often contemptuous."  The record evidence also includes references in renowned scholarly journals and books showing that "redskin" was offensive prior to 1967.  Encyclopedia Britannica described its poor repute in 1911.  The record evidence also shows that in 1972 NCAI, a national Native American organization founded in 1944, sent its president to accompany leaders of other Native American organizations at a meeting with the president of PFI to demand that the team's named be changed.  NCAI also passed a resolution which provided that it has *always* found the term and team name "Redskins" to be derogatory, offensive, and disparaging.

PFI cites to no cases from either the Federal Circuit or the TTAB where the record contained evidence of (1) multiple dictionary definitions and usage labels showing that a term was "often offensive" and "often contemptuous"; (2) scholarly, literary, and media references in journals, books, newspaper articles and editorials, and encyclopedias referencing a term as "derogatory," "deprecatory," an "ethnophaulism," and a "racial epithet";  and (3) statements from individuals and organizations in the referenced group explaining how a mark consists of matter that is offensive to them, and the mark owner was still permitted to maintain a federal

trademark registration. That is because the case law is clear: when all three categories contain evidence that a mark consists of matter that "may disparage" a substantial composite of the referenced group, the TTAB and the Federal Circuit have denied or cancelled the mark's registration.

This remains true even when there is also dictionary evidence that does not characterize the term as offensive, literary references using the term in a non-disparaging fashion, and statements from members of the referenced group demonstrating that they do not think the mark consists of matter that "may disparage." That is because Section 2(a) does not require a finding that *every member* of the referenced group thinks that the matter "may disparage." Nor does it mandate a showing that *a majority* of the referenced group considers the mark one that consists of matter that "may disparage." Instead, Section 2(a) allows for the denial or cancellation of a registration of any mark that consists of or comprises matter that "*may* disparage" a *substantial composite* of the referenced group.

The Court finds that Blackhorse Defendants have shown by a preponderance of the evidence that there is no genuine issue of material fact as to the "may disparage" claim: the record evidence shows that the term "redskin," in the context of Native Americans and during the relevant time period, was offensive and one that "may disparage" a substantial composite of Native Americans, "no matter what the goods or services with which the mark is used." *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264, 2006 WL 1546500, at *16 (T.T.A.B. 2006). "Redskin" certainly retains this meaning when used in connection with PFI's football team; a team that has *always* associated itself with Native American imagery, with nothing being more emblematic of this association than the use of a Native American profile on the helmets of each member of the football team.

 *See supra.*

Accordingly, the Court finds that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period, 1967–1990, and must be cancelled. Also, consistent with the parties' concession that Section 2(a)'s "may disparage" and "contempt or disrepute" provisions use the same legal analysis, the Court further finds that the Redskins Marks consisted of matter that bring Native Americans into "contempt or disrepute." Thus, Blackhorse Defendants are entitled to summary judgment on Count II.

The Court so holds with the benefit of a supplemented record and post-2003 cases from the Federal Circuit and TTAB applying Section 2(a) of the Lanham Act—items that the district court in *Harjo* was not privy to when it made its initial ruling. *See Pro-Football, Inc. v. Harjo,* 284 F. Supp. 2d 96 (D.D.C. 2003). Specifically, this record contained the following supplemental evidence:

1. Evidence establishing that in 1962, "almost all the students at Haskell Institute resent[ed] being called redskins" (at the time, Haskell was a post-secondary vocational school for American Indians, with 1,000 students);

2. Evidence establishing the NCAI, AIM, and other diverse Indian organizations found common ground to fight the team name and met with PFI's President in 1972 to demand that PFI change the team name;

3. Evidence establishing that in 1972, the University of Utah dropped the name "Redskins" due to concern that the term was offensive;

4. Evidence establishing further efforts by NCAI over several decades to bring about a change in PFI's team name;

5. Declarations from prominent Native Americans and representatives of Native American organizations regarding their own experiences with "redskin" used as a slur, their understanding of the term, and the basis of their understanding; and

6. Additional data analysis by Dr. Nunberg demonstrating the negative connotations of "redskin."

(*See* Doc. 71 at 2.)

Also, the standard of review here is different than the standard in *Harjo*. In *Harjo*, the court applied the APA's "substantial evidence" standard: "the Court will reverse the TTAB's findings of fact only if they are 'unsupported by substantial evidence.'" *Harjo*, 284 F. Supp. 2d at 114 (citing 5 U.S.C. § 706). In *Harjo*, the TTAB made only limited findings of fact in two areas: linguists' testimony and survey evidence.[29] *Harjo*, 284 F. Supp. 2d at 119. Thus, it was only those two areas that were subjected to court scrutiny under the substantial evidence standard. *See id.* Here, the TTAB made 39 findings of fact in two areas: "General Analysis of the Word" and "Native American Objection to Use of the Word Redskins for Football Teams." *Blackhorse*, 2014 WL 2757516, at *25–*28. Moreover, because the TTAB review in this case was brought pursuant to 15 U.S.C. § 1071(b), the Court reviews the *entire* record *de novo*—the Court is not restricted to only reviewing the TTAB's findings of fact like the district court in *Harjo*. Even if that was true, the TTAB's findings of fact in *Blackhorse* were more thorough than the findings of fact in *Harjo*.

---

[29] The survey was conducted by Harjo's survey expert Dr. Ivan Ross, President of Ross Research and a former Professor of Marketing and Adjunct Professor of Psychology with the Carlson School of Management of the University of Minnesota.

## D. Laches

With regard to PFI's laches challenge, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint for two reasons. The disparagement claim is not barred by laches because (1) Blackhorse Defendants did not unreasonably delay in petitioning the TTAB; and (2) the public interest at stake weigh against its application.

### 1. No Unreasonable Delay

The laches defense, which PFI bears the burden of proving, requires proof of (1) "[a] lack of due diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002) (internal quotation marks omitted); *see also Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 461 (4th Cir. 1996) (citation omitted) ("In a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, *unreasonably delayed* in seeking redress." (emphasis added)). The applicability of laches "depends upon the particular circumstances of the case." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (citing *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987)).

In order to prevail in its laches defense, PFI must prove that, after turning age 18, each Defendant unreasonably delayed in petitioning the TTAB to cancel the Redskins Marks. *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990); *see also Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 48–49 (D.C. Cir. 2005). Here, each of the Blackhorse Defendants was under the age of 18 in April 1999 when the TTAB granted the *Harjo* petition to cancel the Redskins Marks' registrations. (*See* Doc. 51 at 2; Doc. 1 ¶ 17.) The *Harjo* proceedings in federal court

concluded in 2009. Because Blackhorse Defendants filed their petition with the TTAB in 2006, while the *Harjo* proceedings were pending, the Court finds that they did not unreasonably or unjustifiably delay in petitioning the TTAB. It was sensible for Blackhorse Defendants to see how the cancellation proceedings in the district court progressed. As stated by Blackhorse Defendants, filing any earlier than 2006, one year after the district court's reversal of the TTAB's finding that the Redskins Marks "may disparage," might have resulted in the filing of unnecessary petitions. Thus, to the extent that Blackhorse Defendants did delay in filing their petition to cancel the Redskins Marks, the Court finds that the delay was not unreasonable. Accordingly, the Court holds that Blackhorse Defendants are entitled to summary judgment on Count VII.

### 2. Public Interest

The Court holds that laches does not apply because of the public interest implicated. Public interest is a factor that weighs against the application of laches. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 423 (4th Cir. 1998). The Court agrees with the TTAB's finding that there "is an overriding public interest in removing from the register marks that are disparaging to a segment of the population beyond the individual petitioners." *Blackhorse*, 2014 WL 2757516, at *32. The Court finds that the particular facts and circumstances of this case, namely that Blackhorse Defendants petitioned to cancel the Redskins Marks during other pending litigation seeking cancellation of the same marks on the same grounds (*Harjo*), demonstrate that the application of laches should be barred because of the public's interest in being free from encountering registered marks that "may disparage." Accordingly, the Court holds that the TTAB did not err in rejecting PFI's laches argument and Blackhorse Defendants are entitled to summary judgment on Count VII.

## CONCLUSION

The Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America. With regard to PFI's First Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act does not implicate the First Amendment. Second, the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny.

With regard to PFI's Fifth Amendment challenge, the Court DENIES PFI's Motion for Summary Judgment on Constitutional Claims and GRANTS the cross-motions for summary judgment filed by Blackhorse Defendants and the United States of America for two reasons. First, Section 2(a) of the Lanham Act is not void for vagueness because (1) PFI cannot show that Section 2(a) is unconstitutional in all of its applications; (2) Section 2(a) gives fair warning of what conduct is prohibited; (3) Section 2(a) does not authorize or encourage "arbitrary and discriminatory enforcement"; and (4) Section 2(a) is not impermissibly vague as-applied to PFI. Second, the Takings Clause and Due Process Clause claims fail because a trademark registration is not considered property under the Fifth Amendment.

The Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint. With regard to PFI's "may disparage" claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint because the (1) dictionary

evidence; (2) literary, scholarly, and media references; and (3) statements of individuals and groups in the referenced group show that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period.

With regard to PFI's laches claim, the Court DENIES PFI's Cross-Motion for Summary Judgment on Claims I, II, and VII, and GRANTS Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint for two reasons. First, the "may disparage" claim is not barred by laches because Blackhorse Defendants did not unreasonably delay in petitioning the TTAB. Second, laches does not apply because of the public interest at stake.

The Court has applied the Lanham Act to the issue presented in this trademark cancellation proceeding: whether a substantial composite of Native Americans deem the term "redskin" as one that "may disparage" in the context of PFI's Redskins Marks during the relevant time period. The evidence before the Court supports the legal conclusion that between 1967 and 1990, the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans. Section 2(a) of the Lanham Act requires cancellation of the registrations of PFI's Redskins Marks, resulting in their removal from the PTO's Principal Register.

To be clear, the Court's judgment is _not_ an order that precludes PFI from using the marks in commerce. Nor does the Court's ruling that the Redskins Marks consisted of matter that "may disparage" a substantial composite of Native Americans during the relevant time period preclude sports fans from collecting, wearing, or displaying the Redskins Marks. Courts do not create trademarks; only businesses like PFI control their own destiny with respect to how the public discerns the source and origin of PFI's goods and services. What actions, if any, PFI takes going forward with the marks are a business judgment beyond the purview of this Court's jurisdiction.

Accordingly, it is hereby

**ORDERED** that PFI's Motion for Summary Judgment on Constitutional Claims (Doc. 54) and Cross-Motion for Summary Judgment on Claims I, II, and VII (Doc. 79) are **DENIED**; it is further

**ORDERED** that Blackhorse Defendants' Cross-Motion for Summary Judgment on Claims III–VI (Doc. 105), the United States of America's Motion for Summary Judgment on Constitutional Claims (Doc. 108), and Blackhorse Defendants' Motion for Summary Judgment on Counts I, II, and VII of Complaint (Doc. 69) are **GRANTED**; it is further

**ORDERED** that the TTAB's ruling in *Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080, 2014 WL 2757516 (T.T.A.B. 2014), is **AFFIRMED**; and it is further

**ORDERED** that the United States Patent and Trademark Office is **DIRECTED** to schedule the cancellation of the registrations for the following six marks: Registration No. 0836122, Registration No. 0978824, Registration No. 098666, Registration No. 0987127, Registration No. 1085092, and Registration No. 1606810.

**IT IS SO ORDERED.**

ENTERED this 8th day of July, 2015.

Alexandria, Virginia
7/ 8/ 2015

/s/
Gerald Bruce Lee
United States District Judge

70